I. Scott Bogatz
Nevada Bar No. 3367
Kerry E. Kleiman
Nevada Bar No. 14071
REID RUBINSTEIN & BOGATZ
Bank of America Plaza
300 South 4th Street, Suite 830
Las Vegas, NV 89101
Telephone:  (702) 776-7000
Facsimile:  (702) 776-7900
sbogatz@rrblf.com
kkleiman@rrblf.com

Bryan A. Merryman (*will comply with LR IA 11-2 within 5 days*)
Catherine Simonsen (*will comply with LR IA 11-2 within 5 days*)
WHITE & CASE LLP
555 S. Flower Street, Suite 2700
Los Angeles, CA  90071-2433
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329
bmerryman@whitecase.com
catherine.simonsen@whitecase.com

Claire DeLelle (*will comply with LR IA 11-2 within 5 days*)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
Telephone:  (202) 626-3600
Facsimile:  (202) 639-9355
claire.delelle@whitecase.com

*Attorneys for Plaintiff*
*V5 Technologies, LLC, d/b/a Cobalt Data Centers*

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| V5 TECHNOLOGIES, LLC, d/b/a COBALT DATA CENTERS,<br><br>        Plaintiff,<br>   v.<br><br>SWITCH, LTD., a Nevada limited company; SWITCH BUSINESS SOLUTIONS, LLC, a Nevada limited liability company; SWITCH COMMUNICATIONS GROUP L.L.C., a Nevada limited liability company; SWITCH, INC., a Nevada corporation,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff V5 Technologies, LLC, d/b/a Cobalt Data Centers ("Cobalt") hereby alleges:

1.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a) because this action arises under the antitrust laws of the United States, 15 U.S.C. §§ 1 and 2. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

2.      Cobalt brings this action for damages against defendants Switch, Ltd.; Switch Business Solutions, LLC; Switch Communications Group L.L.C.; and Switch, Inc. (together, "Switch"), pursuant to federal and Nevada antitrust and tortious interference laws.  Based on personal knowledge and/or information and belief, Cobalt complains and alleges as follows:

### NATURE OF THE ACTION

3.      At all times relevant to this lawsuit, Switch has held and maintained an unlawful monopoly of the Las Vegas market for high-end colocation data center services.  Rather than face the competition that is the cornerstone of free-market capitalism, Switch has engaged in a sustained anticompetitive scheme to prevent new competitors from entering the Las Vegas market and to put out of business those who tried.

4.      Switch's anticompetitive scheme has been multi-pronged and effective, forcing exclusive-dealing provisions on its customers and suppliers; threatening refusals to deal on third parties that dare attempt to do business with a Switch competitor; thwarting access to vital resources and partnerships needed to compete; making disparaging and knowingly false and malicious statements about competitors; and using any and all such means to tortiously interfere with competitors' prospective business opportunities.

5.      Switch, through its founder and CEO, Rob Roy, has made clear Switch's intent to retain and increase market dominance in the Las Vegas market by any means possible.  For example, Roy has openly admitted that Switch was "trying to be a monopoly" and that Switch's "ability to dominate the market" was "greater" after Cobalt entered "than it was three years" prior.  By maintaining approximately an 85% or larger market share through its prolonged exclusionary conduct, Switch has, by design, left customers with virtually no other choice in the market than to accept Switch and its supra-competitive prices for high-end colocation data center services.

6.      In early 2013, Cobalt opened a state-of-the-art data center in Las Vegas to attempt to service the rapidly growing demand for high-end colocation space in Southern Nevada and to give consumers in that market a meaningful alternative to Switch.  By all accounts, Cobalt had the infrastructure and highly qualified team necessary to compete head to head with Switch and obtain a meaningful share of the Las Vegas market.

7.      Motivated by preventing any competitor from making inroads into its captive market, Switch, however, embarked upon an exclusionary and tortious campaign to neutralize and eliminate Cobalt as a viable competitor.   By December 2015, Switch's sustained anticompetitive scheme had been completely successful as to Cobalt, and Switch forced Cobalt to discontinue operations and attempt to mitigate its substantial losses.

8.      As a result of Switch's anticompetitive practices, Cobalt seeks damages, interest, costs, and attorneys' fees pursuant to Section 4 of the Clayton Act and under Nevada state law as alleged below.

**THE PARTIES**

9.      Plaintiff V5 Technologies, LLC, d/b/a Cobalt Data Centers, is a limited liability company organized and existing under the laws of the state of Nevada.  Cobalt's headquarters and principal place of business are located in Las Vegas, Nevada.

10.      Defendant Switch, Ltd. is a limited liability company organized and existing under the laws of the state of Nevada with its headquarters and principal place of business in Las Vegas, Nevada.

11.      Defendant Switch Business Solutions, LLC is a limited liability company organized and existing under the laws of the state of Nevada with its headquarters and principal place of business in Las Vegas, Nevada.

12.      Defendant Switch Communications Group L.L.C. is held out by Switch as a limited liability company organized and existing under the laws of the state of Nevada, and its headquarters and principal place of business are located in Las Vegas, Nevada.

13.      Defendant Switch, Inc. is a corporation organized and existing under the laws of the state of Nevada with its headquarters and principal place of business in Las Vegas, Nevada.

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

**REID RUBINSTEIN & BOGATZ**
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

**JURISDICTION, VENUE, AND INTERSTATE COMMERCE**

14.     This action arises under the antitrust laws of the United States, including Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15; and the antitrust and intentional interference laws of the state of Nevada, including Nevada Revised Statutes §§ 598A.060(1)(e) and 598A.210(1) and (2).

15.     Subject matter jurisdiction with respect to the federal law claims is founded on 28 U.S.C. §§ 1331 and 1337(a).  Subject matter jurisdiction with respect to the state law claims is founded on 28 U.S.C. § 1367(a).

16.     Switch may be found, transacts business, and is subject to personal jurisdiction in this judicial district.

17.     The violations of law alleged in this complaint took place in this judicial district and have injured Cobalt in this district, and Switch resides in this district.  Venue is therefore appropriate in Nevada under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391.

18.     The creation, marketing, sale, and provision of high-end colocation data center services and the actions complained of in this complaint occurred in and substantially affect interstate commerce.

### FACTUAL AND INDUSTRY BACKGROUND

#### A.     Colocation Data Centers

19.     Colocation data centers ("data centers") allow organizations to operate their critical computing infrastructure (typically, servers, storage, and/or networking equipment) in a purpose-built and managed facility, rather than incur the capital expenditures and risks associated with housing this equipment (and the underlying data) internally.  The basic offerings of colocation data centers are space, power, cooling, and telecommunications services.

20.     In a typical contract with a data center, the customer pays an agreed-upon amount per month in exchange for a specified number of "cabinets" to house the customer's equipment, which the data center agrees to power, cool, keep secure, and connect.  The customer has access

to these cabinets within the data center and physically installs its own equipment (i.e., servers, storage, and networking equipment) within these cabinets.  At all times relevant to this lawsuit, cabinet prices in the Las Vegas market were significantly higher than comparable cabinet packages in different markets such as Phoenix, Arizona.

21.     In choosing the location of a data center, a customer's principal considerations are: (1) proximity to the organization's place of business (which allows the organization to respond quickly to any issues that arise at the data center); (2) distance of the data center from potential natural disasters; (3) diversification (geographic, vendor, etc.); and (4) any statutes or regulations requiring the organization to keep sensitive data stored in-state (for example, the Nevada Gaming Control Board requires gaming licensees to manage certain types of data exclusively within the State with a data center that has been licensed by the Board).

22.     Once a customer chooses where it wants its data center to be geographically located, it chooses a specific provider based on the available offerings and prices.

23.     One of the most important features of the colocation data center product considered by customers is concurrent maintainability, which allows for continuous uptime/uninterrupted operations.  Concurrent maintainability refers to the extent to which data center operations and the operation of client equipment can be protected from power, cooling, or communications outages and any planned maintenance activity of these systems.

24.     Concurrent maintainability is crucial for most organizations' information technology operations.  Most organizations rely on their information systems to run their operations.  If an information system becomes unavailable, company operations may be impaired or stopped completely.

25.     Data centers typically address customers' requirements for continuous uptime by investing in greater levels of redundant power, cooling, and communications infrastructure. Redundancy refers to the extent to which a data center has alternative/additional sources of power (e.g., emergency backup power generators), connections to communications infrastructure, and cooling systems, which reduce the potential for power, cooling, or connectivity outages resulting in downtime for the customers.

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

26.     High-end data centers are data centers that offer continuous uptime through power, cooling, and connectivity redundancies and are generally seen by customers as distinct from lower-end data centers that do not.

27.     Customers also consider whether the facility is a "carrier neutral" facility and offers security and compliance or other support resources for the customer.  A carrier neutral facility is a data center that permits customers to choose from multiple telecommunication carriers (e.g., AT&T, CenturyLink, Zayo) in order to connect the customer's data in the facility to locations outside the data center, such as their customers/trading partners, headquarters, or other data centers where the customer has also co-located its critical computing infrastructure.

28.     Colocation customers often need to connect not only to their own data elsewhere (whether at their headquarters or at other data centers), but also to third-party vendors, customers, or trading partners.  For example, hotels and casinos often need to inter-connect with in-room entertainment providers, so that the entertainment content can flow through to customers of the hotels and casinos.  If the third-party vendor is located outside the colocation customer's facility, then the colocation customer uses the colocation provider's "cross-connect(s)" to connect to one or more telecommunication providers, in order to access and exchange data with the third-party vendor.  When the customer and the third-party vendor are both co-located in the same data center, a "cross-connect" is still required, but it is an internal cross-connect within the data center, rather than to another data center.

29.     Because of the importance of diverse locations and commercial exchange, data centers typically allow their customers to cross-connect to other data centers, in order to access and exchange data with themselves and third parties co-located elsewhere.  If a customer cannot access a third-party vendor directly through the third-party vendor's data center, it must take a more circuitous, inefficient, slower, and costlier route, potentially causing serious impairment of its ability to offer its own products and services to its own end-customers.

**B.  Switch**

30.     Switch is the largest colocation data center provider in the Las Vegas, Nevada market.  Its Las Vegas facilities have over 2 million square feet comprising twelve data center

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

structures.  Between 2011 and the present, Switch has quintupled its size.

31.     Switch controls at least 85% of the Las Vegas market for high-end colocation data center services.  The only other notable competitor in the Las Vegas market offering high-end colocation is ViaWest, which opened around the same time as Cobalt.  Because of Switch's anticompetitive conduct, however, ViaWest's Las Vegas operation has experienced far less growth in the Las Vegas market over the past five years than it would have absent Switch's anticompetitive conduct.

### C.     Cobalt

32.     In 2011, Cobalt began planning to build a high-end colocation data center to fulfill the need for competition in the Las Vegas market.  With the exception of Switch, there was little supply at any level to meet the increasing awareness and demand from organizations for high-end colocation space and services in the Las Vegas market.  Cobalt was therefore well situated to fill an obvious gap in the market and offer consumers competition on price for the same product being offered by Switch.  Indeed, for the same product that Cobalt intended to offer, Switch's prices were substantially higher than what Cobalt offered when it was in the market.

33.     Cobalt, through its former President Michael Ballard, originally prospected a site on Sahara Avenue in Las Vegas in close proximity to a Switch Las Vegas facility.  (Ballard had previously been employed by Switch for approximately two years, ending in or about April 2006.)

34.     When Switch learned of Ballard's plan, Switch filed a lawsuit in Clark County District Court in Nevada against Ballard pleading that Ballard had misappropriated trade secrets and copyrighted works in designing a data center for Cobalt's Sahara site (which, as Switch alleged in its lawsuit, was never constructed).  Switch alleged: "Ballard cannot reasonably build a datacenter at [the prospected site for Sahara], adjacent to three of Switch's datacenters, without the use of Switch's trade agreements and trade secrets."  Ballard denied each and every Switch allegation and defended the lawsuit.  Ultimately, however, the parties agreed to settle the lawsuit and release their claims in March 2013 — without admission of any liability — for a nominal

REID RUBINSTEIN & BOGATZ

300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

sum of $40,000 to be paid to charities jointly selected by Switch, Ballard, and Cobalt.  (Cobalt executed the settlement agreement though it was never a party to the lawsuit.)

35.   After extensive market research, investment, and development — ultimately amounting to over $15 million — Cobalt opened a state-of-the-art colocation data center facility on Cheyenne Avenue in Las Vegas, Nevada in February 2013.

36.   The facility featured 34,000 square feet of gross space and nearly 21,000 square feet of planned data center space which Cobalt intended to build out in two phases.  Phase I would accommodate 200 cabinets and Phase II was expected to accommodate an additional 250 to 265 cabinets.  The facility featured HVAC and electrical systems designed to accommodate high density computing workloads; N+2 cooling redundancy (meaning the facility had 100% capacity to cool itself, plus capacity of two backups); N+1 power redundancy; carrier neutrality, with access to ten broadband transport providers via four diverse fiber entrances on each side of the facility, allowing for redundancy in the case of interruption; and state-of-the-art security, fire-suppression, and monitoring systems.  Cobalt had a lease agreement with a 32-year term — an initial 12-year term with two consecutive 10-year renewal options — under which to operate the Cheyenne Facility, giving Cobalt a highly secure advantage to achieving its future growth.  In fact, Cobalt anticipated expanding its data center footprint in the Las Vegas market over time, starting with the Cheyenne Facility and then moving on to larger projects in other locations.

37.   Cobalt was led by a strong team, including Jeff Brown, a 15-year industry veteran who replaced Ballard as President in June of 2013.  Tom Harris, one of the most experienced data center engineers in the country, designed the Cobalt facility and served as engineering consultant and on V5's advisory board.  The team was later joined by John Ritter, who has been actively involved in the real estate industry for over 30 years.

38.   Annual revenue projections for Cobalt's Cheyenne Facility by 2016 were in the $9-10 million-dollar range, with EBITDA just under half of that.  Absent Switch's unlawful, anticompetitive practices, Cobalt would have achieved at least these numbers and would have moved forward with plans to open one or two additional facilities in the Las Vegas market.

39.   Independent observers predicted quick success for Cobalt.  For example, in March

of 2013, Sean Tario of Open Spectrum Inc. published a blog post titled, "Las Vegas Data Center Options," discussing Switch Las Vegas and the Cobalt Cheyenne Facility.   On Cobalt's Cheyenne Facility, Tario opined, "I have no doubt they'll fill this place quickly . . . ."

40.    As alleged further below, however, Switch met Cobalt's attempt to enter the Las Vegas market with a scorched-earth campaign of exclusionary conduct designed to put Cobalt out of business and thwart any attempt to grow competition for the benefit of consumers in the Las Vegas market.

41.    As a result of Switch's anticompetitive scheme and due to Switch's conduct, Cobalt discontinued commercial operations in December 2015 — fewer than three years after it opened — for lack of business.

### SWITCH'S TORTIOUS AND EXCLUSIONARY SCHEME

42.    As soon as Switch learned of Cobalt's plans to enter the market and compete with Switch, Switch embarked upon an exclusionary scheme to keep Cobalt — and any other competitor — out of the market, thus maintaining and expanding Switch's monopoly over the market and enabling Switch to continue charging customers inflated prices.

43.    Soon thereafter, however, Switch did not keep its true intentions secret.   For example, Rob Roy, Switch's CEO, told a potential Cobalt investor that Switch was determined to keep a competing data center from being built, and that the investor should stay away from Switch's competition.   In fact, Roy has openly admitted that Switch is trying to be a monopoly and would use exclusionary methods to put the competition out of business.   Roy has stated in no uncertain terms:

- Switch was "trying to be a monopoly";
- Switch's "ability to dominate the market" was "greater" after Cobalt entered "than it was three years" prior;
- Switch planned to "turn up the heat" in particular on ViaWest Las Vegas and "grind" Cobalt until Cobalt "had enough";
- Roy would make it "impossible for Cobalt to compete with Switch";
- Roy was so confident in his and Switch's anticompetitive scheme that Roy was

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

willing to "bet $1 million" that Cobalt would not last one year in operation;

- "If carriers go into Cobalt, then Switch won't use them";
- "Switch will use the threat of taking away business to keep its vendors and carriers exclusive to Switch";
- Roy was confident that 80% of Switch's clients would only use Switch and that he could "give away" cabinets to the other 20% to "keep control"; and
- Roy was determined to protect the Las Vegas market as his "single-city ecosystem."

44.    While Roy and Switch were motivated by a determination to keep any competitor out of the market, they expended considerable effort to specifically exclude Cobalt, Switch's most immediate threat.   That effort involved a multi-pronged anticompetitive scheme that included exclusive-dealing provisions in its multi-year agreements with customers and carriers; threats of refusal to deal with customers, carriers, and other important market players if they did not deal exclusively with Switch; and a campaign of disparagement of its competitors.

45.    For years prior to Cobalt entering the market, Switch required customers and vendors, including telecommunications carriers, to adhere to Switch's "Acceptable Use Policy" ("AUP"), which prohibited: (i) Switch's customers from contracting with other colocation data centers that might compete with Switch; and (ii) carriers from connecting to other colocation data centers that might compete with Switch.   The duration of the AUP depends on the duration of the customer's colocation contract, which is typically years.

46.    There was no pro-competitive justification for this type of exclusive-dealing arrangement Switch embedded in its AUP.

47.    On information and belief, this type of exclusive-dealing arrangement is unusual in colocation data centers' contracts with carriers and customers.

48.    Switch's 2013 AUP was explicit in its anticompetitive purpose, giving Switch the unilateral "***right to remove any unauthorized cross-connects or connections that could compete with Switch's business interests*** . . . .   Cross-connects between connectivity providers that are intended to use [a Switch Las Vegas facility] as a pass-through to ***connect to data centers not***

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

*owned by Switch within a 50-mile radius are not permitted* without express written consent by Switch, which may be granted or withheld in Switch's sole discretion" (emphasis added). Similarly, "Any and all telecommunication connections [that access a Switch Las Vegas facility] . . . that utilize (or could utilize) [a Switch Las Vegas facility] as a pass-through to *connect to data centers not owned by Switch within a 50-mile radius of [a Switch Las Vegas facility] are not permitted* without express written consent by Switch, which may be granted or withheld in Switch's sole discretion" (emphasis added).  The AUP further provided that approved "cross-connects to third-party facilities are priced at $500.00 per month."

49.     Switch's price of $500 per month for a cross-connect to a third-party facility is at least 200% the typical cost of a cross-connect.

50.     Switch's 2013 AUP also specifically targeted Cobalt, providing that "no entities having business dealings (Vendors and Clients) with Cobalt shall be permitted to enter or work with the Switch Ecosystem."  Roy made it known this meant any individual or entity that *ever* did *any* amount of work or business with Cobalt, either in the past or the future, was banned forever from working for, doing business with, or connecting through Switch.

51.     Similarly, the 2015 and 2016 AUPs prohibited customers and carriers from cross-connecting with competitors located "within the State of Nevada" or "within [the] greater geographic area in which [a Switch Las Vegas facility] is located" without Switch's prior approval.

52.     Switch, therefore, made it abundantly clear that (i) its customers could not store their data with Switch while also using a competing colocation data center — specifically targeting Cobalt's Las Vegas facility, and (ii) carriers were prohibited from connecting Switch's facility with another competitor, within Switch's geographical restrictions.

53.     Remarkably, Roy openly confirmed the exclusionary intent behind the AUP exclusive-dealing provisions, bragging to third parties that Cobalt "cannot connect to anything within Switch" and "if carriers go into Cobalt, then Switch won't use them."  Roy stated: "The bottom line is that Switch will use the threat of taking away business to keep its vendors and carriers exclusive to Switch."

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000  FAX:  (702) 776-7900

54.     Upon information and belief, the exclusivity provisions in Switch's contracts with customers and carriers prevented numerous customers and carriers from contracting/connecting with Switch's competitors, including Cobalt and ViaWest Las Vegas, acted as a substantial barrier to new entrants, like Cobalt, and severely constrained the market for the few existing competitors.

55.     For example, Cobalt requested a quote from Zayo Group (an important carrier and provider of fiber communications infrastructure) to provide telecommunications services to Cobalt's current and prospective customers.  The ability to secure telecommunications services from Zayo was of critical importance for Cobalt, because many prospective customers already relied on Zayo and therefore required that any additional co-location sites they opened (i.e., with Cobalt) connect to their preexisting Zayo network connections.

56.     A Zayo representative informed Cobalt that Zayo had a "marketing partnership" with Switch that prevented Zayo from providing services to Cobalt or Cobalt's customers.  On that basis, Zayo refused to provide a quote.

57.     Cobalt later again requested a quote from Zayo.  This time, Zayo provided a quote, but shortly thereafter withdrew its offer because of its non-compete agreement/ understanding with Switch.

58.     Cobalt was thus forced to incur the time and expense of hiring a lawyer specializing in Federal Communications Act law and drafting a demand letter to Zayo, explaining that Zayo had offered no commercial reason to refuse to deal with Cobalt and that Cobalt understood Zayo had entered into an anticompetitive agreement with Switch not to deal with Cobalt, in violation of its federal designation as a common carrier.  Only after this considerable delay and expense, and protracted discussions with Zayo, did Zayo accede and agree to provide connectivity services to Cobalt.

59.     Although Cobalt eventually succeeded in convincing Zayo to provide telecommunications services to Cobalt and Cobalt's customers, the damage had already been done, including in the form of both lost customers and reputational damage.  Some customers Cobalt signed early left for Switch when they learned they would not have access to Zayo's

telecommunications services, and other prospective customers viewed Cobalt as uncompetitive because of its inability to immediately provide Zayo's services.

60.     Switch similarly interfered with Cobalt's relationship with CenturyLink, another crucial telecommunications provider.   In late 2013, Cobalt sought to grow and broaden its relationship with CenturyLink beyond the services CenturyLink then provided Cobalt.   For months, CenturyLink was reluctant to seriously engage with Cobalt because CenturyLink was negotiating an exclusive dealing agreement with Switch, which Switch and CenturyLink announced in 2014.   After expending significant time and resources to overcome Switch's anticompetitive agreement with CenturyLink, Cobalt managed to convince CenturyLink to broaden its service offering to Cobalt, but the time and resources Cobalt had to dedicate to overcoming this barrier erected by Switch raised Cobalt's costs and severely disadvantaged Cobalt in the marketplace.

61.     Switch similarly interfered with important partnerships for Cobalt that could have allowed Cobalt a chance to compete.   For example, Switch's exclusionary tactics caused Cobalt to lose an important partnership with SilverBack Migration Solutions.   SilverBack provides infrastructure migration and support services, ensuring smooth infrastructure migration between data centers for organizations across the country.   This type of vendor relationship is critical to a high-end colocation data center's ability to compete because safe migration of a customer's infrastructure is an important component in a customer's decision to switch data center providers.   Being able to offer SilverBack's services to Cobalt's customers was also crucial to building Cobalt's reputation as a top-tier service provider competitive with Switch.

62.     In or around September 2014, SilverBack contacted Cobalt to propose a partnership under which SilverBack would provide relocation services and Cobalt would provide colocation data services.   This was a key partnership for Cobalt because of the costs and risks involved in moving data center equipment.   SilverBack and Cobalt co-sponsored a public event to promote this partnership and marketed the event on social media, including Twitter.   Rob Roy noticed the tweets about the partnership and repeatedly contacted SilverBack, threatening to deny SilverBack further business within Switch if SilverBack continued its partnership with

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

Cobalt.

63.     Around the same time, Cobalt prepared a press release to announce multiple partnerships (including with SilverBack) in order to build Cobalt's reputation as a top-tier colocation provider with ready-made partnerships to ease the migration.     Unexpectedly, SilverBack contacted Cobalt and told Cobalt to delete all references to SilverBack in the press release.   SilverBack later told Cobalt's Jeff Brown that Rob Roy had threatened to kill all of SilverBack's business with Switch if SilverBack continued to have a commercial relationship with Cobalt.     SilverBack stated that Switch's business was worth millions of dollars to SilverBack, and SilverBack could not afford to fight Roy, despite his disgust with Switch's heavy-handedness and strong desire to partner with Cobalt.

64.     Switch also cut off its competitors from brokers, who are an important source of customers for high-end colocation data centers similarly situated to Cobalt (i.e., new market entrants).   On information and belief, Switch threatened at least one broker, who had previously worked for Cobalt, to the point where he was thereafter unwilling to work with Cobalt.

65.     On information and belief, Switch threatened to withhold crucial subsidies and support from the Technology Business Alliance of Nevada ("TBAN") — a technology business association that serves as an important networking tool for technology companies in the state looking to add or strengthen relationships with customers, suppliers, and partners — unless TBAN excluded Cobalt's brokers, who sought to become involved with TBAN to help locate potential new customers for Cobalt.   As a result, TBAN stonewalled Cobalt's brokers and refused to speak to them.

66.     By interfering with Cobalt's access to brokers, and Cobalt's brokers' access to important networking opportunities, Switch erected significant barriers to entry to the Las Vegas market, insulating itself from competition.

67.     TBAN also refused to allow Cobalt to sponsor any of its events because, according to TBAN, Switch, its primary sponsor, would not permit it.   This sponsorship would have provided important visibility to Cobalt and signaled to the market Cobalt's commitment to the local community.   As a result of Switch's anticompetitive conduct, Cobalt was denied this

1    important avenue for visibility.

2        68.    Switch also interfered with Cobalt's partnership with Opportunity Village, a

3    prominent nonprofit organization in Las Vegas.  Cobalt was in discussions with Opportunity

4    Village to provide the nonprofit with affordable colocation services in the "showcase" area of the

5    Cheyenne Facility (i.e., a prominent display within the data center) where Cobalt and

6    Opportunity Village would jointly promote a world-class data center for local nonprofit

7    organizations.  The Opportunity Village representatives who Cobalt worked with were very

8    enthusiastic about the partnership until they suddenly became silent and ultimately explained that

9    their board had disapproved the partnership.

10       69.    On information and belief, at least one Switch executive sits on the board of

11   directors for the Opportunity Village Foundation. On information and belief, Switch learned

12   about the potential partnership and used its close ties to the board, including the influence of the

13   Switch executive who is on the board, to end the partnership.

14       70.    Switch also interfered with Cobalt's numerous efforts to become involved with

15   the Governor's Office of Economic Development ("GOED") and generate discussions about

16   possible development opportunities to foster competition in the Las Vegas high-end colocation

17   data center market.  On information and belief, when Rob Roy learned of Cobalt's discussions

18   with the GOED, he attempted, as a member of GOED's board of managers, to prevent Cobalt

19   from accessing this resource.  The GOED thereafter informed Cobalt that the GOED could not

20   discuss development opportunities with Cobalt because of Switch.  Cobalt was therefore

21   deprived of access to a critical resource that could help it attempt to compete.  Meanwhile, in

22   2014 and 2015, Switch received lucrative tax credits from the GOED.

23       71.    Switch also directly cut off its competitors' access to customers, routinely

24   coercing customers to refrain from dealing with Cobalt.  For example, in 2015, Cannery Casino

25   & Hotel had decided to co-locate some of its data and equipment.  Cannery entered into

26   extensive, promising discussions with Cobalt.  In or about June 2015, Cobalt learned that

27   Cannery had selected Cobalt, but the next day Cannery unexpectedly informed Cobalt without

28   explanation that it had selected Switch for the deal.  On information and belief, in the less than

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

24-hour period between Cannery's apparent selection of Cobalt and its reneging on this decision in favor of Switch, Rob Roy had targeted Cannery and applied exclusionary tactics to force Cannery to refrain from dealing with Cobalt.

72.     Specifically, on information and belief, Roy reminded Cannery of the numerous vendors Cannery works with that are co-located with Switch.  Roy told Cannery that it could not cross-connect directly to any of those vendors if Cannery co-located with Cobalt, whereas, Switch would provide Cannery those cross-connects if Cannery co-located with Switch.  Even though Cannery preferred Cobalt over Switch for colocation, it had no choice but to give Switch its colocation business, or else it would lose access to vital trading partners.

73.     On information and belief, Switch engaged in numerous other instances of such conduct with other customers that would have preferred to co-locate with Cobalt, but were told by Switch that they would have no access to vital third-party cross-connects if they did not co-locate with Switch.

74.     To maintain its unlawful monopoly, Switch also engaged in predatory-pricing tactics to bar Cobalt and other competitors from obtaining business.  For example, in or around March 2015, Yorba Linda Water District had indicated to Cobalt that it would place an initial, one-half cabinet order with Cobalt for the Cobalt Cheyenne Facility.  On information and belief, when Switch learned about Yorba Linda's deal with Cobalt, Switch induced Yorba Linda not to do the deal with Cobalt and to give its business to Switch by offering Yorba Linda a dramatically lower price that was below cost for Switch.

75.     Switch's predatory pricing practices with respect to the Yorba Linda contract illustrate the anticompetitive and exclusionary intent behind Switch's scheme:  The Yorba Linda contract was for only ***one-half of one cabinet*** — negligible business for Switch.  Switch targeted this customer with predatory practices anyway, to send a message to Cobalt that it could and would steal any other prospective customer of Cobalt with similar tactics.

76.     In addition, by requiring Yorba Linda to agree not to deal with Switch's competitors, Switch ensured that Yorba Linda would give *all* of its future business to Switch.  In other words, Switch engaged in predatory practices to secure new, toe-in-the-water colocation

REID RUBINSTEIN & BOGATZ

300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

1   customers in order to foreclose all of those customers' future business from Switch's

2   competitors.

3       77.    On information and belief, Switch engaged in similar predatory-pricing tactics to

4   prevent ViaWest Las Vegas from obtaining business.  Indeed, a Switch representative told one

5   telecommunications carrier, "We do whatever we can to keep the other guys from getting started.

6   Our roots are deep in the community.  We would even buy a billboard out front of another data

7   center and advertise $1 per month [versus Switch's standard $1,199 per month] to keep the

8   competition from succeeding."   Roy stated, in response to Cobalt entering the market, that

9   Switch would be "giving away 250 cabinets per year."

10      78.    In another instance, on information and belief, Switch told Cobalt customer

11  Networx that it would pay Networx's defense costs and legal fees if it agreed to break its

12  contract with Cobalt.  In response, Networx broke its contract with Cobalt and went to Switch.

13      79.    Upon information and belief, Switch's exclusionary tactics also extended to

14  interference with a federal government contract.  In early 2015, the Defense Advanced Research

15  Projects Agency of the U.S. Department of Defense ("DARPA") contacted Cobalt about

16  Cobalt's capacity and interest in substantial colocation deployment to support a security hacking

17  event that DARPA sponsored.  Cobalt confirmed its capacity and interest and that the Cobalt

18  facility complied with the specifications and requirements of the DARPA request.  The parties

19  proceeded with extensive discussions and negotiations, including exchanging multiple proposals

20  and diagrams.  Cobalt reasonably believed it was in serious contention for the deal with DARPA.

21      80.    Suddenly, however, in or around May 2015, DARPA posted a public solicitation

22  notice describing the same project, but with new "specifications":  Now, DARPA required a data

23  center with offerings other than concurrent maintainability, such as "backup" conference

24  facilities capable of seating up to fifty people in a single room.

25      81.    On information and belief, Switch was the only colocation company that had a

26  facility that would meet the new DARPA specifications.

27      82.    Throughout Cobalt's numerous discussions and negotiations with DARPA,

28  DARPA never expressed the need for offerings beyond concurrent maintainability or for

"backup" conference facilities.

83.     On information and belief, DARPA made this change due to pressure from Switch.  Subsequently, DARPA disclosed that Switch was being awarded the opportunity.

84.     The loss of this high-profile government contract not only cost Cobalt substantial revenues, but also substantial visibility and the legitimacy and prestige associated with being awarded a federal government defense contract.  Given the dearth of competitors that met the original specifications, it is more than reasonable to conclude that Cobalt would have won this contract and realized its related benefits but for Switch's anticompetitive conduct.

85.     Part and parcel of Switch's exclusionary and anticompetitive scheme was its campaign to slander and malign its competitors, including Cobalt.

86.     As detailed above, Switch's 2013 AUP specifically targeted Cobalt by requiring all customers and vendors not to do business with Cobalt.

87.     As a pretext for this provision, the 2013 AUP stated that the provision was in place "to protect Switch's intellectual property": "The CEO of Cobalt Datacenters, Mike Ballard, signed a Settlement Agreement relating to Mike Ballard's unauthorized possession of Switch's intellectual property and confidential information."

88.     The Settlement Agreement contains no admission by Ballard (or Cobalt) that Ballard had "unauthorized[ly] possess[ed] . . . Switch's intellectual property and confidential information."  Yet, to the outside world, Switch presented its defunct allegations against Ballard as though Cobalt — a company with which Ballard was no longer involved — was complicit in the alleged misconduct.

89.     Further underscoring the illegitimacy of Switch's restrictions on consumers and vendors, Switch's defunct lawsuit accused only Ballard — not Cobalt — of use of Switch's trade secrets and intellectual property.

90.     Switch's motives behind the defamatory statements in its 2013 AUP were purely anticompetitive in nature.

91.     Outside of the disparaging 2013 AUP, Switch disparaged Cobalt's reputation in the market in numerous other ways, including referring to various employees and board members

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000  FAX:  (702) 776-7900

1    of Cobalt as "liars" and "thieves" and claiming that Cobalt stole patents and intellectual property

2    from Switch.

3        92.    Upon information and belief, Roy also routinely represented to third parties that

4    ViaWest Las Vegas and the Cobalt Cheyenne Facility did not offer concurrent maintainability

5    and redundancies, which they did in fact provide.

6        93.    Switch's constant barraging of customers, vendors, and other third parties —

7    which were critical to a new entrant's ability to compete — with false and disparaging

8    statements about its competitors, including Cobalt, created a cloud of uncertainty and doubt

9    about doing business with them instead of Switch.  On information and belief, these false and

10   disparaging statements induced many customers, vendors, and third parties not to deal with

11   Switch's competitors and contributed to Cobalt's complete foreclosure from the market.

### THE RELEVANT MARKET

12

13       94.    The relevant market is the market for cabinet space at colocation data centers that

14   offer, at a minimum, concurrent maintainability through fully redundant power and cooling

15   services and robust, carrier neutral telecommunications services in the Las Vegas metropolitan

16   area of southern Nevada, including the cities of Las Vegas and Henderson and the

17   unincorporated area of Clark County, Nevada.

18       **A.    The Relevant Product Market:  High-End Colocation Data Centers**

19       95.    The relevant product market is cabinet space at colocation data centers that offer,

20   at a minimum, concurrent maintainability through N+1 (or better) redundant power and cooling

21   services (i.e., 100% power and cooling capacity, plus capacity for one backup system) and

22   robust, carrier neutral telecommunications services ("high-end" colocation data centers).

23       96.    Colocation data centers that fail to offer these services are not reasonable

24   substitutes for data centers that do offer these services.

25       97.    As detailed above, concurrent maintainability offers significant benefits to

26   customers.  Many organizations need continuous uptime (i.e., uninterrupted operations) to avoid

27   the potential for commercial downtime.

28       98.    Industry participants and insiders recognize the unique benefits of concurrent

**REID RUBINSTEIN & BOGATZ**
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

maintainability.  For example, one article suggesting best practices for selecting a data center compares providers by reference to whether or not they offer at least N+1 redundancies.

99.     The substantial price differences between facilities that offer concurrent maintainability through a minimum of N+1 redundancies and those that do not reinforces the distinct product markets.  For example, in 2012, the average monthly cost of a lower-end data center cabinet was approximately $500, versus $1,200 for a cabinet at a high-end data center that would be comparable to Cobalt Cheyenne.

100.    Given a small but substantial, non-transitory increase in the price of a data center offering concurrent maintainability through N+1 power and cooling and connectivity redundancies within a relevant geographic market, actual and prospective customers would not substitute a data center without this offering.

101.    Data centers within the relevant market offer continuous uptime through at least N+1 redundancies — the non-negotiable requirements that most customers in this market seek. The additional bells and whistles offered by higher-end facilities — for example, 2N redundancies — are generally "nice to have" features that organizations will dispense with readily in exchange for a lower price.

102.    Moreover, in a customer's overall analysis of the comparative risk and reliability of alternative data centers, other attributes of facilities within this product market — for example, the reliability and quality of the equipment, maintenance regimes, personnel training, staffing, procedures, and safety — can more than make up for the lack of the two or three technical differentiators of the data centers in the highest end of the product market.

103.    Cobalt and ViaWest Las Vegas competed for the same customers targeted by Switch.  For example, as detailed above, Switch used its exclusionary conduct to usurp several of Cobalt's customers for Switch's Las Vegas operations.  In addition, Cobalt targeted for its facility several customers of Switch's facility.

104.    Third-party high-end colocation data centers do not compete with do-it-yourself or self-supplied data centers.  Small organizations with very basic needs can self-supply, but once they reach the point of needing concurrent maintainability and significant bandwidth

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

capacity, they generally are not capable of self-supplying those features for anywhere near the economic value of obtaining them from a third-party provider.  Building one's own data center that offered the same services as Cobalt, ViaWest Las Vegas, or Switch would require an enormous capital expenditure outlay and technical expertise most organizations lack, as opposed to paying a monthly fee for a third-party provided data center.

105.   Given a small but significant, non-transitory increase in the price of all data centers offering concurrent maintainability through N+1 redundancies and robust, carrier neutral connectivity in a relevant geographic market, actual and prospective customers would not self-supply instead.

**B.   The Relevant Geographic Market:  Las Vegas Metropolitan Area**

106.   The relevant geographic market is the Las Vegas metropolitan area of southern Nevada, including the cities of Las Vegas and Henderson and the unincorporated area of Clark County, Nevada (the "Las Vegas market").

107.   As explained below, by Switch's own admissions, the Las Vegas market is a distinct geographic market in which its facilities operate.

108.   While there are data center providers of widely varying capabilities all over the United States and the world, organizations looking to put their critical computing infrastructure in the Las Vegas market do not consider data centers outside of the Las Vegas market to be reasonably interchangeable substitutes.

109.   Organizations may have other data centers located in other parts of the United States, yet they use the Las Vegas market for some of their primary and/or some or all of their backup high-end colocation data center needs for reasons specific to this area of the country and do not consider areas outside the Las Vegas market to be reasonable alternatives to satisfy those needs.

110.   Numerous aspects of the Las Vegas market differentiate it from other markets. For example, southern Nevada provides the ideal setting for data center facilities as the area is considered a "safety zone" from natural disasters.  The Las Vegas market is relatively immune from natural disasters, facing neither the earthquake risks associated with coastal California, nor

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

the winter storm problems that afflict the Mountain West and Northeast, nor the hurricane and flooding risks of the Southeast, nor the tornado risks of the Midwest.  Thus, customers that decide they need a high-end colocation data center in such a "safety zone" have virtually no other geographic alternative to the Las Vegas market.  (There are no high-end, third-party colocation data centers in Nevada outside of the Las Vegas market, other than Switch's new Reno facility, which is currently under construction.)

111.    Unremarkably, Switch's own materials recognize and capitalize on this fact.  In marketing Switch Las Vegas, Switch touts the Las Vegas market's location within the "U.S. Safety Zone" as a means to define a unique market:



112.    Southern Nevada also offers abundant fiber networking from multiple top-tier telecommunications providers.  At the same time, real estate, utility, and other operating costs are lower in the Las Vegas market than, for example, metropolitan areas in California.  The Las Vegas market offers low tax rates and business-friendly local regulations.  Humidity levels are low, which allows for efficient and cost-effective cooling.  The Las Vegas market is close to important technology markets such as Los Angeles and San Francisco and has a well-connected international airport, allowing for ease of access to their equipment and data if necessary.  These features render the Las Vegas market uniquely suited for third-party colocation operations.

113.    In addition, some consumers that chose the Las Vegas market to store their data

do so because they place a top priority on close proximity to their data center.  For at least these consumers, data centers in the rest of the country are not reasonable substitutes for data centers in the Las Vegas market.

114.    Data centers outside of the Las Vegas market are also not reasonable substitutes for certain organizations doing business in Nevada that are required by regulation to maintain their data in Nevada, e.g., casinos.  Gaming licensees (casinos) in Nevada have no choice but Switch Las Vegas and ViaWest Las Vegas for their colocation data center needs.

115.    The high costs and risks of moving equipment from one data center to another serve to render data center markets local markets.  The farther a customer has to move its equipment, the higher the costs and the risks of damage to such equipment.  In addition, moving data center equipment outside of a local market means loss of established relationships with local carriers and vendors serving the area.  For this additional reason, data center markets tend to be local markets, with the Las Vegas market representing its own separate market.

116.    Switch's own materials recognize that its Las Vegas facilities do not meaningfully compete with data centers located outside of the Las Vegas market:  Its AUP agreements forbid customer dealing and carrier interconnection with data centers "within a 50-mile radius," "within the State of Nevada," or "within [the] greater geographic area in which [a Switch Las Vegas facility] is located."  These provisions, which Switch designed to exclude competitors, target only other data centers within close proximity to Switch Las Vegas — evidence that Switch considers only data centers in close proximity to compete with it.

117.    Data centers located in other cities in the southwestern United States, for example, Phoenix, Arizona, are not reasonable substitutes for those located in the Las Vegas market.  For instance, the fact that other providers have facilities in both Las Vegas and Phoenix serving distinct customers — for example, ViaWest and zColo (a Zayo brand) — demonstrates the distinct geographic markets.

118.    In addition, during the time when the Cobalt Cheyenne Facility operated, with limited exceptions, Cobalt only competed with other data centers in the Las Vegas market for customers.  Customers rarely submitted a request for proposal to Cobalt and also to a data center

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

1   outside of the Las Vegas market — including, for example, Phoenix.

2       119.   There are also substantial differences in price between data centers in Cobalt's

3   product market in the Las Vegas market and those outside of the Las Vegas market.   For

4   example, Switch's pricing in the Las Vegas market can be roughly double and even triple the

5   Phoenix pricing for comparable services.

6       120.   Given a small but substantial, non-transitory increase in the price of all high-end

7   colocation data centers in the Las Vegas market, actual and prospective customers would not

8   substitute away to data centers located outside of the Las Vegas market.

9                   **C.   Relevant Market Participants**

10      121.   The relevant market participants are Switch Las Vegas, ViaWest Las Vegas, and

11  the Cobalt Cheyenne Data Center (when it operated).

12      122.   Other data center providers in Nevada that do not operate in the relevant product

13  market include zColo, Vegas Colo, tw telecom, ColoXchange, Fiberhub, Corelink, VegasNAP,

14  Lasvegas.net, and Level 3 Communications.   At all relevant times, none of these facilities

15  offered the concurrent maintainability, redundancies, and telecommunications and build-out

16  services (i.e., high-end colocation data center services) offered by Cobalt, ViaWest Las Vegas,

17  and Switch Las Vegas.

18      123.   Another reason for the exclusion of zColo and Level 3 Communications from the

19  market is that, unlike Switch Las Vegas, ViaWest Las Vegas, and the Cobalt Cheyenne Data

20  Center, zColo and Level 3 Communications are not carrier neutral facilities and thus can cross-

21  connect only with other data centers that use Zayo and Level 3 Communications, respectively,

22  for connectivity.

23      124.   Industry participants' perceptions confirm that the relevant market is limited to

24  Switch Las Vegas, ViaWest Las Vegas, and Cobalt.  For example, in March 2013, Sean Tario of

25  Open Spectrum Inc. published a blog post titled "Las Vegas Data Center Options."   Tario

26  explained that for "a specific type of customer with a specific need," Switch Las Vegas, ViaWest

27  Las Vegas, and Cobalt were all "an ideal fit."

28

**REID RUBINSTEIN & BOGATZ**
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ

300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

## SWITCH'S MONOPOLY POWER

125.    By virtue of Switch's high market share and barriers to entry in the relevant market and switching costs, Switch has, and at all relevant times had, monopoly power (i.e., the power to control prices or exclude competition in the relevant market).

126.    Switch is well known as the dominant high-end colocation data center provider in the Las Vegas market.  By Roy's own admissions, Switch is a monopolist.

127.    Switch's market share of the Las Vegas high-end colocation data center market can be measured by (1) the share of total data center square footage it controls in that market, (2) Switch's share of total capital invested in the relevant market, (3) Switch's share of power capacity sold in the relevant market, or (4) Switch's share of cabinets sold in the relevant market.

128.    By any of these measures, before Cobalt's entry into the market, Switch controlled over 85% of the relevant market.  With Cobalt's brief attempt to enter the market, Switch's market share remained at or above this level.  Switch itself brags about its dominant market share.  For example, Roy has stated, "Connectivity in Vegas is very unique.  Switch has 90% of it," and, "85% of the connectivity is inside Switch's facility."

129.    In addition to Switch's high market share, the relevant market is characterized by significant barriers to entry.  Building a high-end colocation data center requires millions of dollars in capital investment, extensive industry expertise and know-how, and time on the order of years to locate and lease the land, build the facility, obtain any necessary certifications, and secure customers.

130.    The most significant barrier to entry in the relevant market is switching costs.  The colocation data center industry in general is extremely "sticky":  once a customer leases cabinets from a provider and installs its equipment there, it takes a significant improvement in price or quality to induce the customer to move its equipment to a different provider's data center.    Migration necessarily involves downtime, which can interrupt crucial business operations.  The longer the migration takes, the longer the disruption.  In addition, moving such large and complex equipment, while keeping it safe, secure, and functional, is a risky, labor-intensive, and costly process.  Some customers may have to plan a move up to two or more years

in advance when considering concurrent agreements with carriers.

131.  This "stickiness" results in significant barriers to entry in the market and reinforces Switch's monopoly power over its current customers.  New entrants have to expend significant resources to overcome these barriers, underscoring the gravity of the effect of Switch's exclusionary conduct where Switch unlawfully barred access to resources essential to competing.

132.  Switch's anticompetitive conduct described herein created further barriers to entry.  Through its refusals to deal with customers who also dealt with competitors, Switch virtually ensured that, once a customer entered into a contract for *any* amount of cabinet space with Switch — even as little as half a cabinet — Switch would receive *all* of that customer's future business as the customer's colocation needs grew.  Once an organization became a customer of Switch, Switch's competitors were effectively foreclosed from competing for any of that customer's future business.

133.  Direct evidence of Switch's monopoly power includes its ability to control prices and raise prices above those that would be charged in a competitive market.  For example, a survey of retail pricing performed in July 2011 revealed that Switch's average cabinet pricing per month was $1,199, compared to ViaWest Las Vegas's $899 per month.  Upon information and belief, that price differential continues to this day.  Moreover, after Cobalt was foreclosed from the market, Switch, upon information and belief, offered a former Cobalt customer a similar cabinet package as the customer had been buying from Cobalt, at a 25% premium to what Cobalt had been charging the customer.

134.  Switch's power to exclude competitors — in particular, Cobalt — serves as further direct evidence of Switch's market and monopoly power.  Switch's threats to withhold its business from carriers and customers effectively kept them from doing business with Cobalt precisely because Switch has such leverage over carriers and customers by virtue of its market dominance.

///

///

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

**SWITCH'S ANTICOMPETITIVE CONDUCT HAS STIFLED COMPETITION IN THE RELEVANT MARKET, THEREBY EXTENDING SWITCH'S MONOPOLY POWER AND INJURING CONSUMERS AND COMPETITORS**

135.    Switch's actions have frustrated competition for high-end data centers offering concurrent maintainability and robust connectivity in the Las Vegas market, rendered competitors less competitive, deprived customers of choice, increased prices, and injured competitors, including Cobalt.

136.    Switch's customer and carrier agreements effectively cover approximately 85% of the relevant market.  As detailed above, these agreements have prevented customers and carriers doing business with Switch from giving any business to competitors.  Switch's customer and carrier agreements have accordingly foreclosed 85% of the market.

137.    The foreclosure effects of Switch's exclusionary agreements have been reinforced and magnified by Switch's other unilateral acts and conduct, including its threats not to deal with and/or promote customers, carriers, vendors, and other third parties doing business with or otherwise associating with competitors; its use of below cost pricing to usurp customers from competitors; and its campaign of disparagement against competitors, including as to Cobalt specifically.

138.    Switch's agreements and conduct has handcuffed its competitors' ability to compete in the relevant market for the benefit of consumers, who otherwise would have benefitted from the increased choice of providers and the lower prices competitors like Cobalt offered.

139.    In particular, Switch's agreements and conduct solely and proximately caused Cobalt's failure to gain enough of a foothold in the market to stay in business.  As detailed above, both Cobalt and neutral industry observers projected rapid and dramatic success for Cobalt based on the extensive experience of its leadership team, the state-of-the-art nature of its facility, and the significant demand for this caliber of cabinet space in the Las Vegas market.

140.    But for Switch's exclusionary conduct, Cobalt would have quickly filled its data center with customers and would be in business today, offering lower prices to customers and a competitive constraint on Switch.

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

141.   Switch's agreements and conduct have also foreclosed ViaWest Las Vegas. Specifically, from 2011 through the present, ViaWest Las Vegas would have achieved far greater growth absent Switch's anticompetitive and exclusionary conduct.

142.   By foreclosing competitors, Switch has been able to keep the supply of cabinet space in the relevant market below competitive levels, thus reducing overall market output below what would have prevailed absent Switch's anticompetitive agreements and conduct.   By reducing overall market output and eliminating competitors, Switch has been able to keep its prices above levels that would have prevailed in a competitive market.   For example, as alleged above, in the non-competitive Las Vegas market, Switch is able to charge a roughly 30% premium over what providers in Phoenix charge for comparable products and services.

143.   When Cobalt was forced to exit the market, customers were forced to accept higher prices — in at least one case, 25% over the price Cobalt would have offered.  Switch's prices for cross-connects are particularly exorbitant in the absence of real competition.

144.   Switch charges between $150 and $300 per month for internal cross-connects and $500 for connections to other data centers.

145.   In stark contrast, Cobalt charged $50 to $100 per month for cross-connects when it operated in the market.  Switch's cross-connect prices thus represent a many-multiple premium over competitive market levels.

146.   No procompetitive justification or effects outweigh the anticompetitive effects of Switch's agreements and exclusionary conduct.  For example, requiring customers and carriers to refrain from doing business with competitors does not serve any interest of Switch in protecting its intellectual property or trade secrets.   Nor does forbidding cross-connects have any procompetitive justification.

### FIRST CLAIM FOR RELIEF

(Violation of 15 U.S.C. § 2 -- Monopolization)

147.   Cobalt alleges paragraphs 1 through 146 as though set forth herein.

148.   Switch has monopolized the relevant market in violation of Section 2 of the Sherman Act.

149. At all relevant times, Switch possessed monopoly power in the relevant market, as demonstrated by Switch's high market share, barriers to entry, Switch's actual exclusion of competition, and its ability to charge supra-competitive prices in the relevant market.

150. Through the scheme described above, and other conduct likely to be revealed in discovery, Switch has willfully and unlawfully maintained and enhanced its monopoly power. Switch's scheme constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

151. Switch's scheme has suppressed competition and produced anticompetitive effects in the relevant market, including causing Cobalt's antitrust injury and damages.

152. Switch's conduct has no procompetitive benefit or justification. The anticompetitive effects of its behavior outweigh any purported procompetitive justifications.

153. As a result of Switch's conduct, and the harm to competition caused by that conduct, Cobalt has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

154. Cobalt is also entitled to recover from Switch costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. § 15.

## SECOND CLAIM FOR RELIEF

(Violation of 15 U.S.C. § 2 -- Attempted Monopolization)

155. Cobalt alleges paragraphs 1 through 146 as though set forth herein.

156. As alleged above, Switch has attempted to monopolize the relevant market in violation of Section 2 of the Sherman Act.

157. Switch possesses substantial market power in the relevant market, as demonstrated by Switch's high market share, barriers to entry, Switch's actual exclusion of competition, and its ability to charge supra-competitive prices in the relevant market.

158. Switch has implemented the anticompetitive scheme set forth above with the specific intent to monopolize the relevant market. Switch's scheme constitutes exclusionary conduct, within the meaning of Section 2 of the Sherman Act.

159. There is a dangerous probability that Switch will succeed in unlawfully extending

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ

300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

1    its monopoly in the relevant market through its anticompetitive scheme.

2          160.    Switch's scheme has suppressed competition and has produced anticompetitive

3    effects in the relevant market, including Cobalt's antitrust injury and damages.

4          161.    Switch's conduct has no procompetitive benefit or justification.    The

5    anticompetitive effects of its behavior outweigh any purported procompetitive justifications.

6          162.    As a result of Switch's conduct, and the harm to competition caused by that

7    conduct, Cobalt has suffered substantial and continuing injuries to its business and property in an

8    amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

9          163.    Cobalt is also entitled to recover from Switch costs of suit, including reasonable

10   attorney fees, as provided by 15 U.S.C. § 15.

11                              **THIRD CLAIM FOR RELIEF**

12               (Violation of 15 U.S.C. § 1 -- Agreements in Restraint of Trade)

13         164.    Cobalt alleges paragraphs 1 through 146 as though set forth herein.

14         165.    Switch possesses substantial market power in the relevant market, as

15   demonstrated by Switch's high market share, barriers to entry, its actual exclusion of

16   competition, and its ability to charge supra-competitive prices in the relevant market described

17   above.

18         166.    As alleged above, Switch has entered into agreements with customers and carriers

19   with the purpose and effect of unreasonably restraining trade and commerce in the relevant

20   market.

21         167.    Switch's solicitation and enforcement of the exclusionary contracts described

22   above constitute unlawful agreements, contracts, and concerted activity that unreasonably

23   restrain trade in the relevant market in violation of Section 1 of the Sherman Act.

24         168.    Switch's exclusionary contracts have foreclosed a substantial share of competitors

25   and had anticompetitive effects in the relevant market.

26         169.    Switch's exclusionary contracts have no procompetitive benefit or justification.

27   The anticompetitive effects of its exclusionary contracts outweigh any purported procompetitive

28   justifications.

170.     As a result of Switch's exclusionary contracts, and the harm to competition caused by those contracts, Cobalt has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

171.     Cobalt is also entitled to recover from Switch costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. § 15.

## FOURTH CLAIM FOR RELIEF

(Violation of Nev. Rev. Stat. § 598A.060 -- Monopolization)

172.     Cobalt alleges paragraphs 1 through 146 as though set forth herein.

173.     Switch has monopolized the relevant market in violation of Nevada Revised Statutes Section 589A.060.

174.     At all relevant times, Switch possessed monopoly power in the relevant market, as demonstrated by Switch's high market share, barriers to entry, its actual exclusion of competition, and its ability to charge supra-competitive prices in the relevant market.

175.     Through the scheme described above, and other conduct likely to be revealed in discovery, Switch has willfully and unlawfully maintained and enhanced its monopoly power. Switch's scheme constitutes exclusionary conduct within the meaning of Nevada Revised Statutes Section 589A.060.

176.     Switch's scheme has suppressed competition and produced anticompetitive effects in the relevant market, including causing Cobalt's antitrust injury and damages.

177.     Switch's conduct has no procompetitive benefit or justification.     The anticompetitive effects of its behavior outweigh any purported procompetitive justifications.

178.     As a result of Switch's conduct, and the harm to competition caused by that conduct, Cobalt has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by Nev. Rev. Stat. § 598A.210(2).

179.     Cobalt is also entitled to recover from Switch costs of suit, including reasonable attorney fees, as provided by Nev. Rev. Stat. § 598A.210(1) and (2).

///

///

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ

300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000  FAX:  (702) 776-7900

### FIFTH CLAIM FOR RELIEF

(Violation of Nev. Rev. Stat. § 598A.060 -- Attempted Monopolization)

180.     Cobalt alleges paragraphs 1 through 146 as though set forth herein.

181.     As alleged above, Switch has attempted to monopolize the relevant market in violation of Nevada Revised Statutes Section 589A.060.

182.     Switch possesses substantial market power in the relevant market, as demonstrated by Switch's high market share, barriers to entry, its actual exclusion of competition, and its ability to charge supra-competitive prices in the relevant market.

183.     Switch has implemented the anticompetitive scheme set forth above with the specific intent to monopolize the relevant market.  Switch's scheme constitutes exclusionary conduct, within the meaning of Nevada Revised Statutes Section 589A.060.

184.     There is a dangerous probability that Switch will succeed in unlawfully extending its monopoly in the relevant market through its anticompetitive scheme.

185.     Switch's scheme has suppressed competition and has produced anticompetitive effects in the relevant market, including Cobalt's antitrust injury and damages.

186.     Switch's conduct has no procompetitive benefit or justification.    The anticompetitive effects of its behavior outweigh any purported procompetitive justifications.

187.     As a result of Switch's conduct, and the harm to competition caused by that conduct, Cobalt has suffered substantial and continuing injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by Nev. Rev. Stat. § 598A.210(2).

188.     Cobalt is also entitled to recover from Switch costs of suit, including reasonable attorney fees, as provided by Nev. Rev. Stat. § 598A.210(1) and (2).

### SIXTH CLAIM FOR RELIEF

(Violation of Nev. Rev. Stat. § 598A.060 -- Agreements in Restraint of Trade)

189.     Cobalt alleges paragraphs 1 through 146 as though set forth herein.

190.     Switch possesses substantial market power in the relevant market, as demonstrated by Switch's high market share, barriers to entry, its actual exclusion of

competition, and its ability to charge supra-competitive prices in the relevant market described above.

191.    As alleged above, Switch has entered into agreements with customers and carriers with the purpose and effect of unreasonably restraining trade and commerce in the relevant market.

192.    Switch's solicitation and enforcement of the exclusionary contracts described above constitute unlawful agreements, contracts, and concerted activity that unreasonably restrain trade in the relevant market in violation of Nevada Revised Statutes Section 589A.060.

193.    Switch's exclusionary contracts have foreclosed a substantial share of competitors and had anticompetitive effects in the relevant market.

194.    Switch's exclusionary contracts have no procompetitive benefit or justification. The anticompetitive effects of its exclusionary contracts outweigh any purported procompetitive justifications.

195.    As a result of Switch's exclusionary contracts, and the harm to competition caused by those contracts, Cobalt has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by Nev. Rev. Stat. § 598A.210(2).

196.    Cobalt is also entitled to recover from Switch costs of suit, including reasonable attorney fees, as provided by Nev. Rev. Stat. § 598A.210(1) and (2).

## SEVENTH CLAIM FOR RELIEF

(Intentional Interference with Contractual Relations)

197.    Cobalt alleges paragraphs 1 through 146 as though set forth herein.

198.    Cobalt had valid and existing contracts with third parties, including without limitation Networx.

199.    At all relevant times, Switch had knowledge of Cobalt's contracts with these third parties.

200.    Switch engaged in the numerous unlawful, improper and intentional acts alleged above with the intent and design to disrupt Cobalt's contractual relationships with these third

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

parties.

201.    Switch was not privileged or justified in its actions.

202.    Switch's intentional conduct did in fact disrupt Cobalt's contracts with these third parties, because it induced them to breach their contracts with Cobalt.

203.    As a result of Switch's conduct, Cobalt has suffered substantial and continuing injuries to its business and property in an amount to be proven at trial.

204.    Switch acted maliciously, fraudulently, and oppressively in interfering with Cobalt's contracts with these third parties by the means alleged above.  Accordingly, Cobalt is entitled to punitive damages.

## EIGHTH CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Advantage)

205.    Cobalt alleges paragraphs 1 through 146 as though set forth herein.

206.    Cobalt had prospective contractual relationships with Zayo, Yorba Linda Water District, Cannery Casino & Hotel, Networx, and DARPA.

207.    At all relevant times, Switch had knowledge of Cobalt's prospective contractual relationships with these third parties.

208.    Switch engaged in the unlawful, improper and intentional acts alleged above with the intent to harm Cobalt by preventing its contractual relationships with these third parties.

209.    Switch was not privileged or justified in its actions.

210.    As a result of Switch's conduct, Cobalt has suffered substantial and continuing injuries to its business and property in an amount to be proven at trial.

211.    Switch acted maliciously, fraudulently, and oppressively in intentionally interfering with Cobalt's prospective contractual relationships with these third parties. Accordingly, Cobalt is entitled to punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Cobalt respectfully prays the Court enter judgment against Switch and in favor of Cobalt, as follows:

a.    Awarding Cobalt money damages, including the enterprise value of Cobalt,

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

**REID RUBINSTEIN & BOGATZ**
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900

trebled pursuant to law as to Cobalt's antitrust claims;

b.   Awarding Cobalt money damages, including the enterprise value of Cobalt, as to the remaining claims;

c.   Awarding Cobalt punitive damages;

d.   Awarding Cobalt pre- and post-judgment interest;

e.   Awarding Cobalt costs of the lawsuit, including reasonable attorney fees and costs;

f.   Declaring Switch's conduct unlawful and in violation of the above-referenced laws;

g.   Ordering such other and further relief as the Court may deem just and proper.

Dated:  September 7, 2017

By: _____
    I. Scott Bogatz
    Nevada Bar No. 3367
    Kerry E. Kleiman
    Nevada Bar No. 14071
    REID RUBINSTEIN & BOGATZ
    Bank of America Plaza
    300 South 4th Street, Suite 830
    Las Vegas, NV 89101
    Telephone:  (702) 776-7000
    Facsimile:  (702) 776-7900
    sbogatz@rrblf.com
    kkleiman@rrblf.com

    Bryan A. Merryman (*will comply with LR IA 11-2 within 5 days*)
    Catherine Simonsen (*will comply with LR IA 11-2 within 5 days*)
    WHITE & CASE LLP
    555 S. Flower Street, Suite 2700
    Los Angeles, CA  90071-2433
    Telephone:  (213) 620-7700
    Facsimile:  (213) 452-2329
    bmerryman@whitecase.com
    catherine.simonsen@whitecase.com

    Claire DeLelle (*will comply with LR IA 11-2 within 5 days*)
    WHITE & CASE LLP
    701 Thirteenth Street, NW
    Washington, DC 20005-3807
    Telephone:  (202) 626-3600
    Facsimile:  (202) 639-9355
    claire.delelle@whitecase.com

    *Attorneys for Plaintiff*
    *V5 TECHNOLOGIES, LLC, d/b/a COBALT DATA CENTERS*

# DEMAND FOR JURY TRIAL

Cobalt demands a trial by jury for all issues triable by jury.

Dated:  September 7, 2017

By: _____

    I. Scott Bogatz
    Nevada Bar No. 3367
    Kerry E. Kleiman
    Nevada Bar No. 14071
    REID RUBINSTEIN & BOGATZ
    Bank of America Plaza
    300 South 4th Street, Suite 830
    Las Vegas, NV 89101
    Telephone:  (702) 776-7000
    Facsimile:  (702) 776-7900
    sbogatz@rrblf.com
    kkleiman@rrblf.com

    Bryan A. Merryman (*will comply with LR IA 11-2 within 5 days*)
    Catherine Simonsen (*will comply with LR IA 11-2 within 5 days*)
    WHITE & CASE LLP
    555 S. Flower Street, Suite 2700
    Los Angeles, CA  90071-2433
    Telephone:  (213) 620-7700
    Facsimile:  (213) 452-2329
    bmerryman@whitecase.com
    catherine.simonsen@whitecase.com

    Claire DeLelle (*will comply with LR IA 11-2 within 5 days*)
    WHITE & CASE LLP
    701 Thirteenth Street, NW
    Washington, DC 20005-3807
    Telephone:  (202) 626-3600
    Facsimile:  (202) 639-9355
    claire.delelle@whitecase.com

    *Attorneys for Plaintiff*
    *V5 TECHNOLOGIES, LLC, d/b/a COBALT DATA CENTERS*

REID RUBINSTEIN & BOGATZ
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
(702) 776-7000 FAX: (702) 776-7900