1   MARK E. FERRARIO
    Nevada Bar No. 1625
2   CHRISTOPHER R. MILTENBERGER
    Nevada Bar No. 10153
3   GREENBERG TRAURIG, LLP
    3773 Howard Hughes Parkway
4   Suite 400 North
    Las Vegas, Nevada 89169
5   Telephone: (702) 792-3773
    Facsimile: (702) 792-9002
6   Email: ferrariom@gtlaw.com
           miltenbergerc@gtlaw.com
7
    *Counsel for Defendants Switch, Ltd.,*
8   *Switch Business Solutions, LLC*
    *Switch Communications Group, LLC and*
9   *Switch, Inc.*

10                  **UNITED STATES DISTRICT COURT**

11                       **DISTRICT OF NEVADA**

12

13  V5 TECHNOLOGIES, LLC, d/b/a            Case No. 2:17-CV-02349-KJD-NJK
    COBALT DATA CENTERS
14                                         **DEFENDANTS' MOTION TO DISMISS**
            Plaintiff,                     **COMPLAINT AND MEMORANDUM**
15                                         **OF POINTS AND AUTHORITIES IN**
    v.                                     **SUPPORT THEREOF**
16
    SWITCH, LTD., a Nevada limited
17  company; SWITCH BUSINESS
    SOLUTIONS, LLC, a Nevada limited
18  liability company; SWITCH             **ORAL ARGUMENT REQUESTED**
    COMMUNICATIONS GROUP, LLC, a
19  Nevada limited liability company;
    SWITCH, INC., a Nevada corporation,
20
            Defendants.
21

22

23          Defendants, by and through their undersigned counsel, hereby move to dismiss Plaintiff's

24  Complaint pursuant to Federal Rule Civil Procedure 12(b)(6) and LR 7-2.  As stated in the

25  following Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss

26  Complaint, the Complaint should be dismissed for failure to state a claim upon which relief can

27

28                              Page 1 of 24
    *LV 420999698v1*

*GREENBERG TRAURIG, LLP*
*3773 Howard Hughes Parkway, Suite 400 North*
*Las Vegas, Nevada 89169*
*Telephone: (702) 792-3773*
*Facsimile: (702) 792-9002*

be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## MEMORANDUM OF POINTS AND AUTHORITIES

### CASE OVERVIEW

Plaintiff's Complaint fails to state a claim upon which relief can be granted and is meritless.[1] This case is simply an attempt by Plaintiff to blame a national competitor for Plaintiff's own business failings. After admitting to unlawfully misappropriating Defendants' intellectual property, and then failing to effectively compete in the open market, Plaintiff now attempts to compensate for its poor judgment and failures by competing with Switch in the courtroom. To do so, Plaintiff intertwines a loosely connected string of allegations, assumptions and legal conclusions to attack Switch; a world-recognized leader in data center services. Even if the allegations raised in Plaintiff's Complaint were true, it would simply highlight Switch's legitimate competition and Plaintiff's bad business acumen; not anticompetitive conduct.

As explained below, there are several reasons why Plaintiff's Complaint *must* be dismissed. First, Plaintiff expressly released all the claims at issue in this matter when Plaintiff signed the 2013 settlement agreement referenced in the Complaint (the "Settlement Agreement") (a copy of which is attached as **Exhibit A**) wherein Plaintiff admitted to misappropriating Switch's technology. Second, Plaintiff fails to provide any specific, plausible factual basis to support its allegations. Third, Plaintiff fails to properly plead the key elements required to sustain the antitrust claims raised in the Complaint.

### PROCEDURAL HISTORY

Plaintiff filed its Complaint on September 7, 2017. The parties stipulated that Switch had until October 16, 2017 to respond to the Complaint. Shortly hereafter, Switch will file a motion

---

[1] Plaintiff's founder and CEO, Michael Ballard, admitted in 2013 in a public settlement agreement that he breached his agreements with Switch; misappropriated Switch's proprietary intellectual property and retained Switch's confidential information; and copied Switch's intellectual property and confidential information to mimic Switch's designs and unlawfully compete. V5 Technologies, Cobalt, and Mr. Ballard each publicly acknowledged the validity of that earlier lawsuit filed by Switch to protect its intellectual property and agreed to pay a settlement for the breach of contract and misappropriation.

LV 420999698v1

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1  to stay discovery seeking to avoid unnecessary costs and expense in conducting discovery in

2  light of the arguments set forth in this Motion to Dismiss.

3                                         **LEGAL STANDARD**

4          **A.  General Standards for Motions to Dismiss.**

5          When evaluating a Rule 12(b)(6) motion, the Court must accept as true all

6  allegations of material fact that are in the complaint and must construe all inferences in

7  the light most favorable to the non-moving party. *See Moyo v. Gomez,* 32 F.3d 1382, 1384

8  (9th Cir. 1994). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a

9  "short and plain statement of the claim showing that the pleader is entitled to relief."

10  Fed. R. Civ. P. 8(a)(2). Dismissal of a complaint for failure to state a claim is not proper

11  where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its

12  face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929

13  (2007). "A claim has facial plausibility when the plaintiff pleads factual content that

14  allows the court to draw the reasonable inference that the defendant is liable for the

15  misconduct alleged. The plausibility standard is not akin to a 'probability requirement,'

16  but it asks for more than a sheer possibility that a defendant has acted unlawfully."

17  *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting

18  *Twombly,* 550 U.S. at 556). As such, "[w]hen faced with two possible explanations, only

19  one of which  can  be true and only one of which results in liability, plaintiffs cannot offer

20  allegations that are 'merely consistent with' their favored explanation but are also

21  consistent   with the alternative explanation." *In re Century Aluminum Co. Securities*

22  *Litigation,* 729 F.3d 1104, 1108 (9th Cir. 2013).

23          That said, and most importantly, Plaintiff's pleading in an antitrust case must meet a

24  higher standard.  It cannot be cursory.  It must contain detailed factual allegations, pled with

25  specificity. "Although for the purposes of a motion to dismiss [the Court] must take all of

26  the factual allegations in the complaint as true, [it] '[is] not bound to accept as true a legal

27  conclusion couched as a factual allegation.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550

28

**GREENBERG TRAURIG, LLP**
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

*LV 420999698v1*

U.S. at 555). Moreover, the Supreme Court has cautioned against permitting antitrust cases to proceed to discovery without a plaintiff demonstrating "plausibility" because of the high cost of discovery in antitrust cases in particular. *See Twombly,* 550 U.S. at 558 ("Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Id.* (internal citation omitted)).

### B.  Standards for Dismissing a Sherman Act Section 2 Claim.

"It is settled law that [a § 2 monopolization] offense requires, [1] the possession of monopoly power in the relevant market, [and 2] the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). A plaintiff pursuing a monopolization claim must show (1) "'the possession of monopoly power in the relevant market'" and (2) the willful "'acquisition or perpetuation of this power by illegitimate "predatory" practices.'" *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.,* 611 F.3d 495, 506 (9th Cir. 2010) (quoting *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 541–42 (9th Cir. 1991)); *see also Trinko,* 540 U.S. at 407, 124 S.Ct. 872 (explaining that "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*").

To establish an attempted monopolization claim, "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). "Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily

*LV 420999698v1*

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

restrictive way." *Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 894 (9th Cir. 2008).

Specific intent to monopolize "may be inferred from ... 'conduct forming the basis for a substantial claim of restraint of trade'" or "'conduct that is clearly threatening to competition or clearly exclusionary,'" but the "focus must be on proof of unfair or predatory conduct." *Drinkwine,* 780 F.2d at 740 (quoting *William Inglis & Sons  Baking Co. v. ITT Cont'l Baking Co.,* 668 F.2d 1014, 1029 n. 11 (9th Cir.1981)). Unlawful conduct "cannot be inferred from conduct alone unless that conduct is predatory or anticompetitive and forms the basis for a substantial claim of restraint of trade." *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 544 (9th Cir.1983), *overruled on other grounds by Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034 (9th Cir.1987).

More generally, the Supreme Court has cautioned that §2 liability should not be "undu[ly] expan[ded]" since "[m]istaken inferences and resulting false condemnations 'are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'" Trinko, 540 U.S. at 414, 124 S.Ct. 872 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Antitrust laws exist to promote competition, including lawful competition by monopolists. *See Alaska Airlines, Inc.,* 948 F.2d at 547.

## FACTUAL BACKGROUND

Data centers are the heart of the internet.  As technology has become increasingly integral to our daily lives, the need for data centers (particularly, efficient and reliable data centers) has increased, exponentially. Central to Switch's innovative technologies, and competitive edge, are Rob Roy's patented and patent pending designs.  This technology has allowed Switch to build and operate their data centers more reliably and at dramatically more cost-efficient margins than their competitors. Because of Switch's novel technologies, various groups have applauded Switch's data centers as superior to those built by Apple, Google, Facebook, Amazon, Microsoft,

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

*LV 420999698v1*

DuPont Fabors, Digital Realty, the NSA, and Equinix, as well as other technology giants.[2]

Because Switch's potential customers often also design their own data centers, Switch's offerings must compete with multi-user data centers ("colocation data centers") as well as the single user, in-house offerings, of its potential customers ("enterprise data centers"). As such, Switch actively competes in a market comprised of colocation data centers and enterprise data centers throughout the United States, Canada, Europe and South America. *See* Kelly Morgan, Stefanie Williams & Mark Fontecchio, <u>Switch hopes to light up investors as it prepares for an IPO</u>, 451 Research, Sept. 11, 2017.[3]

Further, serving geographically diverse clients is industry standard. Colocation data centers serve customers around the world because they rarely serve a customer's entire need. Rather, customers deploy their computer servers in *multiple* locations (to avoid a single point of failure or putting all eggs being in one basket). In other words, a colocation data center's potential clientele is in no way limited to the city or even the state in which it is located. It is the opposite. Data centers offer geographic diversity by serving clients from all over the world.

The cost of establishing a competitive data center requires significant capital investment, time, and intellectual property. *See* Compl., at ¶ 35. Aiding its competitive edge, Switch offers technology incorporating over 350 patented and patent pending claims. Switch's unique and patented offerings have allowed Switch to attract clients from across the world with over 90% of Switch's customer revenue being headquartered outside Nevada.[4]

---

[2] *See* http://www.greenpeace.org/international/en/publications/Campaign-reports/Climate-Reports/clicking-clean-2017/ (accessed Oct. 16, 2017); *see also* http://datacenterfrontier.com/top-10-cloud-campuses/ (accessed Oct. 16, 2017).

[3] The Court may take judicial notice of documents in accordance with Federal Rule of Evidence 201(b) without converting a motion to dismiss into a motion for summary judgment. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Because the facts in the report by 451 Research are free of reasonable dispute, the Court may take judicial notice and consider them as part of Defendants' Motion to Dismiss. *See, e.g.*, *In Re American Apparel, Inc.*, 855 F.Supp.2d 1043, 1060–65 (C.D. Cal. 2012).

[4] *See* Switch, Inc.'s Form S-1, dated Sept. 8, 2017, https://www.sec.gov/Archives/edgar/data/1710583/000119312517280759/0001193125-17-280759-index.htm (accessed Oct. 16, 2017).

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

LV 420999698v1

1    To protect its trade secrets and pending patents from the prying eyes of competitors,

2    Switch requires all employees, visitors, vendors, and customers, to sign confidentiality

3    agreements. When Switch discovered in 2011 that Switch's former Chief Financial Officer,

4    Michael Ballard, had misappropriated Switch's technology and was hiring Switch's former

5    vendors to compete with Switch as "Cobalt", Switch employed heightened exclusivity provisions

6    to further protect itself. *See id*. at ¶ 45.  This was particularly justified as Michael Ballard and

7    Plaintiff eventually admitted to misappropriating and using Switch's confidential information to

8    compete with Switch. *See id*. at ¶ 87.

9    Over the years, multiple competitors have entered the Las Vegas data center market, as

10   well as in other data centers across the country. *See id*. at ¶¶ 117, 121–22. Several of these

11   entities remain in the market and compete with Switch. Other entities, due to inferior product,

12   lack of capital or business acumen, have failed.  But, Las Vegas is but a small portion of the data

13   center market.

14   The data center market spans the country and the world, is fiercely competitive, and

15   requires constant investment, marketing, sales, and innovation.  Non-priced competition as well

16   as securing and retaining key vendors is required to maintain clients. Additionally, the service

17   offered is mission critical and requires advanced physical and digital security. Accordingly,

18   contractual confidentiality and exclusivity provisions and non-compete agreements are required

19   to protect trade secrets, protect customers, and continue to obtain efficiencies in order to keep

20   costs down.

21   Switch eventually sued Defendants, in 2011, for breach of contract, and theft of trade

22   secrets, among other claims.  Compl., ¶ 34.  During the course of litigation, Plaintiff complained

23   Switch was being monopolistic and engaging in antitrust activities as justification for Plaintiff's

24   unlawful actions. When Plaintiff finally and publicly admitted to engaging in unlawful conduct,

25   Plaintiff released all further claims and causes of action, including antitrust claims. *See* Ex. A,

26   Settlement Agreement, § 4.

27

28

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

*LV 420999698v1*

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1    Despite these realities, Plaintiff's Complaint ignores the Settlement Agreement, the

2  national and global nature of the market and confuses active competition with anticompetitive

3  conduct.  It also blames its failure on Switch, without focusing on its internal issues that caused it

4  to fail in the market.  Switch did not cause Plaintiff to fail, and Switch did not injure the market.

5  Accordingly, Plaintiff's claims should be dismissed.

6                                    **ARGUMENT AND AUTHORITIES**

7  **I.    PLAINTIFF HAS ALREADY EXPRESSLY RELEASED AND WAIVED ALL CLAIMS.**

8    The Court should dismiss Plaintiff's Complaint in its entirety because Plaintiff previously

9  waived and released all of the claims set forth therein. A release and waiver is recognized under

10  Nevada law where there is in an intentional relinquishment of a known right. *See Nevada Yellow*

11  *Cab Corp. v. Eighth Jud. Dist. Ct.*, 123 Nev. 44, 152 P.3d 737 (2007).  This Court may look to

12  and rely upon the Settlement Agreement at the motion to dismiss stage without converting this

13  Motion into one for summary judgment. *See Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir.

14  1996); *Mitchell v. Cox*, No. 2:12-CV-2082-RFB-CWH, 2015 WL 871228, at *4 (D. Nev. Mar. 2,

15  2015) (slip op.) (considering a release contained in a prior settlement agreement in connection

16  with a motion to dismiss).  This is because at this stage of the proceedings, the Court is permitted

17  to consider documents "'properly submitted as part of the complaint,' meaning documents either

18  attached to the complaint or upon which the plaintiff's complaint necessarily relies and for which

19  authenticity is not in question."  *Mitchell*, 2015 WL 871228 at *4, quoting *Lee v. City of Los*

20  *Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

21    Here, the Complaint should be dismissed because Plaintiff released Switch and the

22  remaining Defendants from any and all claims and damages relating to unfair competition,

23  antitrust, and tortious interference. Ex. A, Settlement Agreement, § 4.  The release at issue in the

24  Settlement Agreement is clear and unambiguous and was negotiated by Plaintiff's current

25  counsel. It was relied upon by Switch. The instant Complaint is predicated on and related to the

26  facts giving rise to the earlier lawsuit, which is demonstrated by Plaintiff's own allegations

27

28

*LV 420999698v1*

incorporating the prior lawsuit and underlying facts therein. *See, e.g.*, Compl., ¶¶ 32-35. Plaintiff cannot now (over four years later) revive these released claims as a basis for this case.

As Plaintiff acknowledges in its Complaint, Plaintiff entered into the Settlement Agreement with Switch in March 2013. Compl., ¶ 34. The Settlement Agreement contained a release pertaining to a variety of claims that were discussed and could have been asserted in that litigation as an affirmative defense or justification, and/or were otherwise related to the facts related to that litigation. *See* Ex. A, Settlement Agreement, § 4. Specifically, Section 4, entitled "Release of all Claims," provided, in relevant part, that David Michael Ballard, Plaintiff's founder and former president:

> together with his past, present and future employees, agents, attorneys, partners, affiliates, representatives, ***affiliated companies***, heirs, successor and assigns and the Ballard Affiliated Persons, hereby release any and all claims, causes of action, disputes and damages, including, but not limited to claims of abuse of process, ***unfair competition***, ***antitrust***, defamation, or ***tortious interference*** against Switch Related Persons, stemming from the actions of Switch or any Switch Related Persons, and arising out of the facts related to the Lawsuit. . . .

*Id.* (emphasis added).

Moreover, the Settlement Agreement expressly released any unknown claims, and expressly waived Cal. Civil Code Sect. 1542:

> This release shall remain in full effect notwithstanding the discovery or existence of any such additional or different facts. Ballard intends this release to be effective notwithstanding statutes or laws similar to Cal. Civil Code. Sect. 1542, which reads: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing of the release, which if known by him or her must have materially affected his or her settlement with the debtor." Ballard hereby waives the provisions of that statute and any substantially similar laws.

Plaintiff was a negotiating party and signatory to the Settlement Agreement and a party expressly covered by this waiver and release. *Id.* at p. 4. This release was thoroughly negotiated and reviewed by attorneys representing both parties (namely, John Ritter, and Plaintiff's counsel). Despite this release specifically addressing unfair competition, antitrust, and tortious interference claims, Plaintiff chose to file the instant lawsuit asserting these same claims for unfair competition, antitrust and tortious interference in direct breach of this release in the

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

*LV 420999698v1*

1   Settlement Agreement.

2       Based on the plain, unambiguous language of the release contained in the Settlement

3   Agreement, Plaintiff is barred from asserting the claims it seeks to raise in this action.  As a

4   result, the Complaint should be dismissed in its entirety.

5   **II.    CLAIMS 1-3 MUST BE DISMISSED FOR FAILURE TO COMPLY WITH FEDERAL
        PLEADING REQUIREMENTS.**

6

7       **A.    Plaintiff Has Failed To Plead With Specificity As Required By Supreme
             Court Precedent.**

8       An antitrust complaint must set forth specific facts to demonstrate that the stated claim is

9   plausible on its face. *See Twombly*, 550 U.S. at 570. Otherwise, the complaint must be dismissed.

10  Here, Plaintiff's Complaint lacks the specificity required to proceed beyond a motion to dismiss

11  because Plaintiff's Complaint does not demonstrate unlawful conduct. Plaintiff regularly repeats

12  the allegation that Switch has engaged in anticompetitive conduct, yet Plaintiff fails to give any

13  specific instances or details.  Rather, it draws disconnected assertions as conclusions and tries to

14  pass those conclusions off as facts.

15      The Complaint is fully comprised of insufficient conclusory statements.  For example, in

16  paragraph 38, Plaintiff states that it did not achieve its annual revenue projections because of

17  "Switch's unlawful, anticompetitive practices."  Plaintiff offers no support for the reasonableness

18  of its revenue projections, does not address other factors that could have impacted its ability to

19  reach its revenue projections (such as lack of business acumen or inferior product offerings), and

20  does not point to a single anticompetitive act by Switch that cost it the business of a specific

21  customer.

22      Similarly, in paragraph 46, Plaintiff alleges that "[t]here was no pro-competitive

23  justification for this type of exclusive-dealing arrangement Switch embedded in its [Acceptable

24  Use Policy]."  This statement is not supported by any facts, and is belied by case law, and the

25  Settlement Agreement.  Courts have held for years that exclusive dealing arrangements can be

26  procompetitive because they can help increase efficiencies, lower costs, and fight against free

27  riders in the market, like Plaintiff. *See, e.g.*, *Omega Envtl., Inc. v. Gilbarco, Inc.,* 127 F.3d 1157,

28

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

LV 420999698v1

1162 (9th Cir. 1997).  Exclusive dealings are particularly justified when Switch was aware that the Defendant's founder and once-CEO, Michael Ballard, admitted to misappropriating Switch's intellectual property and confidential information to compete with Switch.  This alone justifies an exclusive dealing arrangement, not to anti-competitively block competitors, but to protect against the acts of an individual who had admittedly breached its agreements and otherwise misappropriated Switch's confidential, proprietary information.

Plaintiff also refers to "other prospective customers" and "important partnerships" in paragraphs 59, 61, and 73, without giving details of who the customers were and who the important partners were. Moreover, not a *single* exhibit is attached to support the allegations.  All alleged quotes, facts or conclusions are baseless.  Absent specifics, Plaintiff's allegations do not rise to the level of "plausible," and therefore do not meet the pleading standards.  *Twombly*, 550 U.S. at 570.

### B. Alleged "Facts" Plaintiff Has Introduced are Protected as Prior Settlement Discussions.

Plaintiff's claims are impermissibly based on unsupported and false statements made by Rob Roy, Defendants' Chief Executive Officer.  Mr. Roy's interactions with Plaintiff were very limited, the most substantive interactions occurring during confidential settlement discussions.  Alleged statements made during the course of settlement negotiations are inadmissible and cannot serve as the basis to state an affirmative claim.  *See Wilkinson v. Clark Cty. Sch. Dist.*, No. 2:10-CV-1561-JCM-RJJ, 2010 WL 5141749, *2 (D. Nev. Dec. 13, 2010) (dismissing a retaliation claim predicated on statements made during confidential settlement discussions).  Similarly, it is necessary to strike such inadmissible allegations from complaints at the motion to dismiss stage and not consider such illicit allegations in considering a motion to dismiss. *See Network of Construction and Dev. v. Bessamaire Sales, LLC*, No. CV-11-269-RMP, 2012 WL 1565313, *2 (E.D. Wash. May 2, 2012) (striking allegations from complaint that were inadmissible under Federal Rule of Civil Procedure 408 and not considering them on a motion to dismiss); *Blodgett v. Allstate Ins. Co*, No. 2:11-cv-02408- MCE-KJN, 2012 WL 2377031, *6

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

*LV 420999698v1*

(E.D. Cal. June 22, 2012) (same); *see also Ogundele v. Girl Scouts-Arizona Cactus Pine Council, Inc.*, No. CV-10-1013-PHX-GMS, 2011 WL 1770784, at *9 (D. Ariz. May 10, 2011) (striking exhibits to complaint submitted in violation of Fed. R. Evid. 408 deeming them "inadmissible" and "immaterial").

Federal Rule of Evidence 408 explicitly deems inadmissible any "statement made during compromise negotiations" offered to prove the validity of a party's claim, except in narrow circumstances inapplicable here. Fed. R. Evid. 408(a)(2). Nevada's equivalent statute, Nevada Revised Statute § 48.105, provides substantially similar protections. *See* Nev. Rev. Stat. § 48.105(1)(b) ("Evidence of conduct or statements made in compromise negotiations is likewise not admissible.")

Here, Plaintiff's claims asserting antitrust conduct and intentional interference should be dismissed because they are predicated upon alleged (and false) statements Mr. Roy made to Plaintiff during settlement negotiations of the earlier lawsuit. *See e.g.,* Compl., ¶ 43. Plaintiff alleges that Mr. Roy made these statements "openly" to them. *Id.*[5] Yet, Plaintiff offers no context or foundation as to when or where these statements were made.  As Mr. Roy's interactions with Plaintiff were limited predominantly to confidential settlement discussions, where Plaintiff admitted to the unlawful conduct and ultimately publicly settled, reliance on statements during such discussions is impermissible.[6]  Therefore, the quoted material shared during a settlement conference should be stricken from the Complaint under Fed. R. Civ. P. 12(f). As such information was improperly relied upon in the Complaint to support its claims, this further supports dismissal of the Complaint in its entirety.

---

[5] These purported representations are also protected by nondisclosure and confidentiality agreement entered into between the parties in furtherance of those settlement discussions.

[6] As reflected by the Complaint, Plaintiff uses baseless or distorted factual allegations concerning statements purportedly made during settlement discussions to demonstrate its misguided belief that "Switch is trying to be a monopoly and would use exclusionary methods to put the competition out of business." *Id.* Such allegations are made in the Complaint for no other purpose than to engage in *ad hominin* attacks and support Plaintiff's position on liability. While Defendants contest the truthfulness of the statements attributed to Mr. Roy in Plaintiff's Complaint, those statements cannot be used to support any claim for relief as they are inadmissible and should be stricken. *See Wilkinson,* 2010 WL 5141749 at *2; *Bessamaire Sales, LLC,* 2012 WL 1565313 at *2.

*LV 420999698v1*

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

**C.      Plaintiff Has Not Properly Alleged Predatory Pricing.**

To state a predatory pricing claim under the Sherman Act, a plaintiff must allege that (1) "the prices complained of are below an appropriate measure of [defendant's] costs" and (2) there is "a dangerous probability of [defendant] recouping its investment in below-cost prices" by raising prices after it has obtained monopoly power. *Brooke Grp.*, 509 U.S. at 222, 224. Further, "[p]rice reductions that constitute a legitimate, competitive response to market conditions are entirely proper." *Inglis v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1031 (9th Cir. 1981). In the Ninth Circuit, prices are measured against average variable cost. *Cascade Health Solutions,* 515 F.3d at 909–10. Variable costs "change with the amount of output," *id.* at 909, and average variable cost is "the sum of all variable costs divided by output," *Rebel Oil Co. v. Atl. Richfield Co.,* 146 F.3d 1088, 1092– 93 (9th Cir.1998). In short, to plead below-cost pricing, Plaintiff must plead both prices *and* costs.

Here, Plaintiff fails because Plaintiff does not allege either, let alone comparative pricing. Without a comparison, Plaintiff is left to simply allege conclusory statements that Switch's prices were below "cost". Plaintiff alleges only that "Switch engaged in predatory-pricing tactics to bar [Plaintiff] and other competitors from obtaining business". Complaint at ¶ 74. Plaintiff does not allege *any* facts regarding the costs incurred by Switch *See Vollrath Co. v. Sammi Corp.*, No. CV-85-820-MRP, 1989 U.S. Dist. LEXIS 16902, at *33- 35 (C.D. Cal. Dec. 20, 1989), or even Plaintiff's own prices. Nor does it explain why those costs are an appropriate measure of cost or allege that prices for data center services are below that appropriate measure.

Instead of actually meeting the proper pleading standards, Plaintiff merely insists (without support) that Switch has 85% of the (myopically) defined relevant market.[7] But

---

[7] As explained in Section III, in a properly defined market, Switch has much less than 50% of the relevant market, which as a matter of law is too low to engage in monopolistic conduct such as predatory pricing. *See, e.g., Rebel Oil Co.*, 51 F.3d at 1438 (acknowledging that "numerous cases hold that a market share of less than 50 percent is presumptively insufficient to establish market power"). Further, Switch's low market share effectively prevents Plaintiff from succeeding on its exclusionary contracting claims. *See Omega*, 127 F.3d at 1162 (noting the concern of antitrust law is "[o]nly those arrangements whose probable effect is to foreclose competition in a substantial share

*LV 420999698v1*

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1   even this is not sufficient to withstand a motion to dismiss.  "A mere showing of substantial

2   or even dominant market share alone cannot establish market power sufficient to carry out a

3   predatory scheme." *Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l*

4   *Publs.*, 108 F.3d 1147, 1154 (9th Cir. 1997) ("The plaintiff must show that new rivals are

5   barred from entering the market and show that existing competitors lack the capacity to

6   expand their output to challenge the predator's high price."); *Rebel Oil*, 51 F.3d at 1441

7   (recognizing that if "rivals [are] idle [] and can quickly respond to any predator's attempt to

8   raise prices, the predator will suffer an immediate loss of market share to competitors").

9        While Plaintiff does state that high barriers to entry exist, these allegations are set

10  forth in a conclusory fashion, and do not support an argument that Switch could recoup any

11  losses suffered due to below cost pricing. *See Rheumatology Diagnostics Lab., Inc. v. Aetna,*

12  *Inc.*, No. 12-cv-05847, 2013 U.S. Dist. LEXIS 89208, at *43 (N.D. Cal. Jun. 25, 2013)

13  (dismissing predatory pricing claim because plaintiff failed to allege defendant would later

14  be able to raise prices above competitive levels); *Dial A Car*, 82 F.3d at 487–88.  Plaintiff

15  has not alleged with particularity that other competitors from within the properly defined

16  relevant market would *not* be able to police Switch's pricing.  Nor has Plaintiff alleged that

17  potential entrants would not be able to enter the market if Switch were to improperly and

18  artificially increase its prices.

19       Plaintiff does make a half-hearted attempt to set forth a specific example of Switch's

20  alleged predatory pricing.  However, this attempt fails.  On page 16 of its Complaint, ¶¶73-

21  75, Plaintiff details an instance where Switch lowered its prices to compete for business.

22  Without naming any price, Plaintiff assumes that the supposed lower price was below some

23  undefined measure of cost, but it alleges no facts to support this. Moreover, Plaintiff makes

24

25

26  of the line of commerce affected") (internal quotation marks omitted); *see also Masimo Corp. v. Tyco Health Care*

27  *Grp., L.P.*, No. CV 02-4770 MRP, 2006 WL 1236666, at *4 (C.D. Cal. Mar. 22, 2006) (noting foreclosure "must be
    substantial enough that competitors are truly 'frozen out of a market'") (quoting *Omega*, 127 F.3d at 1162).

28

*LV 420999698v1*

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1   no attempt to allege that Switch would soon raise its prices to anticompetitive levels to

2   recoup its losses that resulted from the discounted pricing.

3          Plaintiff's assertions at ¶ 77 fare no better.  Switch's alleged statement that it would

4   cut costs to compete with "the other guys" simply shows that Switch was willing to engage

5   in aggressive price competition; a benefit to the market. Switch's aggressive pricing was not

6   only lawful but also *pro*competitive as a matter of law.  *See Cascade Health Solutions,* 515

7   F.3d at 896 (observing that "benefits ... flow to consumers from discounted prices" and

8   that "price cutting is a practice the antitrust laws aim to promote").  Therefore, Plaintiff's

9   complaint falls far short of the pleading requirements necessary to set forth a valid claim for

10  predatory pricing.  As a result, any claims based on predatory pricing should be dismissed.

**D.   Plaintiff Fails to Properly Allege Exclusive Dealing Contracts in Violation of Either Section 1 or Section 2 of the Sherman Act.**

13          The main antitrust objection to exclusive dealing is its tendency to "foreclose" existing

14  competitors or new entrants from competition in the covered portion of the relevant market

15  during the term of the agreement. *See Roland Machinery Co. v. Dresser Industries, Inc.,* 749

16  F.2d 380, 393 (7th Cir.1984). There are "well-recognized economic benefits to exclusive dealing

17  arrangements, including the enhancement of interbrand competition." *Omega,* 127 F.3d at 1162.

18  Consequently, "an exclusive-dealing arrangement does not constitute a per se violation of section

19  1." *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,* 676 F.2d 1291, 1303-04 (9th

20  Cir.1982). Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1

21  only if its effect is to "foreclose competition in a substantial share of the line of commerce

22  affected." *Omega,* 127 F.3d at 1162 (quoting *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S.

23  320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)).  Similarly, an exclusive arrangement can only be

24  the basis for a Section 2 claim if the arrangement forecloses competition.

25          Here, Plaintiff's Complaint fails to properly plead the existence of improper exclusive

26  contracts because Plaintiff alleges in ¶¶ 60 and 61, that Switch's exclusive arrangements

27  interfered with Plaintiff's relationships with CenturyLink and SilverBack Migration

28

*LV 420999698v1*

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

Solutions. However, in both instances, Plaintiff admits that ultimately CenturyLink and SilverBack agreed to do business with it, regardless of the exclusive contracts they had with Switch. These instances cannot support any claim of foreclosure, and therefore do not support a violation of the Sherman Act.

Plaintiff also sets forth conclusory assumptions in paragraphs 64 through 67 without providing specific names of brokers who were prevented from working with Plaintiff due to Switch's contract terms. At best, Plaintiff alleges "Switch threatened at least one broker, who had previously worked for Cobalt, to the point where he was thereafter unwilling to work with Cobalt." Compl., ¶ 64. But Plaintiff does not name the broker, nor does Plaintiff assert that no other brokers were available or allege foreclosure of the market. Plaintiff's claim that Switch violated Sections 1 and 2 of the Sherman Act through its alleged exclusionary contracts and agreements fail.

Plaintiff's inability to articulate any foreclosure of the market due to Switch's exclusivity provisions in its contracts, coupled with Switch's actual market share, does not result in a plausible claim that Switch's contract terms violated either Section 1 or Section 2 of the Sherman Act. Moreover, Plaintiff fails to allege that Switch's contracts did not actually enhance inter-brand competition or increase efficiencies in the marketplace. In light of Plaintiff's pleading deficiencies, this claim should be dismissed.

## III.  PLAINTIFF'S ATTEMPT TO DEFINE THE RELEVANT GEOGRAPHIC MARKET IS FACIALLY FLAWED.

Even though the validity of the relevant market is often a factual issue, "a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1045 (9th Cir. 2010). The Ninth Circuit has articulated several principles to guide this determination, including that the relevant market must be defined by the product (as opposed to consumers of the product), and that it "must encompass the product at issue as well as all economic substitutes for that product." *Id.* "A geographic market is an area of

LV 420999698v1

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

effective competition ... where buyers can turn for alternate sources of supply." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484, 1490 (9th Cir.1991). A geographic market must "'correspond to the commercial realities' of the industry and be economically significant." *Id.* at 336–37, 82 S.Ct. 1502.  The relevant market is one "in which the seller operates, and to which the purchaser can practicably turn for suppliers." *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).  In identifying the relevant geographic market, "the threatened foreclosure of competition must be in relation to the market affected." *Tampa Elec.,* 366 U.S. at 327, 81 S.Ct. 1243.

The relevant geographic market is the "area of effective competition where buyers can turn for alternate sources of supply." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484, 1490 (9th Cir. 1991) (alteration omitted) (quoting *Oltz v. St. Peter's Cmty. Hosp.,* 861 F.2d 1440, 1446 (9th Cir. 1988)) (internal quotation marks omitted). Put differently, "a market is the group of sellers or producers who have the actual or potential ability to deprive each other of significant levels of business." *Rebel Oil Co.,* 51 F.3d at 1434 (quoting *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1374 (9th Cir. 1989)) (internal quotation marks omitted). The plaintiff has the burden of establishing the relevant geographic market. *See United States v. Conn. Nat'l Bank,* 418 U.S. 656, 669–70, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974).

Here, Switch operates and competes in multiple venues outside of Las Vegas, and hosts customers from around the country. In fact, Switch's top ten customers which represent more than 90% of Switch's annual revenue are all located *outside* the state of Nevada. Of Switch's top 30 customers representing more than 95% of Switch's annual revenue only *two* are located in Nevada.[8]  Limiting the geographic market to just Las Vegas and the customers that may be based in Las Vegas is artificial and contradicts Plaintiff's own description of the services it provides and the types of customers it, Switch, and others vie for.[9]

[8] Motley Fool, "Switch IPO: What Investors Need to Know." October 2, 2017.
[9] *See* https://wiredre.com/las-vegas-data-center-market-update-04-2013/ (accessed Oct. 16, 2017).

LV 420999698v1

As Plaintiff admits, Compl. at ¶¶ 21–22, possible clients can exist in many locations outside of Las Vegas. Their data can be stored anywhere, as long as it can be accessed on demand. While Plaintiff may have focused its marketing efforts on just potential clients located in Las Vegas, that does not mean that this is the proper geographic market. Rather, the focus needs to be on the locations around the U.S., or the world, where competitors have operations, and whether those competitors are out attempting to secure contracts from the same types of clients as Switch or as Plaintiff. Plaintiff attempts to define the market based upon where it chose to market its services. This is incorrect. The focus must be on the geographic location of all competitors who either did or could have competed with Plaintiff for business.

Plaintiff also overlooks the dynamic nature of the market. Switch competes with enterprise data centers and colocation data centers.  Potential customers have their own data centers and can look to their own teams and their own offerings as an alternative to any colocation data center.  It is facially flawed to suggest Las Vegas is a distinct market.

Because Plaintiff has failed to define the relevant market in line with Ninth Circuit precedent, its geographic market is flawed on its face and cannot form the basis of any antitrust claim. Further, because Plaintiff has not properly alleged the geographic market, Plaintiff's allegation of Switch's market power, and alleged market share of 85%, are incorrect as a matter of law.  In determining whether a firm possesses market power, "the first step in a court's analysis must be a definition of the relevant markets." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 268 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Without a definition of the relevant market, there is no way to measure a company's ability to act as a monopolist. *Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965).

Here, Plaintiff alleges that Switch has an 85% share of the facially improper market that Plaintiff has set forth. Because Plaintiff's market is facially flawed, the allegation of an 85% market share is not plausible and should be disregarded. Without a proper allegation of market

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

*LV 420999698v1*

power or market share, Plaintiff's assertion of monopolization and attempted monopolization fail.

## IV.   PLAINTIFF'S COMPLAINT DETAILS AGGRESSIVE COMPETITION AND DOES NOT ESTABLISH ANY INJURY TO COMPETITION.

The antitrust laws "were enacted for 'the protection of competition not competitors.'" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). As such, antitrust plaintiffs must allege injury to competition. *See Brantley v. Nbc Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) ("In order to plead injury to competition . . . claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably."). Also "injuries to rivals are byproducts of vigorous competition" of the kind and quality that the antitrust laws seek to nurture. *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1338 (7th Cir. 1986). Tougher competition entails steeper stakes for everyone involved. Indeed, "[t]he firm that slashes costs the most captures the greatest sales and inflicts the greatest injury. The deeper the injury to rivals, the greater the potential benefit" to competition and consumers. *Id.*

The Sherman Act does not punish a competitor for developing a superior product, *see United States v. Syufy Ent.*, 903 F.2d 659, 668-69 (9th Cir. 1990) ("'growth or development as a consequence of a superior product, business acumen, or historic accident'" is "off limits" from the antitrust laws) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)). Here, the choice of customers, such as the choice allegedly made by DARPA, Compl. ¶ 83, reflect customer choice.  Absent specific facts to the contrary, the actions regarding customers like DARPA cannot be the basis for an antitrust claim.

It is clear, that Plaintiff expected Switch to suddenly cease competing, and change its contract terms once Plaintiff entered the market. Plaintiff wanted to be elevated to Switch's market stature without actually earning this stature or the customer base. Plaintiff is not entitled to such a free-riding windfall. *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

LV 420999698v1

1555, 1572-73 (11th Cir. 1991). That "is not a function of the antitrust laws": they "are not intended to support artificially firms that cannot effectively compete on their own." *Id.* Nor do the antitrust laws condemn "one 'who merely by superior skill and intelligence . . . got the whole business because nobody could do it as well.'" *Cal. Com. Prods., Inc. v. Int'l Business Machines Corp.*, 613 F.2d 727, 735 n.6 (9th Cir. 1979). Lastly, Plaintiff's Complaint does not identify any market injury arising from Switch's competition.

Plaintiff does not allege a shortage of services to customers, a lack of innovation, or an inability for other competitors to compete in the market due to Switch's actions. Therefore, Plaintiff has not alleged injury to competition, so Plaintiff's claims fail and should be dismissed.

## V.       PLAINTIFF DOES NOT ESTABLISH ANTITRUST INJURY.

Plaintiff does not allege *any* antitrust injury. "It is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers." *Am. Ad Management, Inc.,* 190 F.3d at 1055. There are four requirements for antitrust injury: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Id.* "[I]t is appropriate to vet a plaintiff's ability to establish antitrust injury at the pleading stage, given that a plaintiff's ability to establish antitrust injury depends less on the plaintiffs' proof than on its underlying theory of injury." *Korea Kumho Petrochemical v. Flexsys America LP*, 2007 WL 2318906, at *2 n.1 (N.D. Cal. 2007); *see also Brantley*, 675 F.3d at 1199 ("Plaintiffs must plead 'antitrust injury' . . . in addition to, rather than in lieu of, injury to competition.")

Here, as previously stated, Plaintiff's Complaint should be dismissed because it fails to allege any unlawful conduct. *See Am. Ad Management.,* 190 F.3d at 1055 ("Plaintiffs sometimes forget that the antitrust injury analysis must begin with the identification of the defendant's specific unlawful conduct."). And because "[h]arm to a competitor . . . without harm either to competition or consumer welfare, is not sufficient to establish antitrust injury," Plaintiff has not

LV 420999698v1

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

alleged antitrust injury. *POURfect Prod. v. Kitchen Aid*, 2010 WL 1769413, at *5 (D. Ariz. 2010).

Moreover, the Complaint does not allege an injury of the type the antitrust laws were intended to prevent. *See Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931, at *13 (N.D. Cal. 2009) (noting that "[t]he antitrust laws are intended to prevent harm to competition manifested as higher prices, lower output, or decreased quality in the products within a defined market."). In fact, Plaintiff's Complaint is void of any allegation or fact that it has been harmed by any action deemed unlawful by the antitrust laws. Rather, Plaintiff notes that Switch actually *lowered* its prices to compete with Plaintiff. Compl., ¶ 94. This is competition at work. The claim should be dismissed.

## VI.   PLAINTIFF'S FOURTH, FIFTH AND SIXTH CLAIMS FOR RELIEF FOR VIOLATION OF NEV. REV. STAT. § 598A.060.

With respect to Plaintiff's state law claims for violation of Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598.060, each of those claims fail for the same reasons that the federal claims fail. The Nevada Unfair Trade Practices Act expressly notes that "provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes." Nev. Rev. Stat. § 598A.050. The Ninth Circuit has specifically found that claims under this statute are thus subject to the same pleading and proof requirements as set forth in federal law under the Sherman and Clayton Acts. *See Boulware*, 960 F.2d at 800–01.

Nevada courts have also found that that a plaintiff asserting claims for unfair trade practices under the Nevada Unfair Trade Practices Act are required to plead factual allegations demonstrating "how" the defendant's conduct constituted "anticompetitive behavior." *Jafbros, Inc. v. GEICO Indem. Co.*, 127 Nev. 1148, 2011 WL 2852304, at * 2 (Nev. 2011) (unpublished disposition). Echoing the *Iqbal* and *Twombly* standards, the Court is not required to accept as true conclusory allegations in such a situation. *Id.*, citing *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004). As a result, Plaintiff's Fourth, Fifth and Sixth Claims for Relief, all of which are predicated on alleged violations of Nev. Rev. Stat. § 598A.060, fail for the very

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1    same reasons set forth above with respect to Plaintiff's First, Second and Third Claims for Relief

2    under the Sherman and Clayton Acts.

3    **VII.   PLAINTIFF'S SEVENTH AND EIGHTH CLAIMS FOR RELIEF FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.**

4

5          To plead a claim for intentional interference with contractual relations, Plaintiff must

6    plead facts demonstrating: (1) a valid and existing contract; (2) Defendants' knowledge of the

7    contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4)

8    actual disruption of the contract; and (5) resulting damages. *Sutherland v. Gross*, 105 Nev. 192,

9    196, 772 P.2d 1287, 1290 (1989); *Paul Steelman Limited v. HKS, Inc.*, No. 2:05-CV-1330-BES-

10   RJJ, 2007 WL 295610 at *2 (D. Nev. Jan. 26, 2007).

11         Similarly, to plead a claim for intentional interference with prospective economic

12   advantage, Plaintiff was required to plead facts demonstrating: (1) a prospective contractual

13   relationship exists or existed between the Plaintiff and a third party; (2) defendants' knowledge

14   of this prospective relationship; (3) the intent to harm the plaintiff by preventing the relationship;

15   (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff

16   as a result of the defendants' conduct.   *Consolidated Generator-Nevada, Inc. v. Cummins*

17   *Engine, Co. Inc.*, 114 Nev. 1304,1311, 971 P. 2d 1251, 1255 (1998); *Las Vegas-Tonopah-Reno*

18   *Stage Line v. Gray Line Tours of So. Nev.*, 106 Nev. 283, 287 (1990).

19         A plaintiff is required to plead specific facts demonstrating actual damages arising from

20   defendants' conduct to support such a claim by holding that mere conclusory allegations of harm

21   do not suffice. *See Echevarria v. Echevarria*, 2015 WL 7431757, at *1 (Nev. App. Nov. 19,

22   2015) (conclusory allegations of harm from tortious interference are insufficient).  Here, Plaintiff

23   has failed to plead these claims because Plaintiff did not plead any facts supporting the

24   conclusory claims that it was harmed as a result of Defendants' conduct.

25   / / /

26   / / /

27   / / /

28

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

*LV 420999698v1*

1

## <u>CONCLUSION</u>

2

Plaintiff has failed to provide any factual or legal basis to support the claims raised in the

3

Complaint, and Plaintiff's Complaint should be dismissed.  And, because no editing or amending

4

can produce a plausible scenario under which Plaintiff's antitrust claims could proceed,

5

Plaintiff's claims should be dismissed with prejudice.

6

Dated: this 16th day of October 2017

7

Respectfully Submitted,

8

**GREENBERG TRAURIG, LLP**

9

By:*/s/ Mark E. Ferrario*

10

Mark E. Ferrario (Bar No. 1625)
Christopher R. Miltenberger (Bar No. 10153)

11

3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169

12

Gregory J. Casas (*pro hac vice* forthcoming)

13

Texas Bar No. 455329
GREENBERG TRAURIG LLP

14

300 West 6th Street, Suite 2050
Austin, Texas 78701

15

Samuel Castor (Bar 11532)

16

Anne-Marie Birk (Bar No. 12330)
SWITCH, LTD.

17

7135 S. Decatur Blvd.
Las Vegas NV, 89118

18

*Attorneys for Defendants SWITCH, LTD., et al.*

19

20

21

22

23

24

25

26

27

28

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

*LV 420999698v1*

1

## **CERTIFICATE OF SERVICE**

2          Pursuant to Fed. R. Civ. P. 5(b), I hereby certify that a copy of the foregoing ***Defendants'***

3   ***Motion to Dismiss Complaint and Memorandum of Points and Authorities in Support Thereof***

4   was filed electronically via the Court's CM/ECF system.  Notice of Filing will be served on all

5   parties by operation of the Court's CM/ECF system.

6          Dated this 16th day of October, 2017.

7                                                      */s/ Andrea Lee Rosehill*

8                                              An employee of Greenberg Traurig, LLP

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GREENBERG TRAURIG, LLP**
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

*LV 420999698v1*