I. Scott Bogatz
Nevada Bar No. 3367
Kerry E. Kleiman
Nevada Bar No. 14071
REID RUBINSTEIN & BOGATZ
Bank of America Plaza
300 South 4th Street, Suite 830
Las Vegas, NV 89101
Telephone:  (702) 776-7000
Facsimile:  (702) 776-7900
sbogatz@rrblf.com
kkleiman@rrblf.com

Bryan A. Merryman (*Pro Hac Vice*)
Catherine Simonsen (*Pro Hac Vice*)
WHITE & CASE LLP
555 S. Flower Street, Suite 2700
Los Angeles, CA  90071-2433
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329
bmerryman@whitecase.com
catherine.simonsen@whitecase.com

Claire DeLelle (*Pro Hac Vice*)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
Telephone:  (202) 626-3600
Facsimile:  (202) 639-9355
claire.delelle@whitecase.com

*Attorneys for Plaintiff*
*V5 Technologies, LLC, d/b/a Cobalt Data Centers*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| V5 TECHNOLOGIES, LLC, d/b/a COBALT DATA CENTERS,<br><br>Plaintiff,<br><br>v.<br><br>SWITCH, LTD., a Nevada limited company; SWITCH BUSINESS SOLUTIONS, LLC, a Nevada limited liability company; SWITCH COMMUNICATIONS GROUP L.L.C., a Nevada limited liability company; SWITCH, INC., a Nevada corporation,<br><br>Defendants. | Case No. 2:17-cv-02349-KJD-NJK<br><br>**PLAINTIFF V5 TECHNOLOGIES, LLC, d/b/a COBALT DATA CENTERS': (1) MOTION TO COMPEL FURTHER RESPONSES AND PRODUCTION  OF DOCUMENTS RESPONSIVE TO COBALT'S FIRST SET OF REQUESTS FOR PRODUCTION; (2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; AND (3) DECLARATION OF KERRY E. KLEIMAN**<br><br>[*Declaration Filed Separately*] |

<u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................. 1

II.  BACKGROUND .................................................................. 2

    A.  Factual Background ................................................. 2

    B.  Procedural Background ............................................ 4

    C.  Switch's Responses to Cobalt's Requests for Production ........................ 13

III.  LEGAL STANDARD ............................................................ 16

IV.  THE COURT SHOULD ORDER SWITCH TO SERVE FURTHER WRITTEN RESPONSES AND PRODUCE RESPONSIVE DOCUMENTS IN COMPLIANCE WITH THE ESI ORDER .......................... 17

    A.  Three Defendants Waived Their Objections by Failing to Serve Timely Written Responses ........................................ 17

    B.  Switch's Objections Do Not Comply with Rule 34 and the Court Should Order Them Stricken from Switch's Responses ........................... 18

    C.  The Court Should Order Switch to Serve Further Responses Agreeing to Conduct a Good Faith Search for and Produce All Responsive, Non-Privileged Documents in Switch's Possession, Custody, or Control ................................................. 22

    D.  The Court Should Order Switch to Produce All Responsive, Non-Privileged Documents in Compliance with the ESI Order by May 31, 2018 ............................................................ 24

V.  CONCLUSION .................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Am. Rock Salt Co., LLC v. Norfolk S. Corp.*,
   228 F.R.D. 426 (W.D.N.Y. 2004) ........................................................................................17, 20

*Banuelos v. City of San Bernardino*,
   No. EDCV 13-736-GW, 2017 U.S. Dist. LEXIS 198247 (C.D. Cal. Dec. 1,
   2017) ....................................................................................................................................25

*Caballero v. Bodega Latina Corp.*,
   No. 2:17-cv-00236-JAD-VCF, 2017 U.S. Dist. LEXIS 116869 (D. Nev. July
   24, 2017) ..............................................................................................................................16

*Caesars Entm't Operating Co. v. Emarker, LLC*,
   No. 2:15-cv-02214-JAD-VCF, 2016 U.S. Dist. LEXIS 86735 (D. Nev. July 1,
   2016) ................................................................................................................................21, 22

*Collins v. Landry's Inc.*,
   No. 2:13-cv-01674-JCM-VCF, 2014 U.S. Dist. LEXIS 83003 (D. Nev. June
   17, 2014) ..............................................................................................................................20

*Feldman v. PokerTek, Inc.*,
   No. 2:09-cv-01598-JCM-LRL, 2010 U.S. Dist. LEXIS 131136 (D. Nev. Nov.
   29, 2010) ........................................................................................................................17, 20

*Fifty-Six Hope Rd. Music, Ltd. v. Mayah Collections, Inc.*,
   No. 2:05-cv-01059-KJD-GWF, 2007 U.S. Dist. LEXIS 43012 (D. Nev. June
   11, 2007) ..............................................................................................................................17

*Fischer v. Forrest*, Nos. 14 Civ. 1304, 1307 (PAE) (AJP),
   2017 U.S. Dist. LEXIS 28102 (S.D.N.Y. Feb. 28, 2017) ..................................................18, 20

*Garcia v. Bana*,
   No. C 11-02047 LB, 2012 U.S. Dist. LEXIS 79888 (N.D. Cal. June 9, 2012) ........................25

*Gen. Cigar Co. v. Cohiba Caribbean's Finest, Inc.*,
   No. 2:06-cv-00575-BES-GWF, 2007 U.S. Dist. LEXIS 24595 (D. Nev. Mar.
   30, 2007) ..............................................................................................................................23

*Herrera v. AllianceOne Receivable Mgmt.*,
   No. 14-CV-1844-BTM (WVG), 2016 U.S. Dist. LEXIS 40474 (S.D. Cal. Mar.
   28, 2016) ..............................................................................................................................23

*Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc.*,
   Nos. 2:05-cv-01532-RLH-GWF, 2:06-cv-00101-RLH-GWF, 2007 U.S. Dist.
   LEXIS 13956 (D. Nev. Feb. 21, 2007) ................................................................................20

- ii -

*Kristensen v. Credit Payment Services*,
 No. 2:12-cv-0528-APG-PAL, 2014 U.S. Dist. LEXIS 165489 (D. Nev. Nov.
 24, 2014) ...................................................................................................................18, 20

*Lizarraga v. Buffalo Wild Wings, Inc.*,
 No. 2:15-cv-1655-MMD-VCF, 2016 U.S. Dist. LEXIS 50358 (D. Nev. Apr.
 14, 2016) .................................................................................................................................23

*Prado-Guajardo v. Perez*,
 No. 2:16-cv-00546-GMN-VCF, 2017 U.S. Dist. LEXIS 114844 (D. Nev. July
 24, 2017) .................................................................................................................................17

*Queensridge Towers, LLC v. Allianz Glob. Risks US Ins. Co.*,
 No. 2:13-cv-00197-JCM-PAL, 2014 U.S. Dist. LEXIS 14167 (D. Nev. Feb. 4,
 2014) .......................................................................................................................................18

*Richmark Corp. v. Timber Falling Consultants*,
 959 F.2d 1468 (9th Cir. 1992)................................................................................................17

*Santa Monica Baykeeper v. Kramer Metals, Inc.*,
 No. CV 07-3849 DDP, 2009 U.S. Dist. LEXIS 69130 (C.D. Cal. Feb. 27,
 2009) .......................................................................................................................................17

*Santos v. Baca*,
 No. 2:11-cv-01251-KJD-NJK, 2015 U.S. Dist. LEXIS 155894 (D. Nev. Nov.
 17, 2015) (Koppe, J.) .............................................................................................................16

*Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns, LLC*,
 No. 11-2684- JWL, 2014 U.S. Dist. LEXIS 16938 (D. Kan. Feb. 11, 2014) ..........................23

*Sweeney v. UNLV Research Found.*,
 No. 2:09-cv-01167-JCM-GWF, 2010 U.S. Dist. LEXIS 143869 (D. Nev. Apr.
 30, 2010) .................................................................................................................................20

*Switch Communs. Grp. v. Ballard*,
 No. 2:11-cv-00285-KJD-GWF, 2011 U.S. Dist. LEXIS 101526 (D. Nev. Sep.
 7, 2011) .....................................................................................................................................2

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
 No. C-07-05634 CRB (DMR), 2012 U.S. Dist. LEXIS 5648 (N.D. Cal. Jan. 18,
 2012) .......................................................................................................................................19

## RULES

Fed. R. Civ. P. 26(b)(1)...................................................................................................................16

Fed. R. Civ. P. Rule 34 .................................................................................................1, 7, 18, 22

Fed.R. Civ. P. Rule 34(b)(2)(A).................................................................................................6, 17

Fed. R. Civ. P. Rule 34(b)(2)(B) ........................................................................................18

Fed. R. Civ. P. 34(b)(2)(B) & (C) .................................................................................18, 22

Fed. R. Civ. P. Rule 34(b)(2)(C) ........................................................................................18

Fed. R. Civ. P. 37(a)(1) .........................................................................................................1

Fed. R. Civ. P. 37(a)(3)(B)(iv) ..............................................................................................1

Fed. R. Civ. P. Rule 37(a)(4) ...............................................................................................20

Fed. R. Civ. P. 37(a)(4) ..........................................................................................................1

Local Rule 26-7 ................................................................................................................1, 2

Local Rule 26-7(c) ..................................................................................................................1

## I.      INTRODUCTION

Defendants' (collectively, "Switch") responses to plaintiff V5 Technologies, LLC, d/b/a/ Cobalt Data Centers' ("Cobalt") requests for production — which Cobalt served *six months* ago — blatantly violate Rule 34 of the Federal Rules of Civil Procedure.  They consist virtually entirely of meritless, boilerplate objections, statements of refusal to produce responsive documents, facially non-credible representations that no responsive documents exist, and reservations of rights to withhold responsive documents.  Switch's meager document "production" to date consists of a few PDF files combining hundreds of individual documents — mostly irrelevant or already in Cobalt's possession — in no apparent order, some with bates numbers and some without, and stripped of all metadata, in violation of the ESI order this Court entered almost four months ago.  Despite repeated requests, Switch has failed to re-produce any documents in compliance with the ESI order and has failed to produce virtually any responsive documents at all.

Counsel for Cobalt has attempted for months to meet and confer with counsel for Switch to obtain further written responses compliant with the Federal Rules of Civil Procedure and a complete production from Switch in accordance with the ESI order.  Switch has responded with obstruction, delay, and empty promises at every turn — not to mention highly unusual and hostile conduct by Switch's in-house counsel who, until Cobalt filed a motion revealing it would imminently file its motion to compel, insisted they be the sole point of contact for Switch.[1]

Pursuant to Federal Rule of Civil Procedure 37(a)(3)(B)(iv) and (a)(4) and Local Rule 26-7, Cobalt now asks this Court to order Switch to comply with its discovery obligations.[2]  The Court should order Switch to serve further written responses that omit unfounded or waived objections and that state Switch's agreement to search in good faith for responsive documents and

---

[1] One business day after Cobalt filed its motion to attach Cobalt's Requests and Switch's responses to Cobalt's motion to compel, new outside counsel for Switch contacted counsel for Cobalt and advised they would appear on behalf of Switch and wished to discuss Cobalt's motion.  Declaration of Kerry E. Kleiman ("Kleiman Decl."), ¶ 25.

[2] Pursuant to Federal Rule of Civil Procedure 37(a)(1) and Local Rule 26-7(c), counsel for Cobalt certifies counsel in good faith conferred and attempted to confer with counsel for Switch in an effort to resolve the issues raised herein without court action and was unable to do so.  *See infra*, pages 4-13; Kleiman Decl., ¶¶ 6-26.

- 1 -

1   produce all responsive documents in Switch's possession, custody, or control.  The Court should

2   also order Switch to complete its production of responsive documents by May 31, 2018.[3]

3   **II.     BACKGROUND**

4       **A.     Factual Background**

5       Switch is the long-time dominant high-end colocation data center provider in Las Vegas.

6   Compl. (ECF No. 1) ¶¶ 30-31.  Colocation data centers allow organizations to operate their

7   computing infrastructure in a third-party purpose-built and managed facility.  *Id.* ¶ 19.  The basic

8   offerings of data centers are space, power, cooling, and connectivity, including "cross-connects."

9   *Id.*  Cross-connects allow a data center's customers to connect to their vendors, suppliers, and

10   data located elsewhere.  *Id.* ¶¶ 28-29, 72-73.  High-end colocation data centers (the relevant

11   product market) offer their customers uninterrupted operations through backup power, cooling,

12   and networking capabilities.  *Id.* ¶¶ 23-26, 95-100.

13       Switch controls at least 85 percent of the high-end colocation data center market in Las

14   Vegas.  Compl., ¶¶ 30-32.  Switch has used that market power to charge prices well above what a

15   competitive market would bear.  *Id.* ¶¶ 5, 20, 32, 42, 49, 119, 133.  In 2011, seeking to introduce

16   much-needed competition and lower prices, Michael Ballard, former President of Cobalt began

17   prospecting sites for a new data center.  *Id.* ¶ 33.  Ballard developed plans for a data center on

18   Sahara Avenue.  *Id.* ¶¶ 33-34.  Switch learned of Ballard's plans, sued Ballard, and eventually

19   agreed to dismiss its lawsuit in exchange for a nominal $40,000 payment.  *Id.* ¶ 34.  The

20   Settlement Agreement, which Cobalt also signed, contains a release of any claim against Switch

21   arising out of facts *already in existence* that related to Switch's lawsuit against Ballard, but not

22   claims arising out of unrelated facts or that may later accrue based on *future* facts.  *See* ECF No.

23   26-1 (Settlement Agreement) ¶ 4.

24       While Switch's lawsuit against Ballard was pending, Cobalt began designing a new data

---

[3] This is not the first time Switch's recalcitrance in discovery has required this Court's intervention.  *See, e.g.*, *Switch Communs. Grp. v. Ballard*, No. 2:11-cv-00285-KJD-GWF, 2011 U.S. Dist. LEXIS 101526, at *27 (D. Nev. Sep. 7, 2011) (largely granting motion to compel Switch's production of responsive documents where movant argued "Switch has asserted invalid objections to its requests for production of documents and, to the extent Switch has produced documents, its production has been substantially incomplete and deficient.").

center, on Cheyenne Avenue, which opened in February 2013.  Compl. ¶¶ 35-36.  With quality matching Switch's Las Vegas facility and lower prices, Cobalt was well positioned to compete with Switch.  *See id.* ¶¶ 32, 133, 138, 140, 143-45.  An experienced team of data center and real estate veterans led Cobalt.  *Id.* ¶ 37.  Industry participants quickly predicted Cobalt's success after touring its state-of-the-art facility.  *Id.* ¶ 39.

What neither Cobalt nor these industry participants anticipated, however, was the barrage of anticompetitive and tortious conduct that Switch would inflict on Cobalt and Switch's only other competitor in the market, ViaWest Las Vegas.  *See* Compl. ¶¶ 121-24.  Switch's intentions quickly became clear shortly after Cobalt Cheyenne opened its doors, when Rob Roy, founder and CEO of Switch, told Cobalt in no uncertain terms that Switch would make it "impossible for Cobalt to compete with Switch" and that Switch was "trying to be a monopoly."  *Id.* ¶ 43.  Specifically, Roy told Cobalt that Switch would refuse to use carriers that "go into Cobalt"; "use the threat of taking away business to keep its vendors and carriers exclusive to Switch"; and "give away" cabinets at its Las Vegas data center to "keep control" of the market.  *Id.*; *see id.* ¶ 77.

That is precisely what Switch proceeded to do.  First, Switch required its customers to agree to successive "Acceptable Use Policies" (AUPs) under which they were forbidden from dealing with competing data centers within 50 miles.  Compl. ¶ 48.  Switch's 2013 AUP specifically targeted Cobalt, providing that "no entities having business dealings (Vendors and Clients) with Cobalt shall be permitted to enter or work with the Switch Ecosystem."  *Id.* ¶ 50.  Switch reinforced the exclusionary effects of its AUPs with additional, exclusive "partnerships" with important carriers, including Zayo Group and CenturyLink.  *Id.* ¶¶ 55-60.

Switch also threatened to refuse to deal with virtually anyone who dealt with competitors in any way.  For example, in June 2015, after promising discussions with Cannery Casino & Hotel, Cobalt learned Cannery had decided to co-locate with Cobalt.  Compl. ¶ 71.  Switch heard about Cannery's decision and told Cannery that if it co-located with Cobalt, Cannery could not cross-connect directly to any of its vendors co-located at Switch.  *Id.* ¶ 72.  Switch made similar threats to suppliers that Switch's competitors needed to compete effectively.  For example, in September 2014, Cobalt and SilverBack Migration, a supplier of infrastructure migration and

support services, were in talks to establish a partnership. *Id.* ¶ 62.  When Switch learned of the potential partnership, Roy threatened to deny SilverBack all further business with Switch if SilverBack consummated its partnership with Cobalt. *Id.* ¶¶ 62-63.  As a result, SilverBack reluctantly reneged on the partnership. *Id.* ¶¶ 61, 63.  Switch similarly threatened brokers, the Technology Business Alliance of Nevada (TBAN) (an important source of customers), Opportunity Village (a prominent nonprofit organization Cobalt was in talks with to pursue a joint promotional partnership), and the Governor's Office of Economic Development (GOED), resulting in their refusing to deal with or support Cobalt. *Id.* ¶¶ 64-70.

On top of its exclusive agreements and threats, Switch selectively employed predatory pricing to steal prospective customers from its competitors, knowing Switch could raise prices once it sidelined its competitors.  Compl. ¶¶ 74-78.  Indeed, one Switch representative admitted, "We would even buy a billboard out front of another data center and advertise $1 per month [versus Switch's standard $1,199 per month] to keep the competition from succeeding." *Id.* ¶ 77.  And Roy stated, in response to Cobalt entering the market, that Switch would be "giving away 250 cabinets per year." *Id.*  For example, Switch stole Yorba Linda Water District's business from Cobalt with a price that was below Switch's costs. *Id.* ¶ 74.  And Switch told Networx that it would pay Networx's legal fees if it broke its contract with Cobalt — which Networx did. *Id.* ¶ 78.  Switch rounded out its anticompetitive scheme with a campaign to slander and malign its competitors, creating a cloud of uncertainty about doing business with them and inducing numerous third parties not to deal with them. *Id.* ¶¶ 87, 91-93.

Switch's anticompetitive scheme caused Cobalt's death by a thousand cuts.  Compl. ¶¶ 139-40.  Less than three years after it opened, Cobalt closed. *Id.* ¶ 41.  ViaWest Las Vegas also achieved far less growth than it would have absent Switch's anticompetitive conduct. *Id.* ¶ 141.  As a result, customers had nowhere to turn.  Having driven Cobalt from the market, Switch was able to maintain its supracompetitive prices far above those offered by Cobalt or ViaWest for comparable services in competitive markets. *Id.* ¶¶ 133, 138, 142-45.

**B.     Procedural Background**

Cobalt filed its complaint on September 7, 2017.  ECF No. 1.  Cobalt's complaint seeks to

- 4 -

recover the damages caused by Switch's tortious and exclusionary scheme in violation of the Sherman Act, Nevada's Unfair Trade Practices Act, and the common law against intentional interference with contract and prospective economic advantage.  Compl. ¶¶ 147-211.

On October 16, 2017, Cobalt served its first set of requests for production on the four Switch defendants ("Requests").  *See* Kleiman Decl., Ex. A.  Cobalt's Requests seek documents, generally from January 1, 2011 to the present, concerning:

- Cobalt and Cobalt's Cheyenne data center (RFP Nos. 1-3, 72);
- Switch's potential acquisition of Cobalt (RFP Nos. 22, 73);
- ViaWest (RFP No. 4);
- Switch Las Vegas's prices, costs, revenues, and profits (RFP Nos. 9-15, 17);
- Switch Las Vegas's growth/expansion, market share/power, monopolization of the Las Vegas colocation data center market, exclusion of competitors, and intent (RFP Nos. 5-8, 86-87);
- Relevant product and geographic market, prices, competition, entry barriers, and switching costs (RFP Nos. 20-21, 67-79, 81-84, 88);
- Switch Las Vegas's competitors' prices (RFP Nos. 16, 17);
- Switch Las Vegas's customer contracts and agreements (RFP Nos. 23);
- Switch's AUPs, Carrier Access Agreements, and Data Center Partnership Agreements (RFP Nos. 24-29);
- Switch Las Vegas's policies and practices with respect to cross-connects to competitors' facilities (RFP Nos. 18-19);
- Switch Las Vegas's actual or threatened refusals to deal, and/or exclusive deals, with customers, suppliers, vendors, and other third parties, including Silverback, brokers, TBAN, Opportunity Village, GOED, Cannery Casino, DARPA, Networx, Yorba Linda Water District, Zayo, and CenturyLink, (RFP Nos. 30-66);
- Switch Las Vegas's marketing materials (RFP No. 80);
- The Switch-Ballard/Cobalt Settlement Agreement release (RFP No. 89);
- Switch's organizational structure, officers, directors, and employees, and their titles and roles (RFP Nos. 90-91);
- Switch's document retention policy (RFP No. 92).

On October 16, 2017, Switch filed a motion to dismiss the complaint, ECF No. 26, followed by an "emergency" motion to stay discovery, ECF No. 28.  On October 23, 2017, the Court denied Switch's request for emergency treatment and ordered an interim stay of discovery

1    pending resolution of the motion to stay discovery.  ECF No. 30.  On November 28, 2017, the

2    Court denied Switch's motion to stay discovery and ordered the parties to file a joint proposed

3    discovery plan by December 5, 2017.  ECF No. 36.

4         On December 6, 2017, the Court adopted a discovery plan.  ECF No. 40.  On December

5    20, 2017, the Court adopted the parties' proposed protective order with some modifications.  ECF

6    Nos. 45-46.  On December 26, 2017, the Court entered the parties' proposed ESI order.  ECF No.

7    49.  The ESI order generally requires the parties to produce documents as TIFF images

8    accompanied by a load file with each document's respective metadata and extracted text.  *See id.*

9    at 3-4, ¶¶ 3-4, 6, 9.  The order does not permit the parties to convert ESI into portable document

10   files ("PDFs") stripped of the original metadata.  *Id.*

11        On December 20, 2017, Switch "produced" a 1,417-page single PDF file containing a

12   copy of Cobalt's complaint, copies of settlement agreements between Switch and Ballard, Switch

13   promotional materials and pictures, online articles about Switch, logistical emails between Switch

14   representatives and TBAN, and some of Switch's AUPs.  Kleiman Decl., ¶ 4 & Ex. B.  On

15   December 21, 2017, Switch, Ltd. — but not the other three Switch defendants — served

16   responses and objections to Cobalt's Requests ("Responses").  *Id.*, Ex. C.

17        On January 4, 2018, counsel for Cobalt sent a letter to Mr. Castor outlining the significant

18   deficiencies in Switch, Ltd.'s Responses.  Counsel for Cobalt requested Switch, Ltd. serve further

19   responses omitting its unfounded, boilerplate objections, removing the "without waiving the

20   foregoing objections" language, and identifying with specificity the responsive documents it

21   agreed to produce.  *See* Kleiman Decl., Ex. D.  Counsel for Cobalt also requested Switch provide

22   an affidavit detailing the nature of its efforts to locate documents responsive to the requests in

23   response to which Switch, Ltd. stated no responsive documents exist.  *Id.* at 4.  Counsel for

24   Cobalt requested the remaining three Switch defendants serve responses to Cobalt's Requests

25   stating they would produce all responsive documents, as those defendants waived any objections

26   by failing to serve responses within the 30-day period provided by Rule 34(b)(2)(A).  *Id.*  Finally,

27   counsel for Cobalt requested Switch complete its production of documents and serve a complete

28   privilege log by January 30, 2018.  *Id.*

1    Mr. Castor responded to counsel for Cobalt's letter on January 12, 2018.  Kleiman Decl.,

2    Ex. E.  Mr. Castor took the position that Cobalt had served its Requests only on Switch, Ltd. —

3    and not the other three Switch defendants — because Cobalt delivered only one copy of the

4    Requests (rather than four identical copies) on counsel for Switch.  *Id.* at 1.  Even though the

5    Requests were specifically directed to all four Switch defendants, Mr. Castor said there was only

6    one copy in the envelope so he chose to respond on behalf of only one Switch defendant of his

7    choosing.  *Id.*  Mr. Castor further stated that "Switch will not agree to waive any objections."  *Id.*

8    He also represented that "Switch will produce the requested affidavit" detailing the searches

9    Switch ran for documents.  *Id.* at 2.

10    In a January 29, 2018 letter response, counsel for Cobalt again explained why Switch,

11    Ltd.'s objections and responses do not comport with Switch's obligations under Rule 34 and that

12    there is no legal authority for the proposition that multiple copies of the same document addressed

13    to multiple entities must be served on counsel representing all of these entities.  Kleiman Decl.,

14    Ex. F.  Counsel for Cobalt further explained that the 1,417-page single PDF document comprised

15    mostly of documents already in Cobalt's possession and Switch's promotional materials could not

16    possibly represent all documents responsive to Cobalt's Requests.  *Id.* at 2.  Counsel for Cobalt

17    also advised that Cobalt still awaited Switch's promised affidavit.  *Id.*  Counsel for Cobalt

18    requested a telephonic meet and confer the week of January 29, 2018.  *Id.*

19    On February 1, 2018, Mr. Castor sent a letter to counsel for Cobalt reiterating his position

20    — with no citation to authority — that only Switch, Ltd. was served with Cobalt's Requests and

21    standing by Switch, Ltd.'s objections.  Kleiman Decl., Ex. G.  Counsel for Switch advised they

22    were not available to meet and confer until February 14, 2018.  *Id.*, Ex. H at 1.

23    On February 6, 2018, Mr. Castor's assistant sent counsel for Cobalt a link to download 22

24    PDFs, which appear to represent the documents Switch earlier claimed it had been waiting on

25    third parties to provide approval to produce.  Kleiman Decl., Ex. I; *see id.*, Ex. B at 1.  Among

26    them are another copy of Cobalt's complaint, settlement agreements with Ballard, Switch, Inc.'s

27    Form S-1 Registration Statement, printouts of webpages and documents available on Switch's

28    public website, some of Switch's AUPs, online articles about Switch, Switch promotional

materials, correspondence between Switch and Cobalt already in Cobalt's possession, and hundreds of irrelevant emails (e.g., an email listing the Las Vegas Metro Chamber of Commerce's then-upcoming April 2014 events).  Kleiman Decl., ¶ 12.  Switch did not produce a single internal communication.  *Id.*  Hundreds of these documents do not contain a bates number. *Id.*  Like Switch's December 20, 2017 "production," the February 6, 2018 "production" entirely failed to comply with the ESI order.  *Id.*

On February 14, 2018, counsel for Cobalt and Mr. Castor and Ms. Birk met and conferred regarding the deficiencies in Switch's Responses and failure to produce responsive documents. Counsel for Cobalt asked counsel for Switch when Switch would re-produce the documents it had produced to date in compliance with the ESI order.  Kleiman Decl., ¶ 13.  Mr. Castor responded that Switch was in the final stages of contracting with an e-discovery vendor and expected to be able to re-produce the documents within two to three weeks, i.e., by the end of February or early March 2018.  *Id.*  Counsel for Cobalt asked Mr. Castor and Ms. Birk what they did to search for and identify responsive documents.  *Id.*  Mr. Castor and Ms. Birk stated they were not in a position to provide the search terms they used and could not provide information about the custodians from whom Switch collected documents, other than to represent that counsel for Switch searched Switch's "entire email system."  *Id.*  Counsel for Switch asked counsel for Cobalt to send them an email outlining the information Cobalt needed.  *Id.*  Mr. Castor stated several times during the call his belief that Cobalt's complaint is "frivolous."  *Id.*

That same day, counsel for Cobalt sent the following email to Mr. Castor and Ms. Birk:

> As discussed, I am following up with an email documenting the information we are requesting:
>
> - What did you search for responsive documents?  So far, you have told me you searched Switch, Ltd.'s "entire email system" from 2011 until 2014 or 2015 (you will confirm the date range).  Did you search anything else? For example, shared folders on the company's server; files saved to specific custodians' hard drives (if so, whose); specific custodians' personal email (if so, whose); specific custodians' text messages (if so, whose); specific custodians' paper (hard-copy) files and notes (if so, whose).
> - What search terms did you use for the searches of electronic documents that you ran?

- • What did you do to review the search term hits?
- • Did you withhold any documents responsive to any of the RFPs?

Kleiman Decl., Ex. J.

On February 16, 2018, Ms. Birk sent an email to counsel for Cobalt providing what she described as "a sample list of the terms used by our IT team when searching the email databases." Kleiman Decl., Ex. K at 7.  This search list included only *external* communications between "any Switch account" and ten external domain names (e.g., @teamsilverback.com) from 2011 to 2015. *Id.*  The remaining external communications Switch searched for were all communications with Cobalt or its representatives, which Cobalt already possesses.  *Id.* at 7-8.  In the case of some (unspecified) number of the communications Switch allegedly searched for, Switch narrowed the results to only those including one or more of 27 highly specific terms.  *Id.* at 7-8.  Ms. Birk stated she was unsure whether counsel for Switch conducted a "system wide search" for the term "Cobalt" and represented that "[i]f no search was conducted, we will amend our responses to disclose any additional documents that may come to light."  *Id.* at 7.  Ms. Birk further stated, "In addition, we also went through our drives to locate any contracts, service orders, or documents relative to any of the vendors, customers, or potential customers mentioned in your Complaint. We also requested that our branding team go through and identify any marketing materials that would be responsive to your requests."  *Id.* at 8.  In response to counsel for Cobalt's question regarding Switch's hard-copy document search, Ms. Birk stated:  "Consistent with our commitment to sustainable practices, our data is electronic shared and stored."  *Id.*

On February 22, 2018, counsel for Cobalt asked for clarification regarding whether the "sample list" of search parameters was a complete list and again requested the affidavit Mr. Castor had promised on January 12, 2018.  Kleiman Decl., Ex. K at 7.  Ms. Birk responded, "We are working on it" and requested counsel for Cobalt "provide a list of any search terms you would want us to run."  *Id.*

On March 7, 2018, counsel for Cobalt responded that, given Ms. Birk's failure to answer the question regarding whether the "sample" search terms list was a complete list, counsel for Cobalt would interpret Switch's non-response to mean the "sample" list represented the entirety

of the searches Switch ran.  *Id.* at 5.  Counsel for Cobalt explained that counsel for Switch's limited search for external communications only and "[going] through [Switch's] drives" in some unspecified way did not remotely approach a good faith search for responsive documents.  *Id.*  In light of this fact, counsel for Cobalt explained, a further meet and confer on Switch's written responses would be necessary.  *Id.*

As a courtesy, counsel for Cobalt also provided a list of additional search terms Cobalt expects Switch to run.  *Id.*  Counsel for Cobalt explained that running search terms is only part of a good faith effort to locate responsive documents and that counsel for Switch is also required to ascertain from employees with knowledge of the relevant events whether and where additional responsive documents may be located, including on individual employees' hard drives, in their loose paper files, and in their personal emails and text messages.  *Id.*  Counsel for Cobalt further explained that Switch is obligated to perform manual searches for responsive documents not amenable to identification through search terms, e.g., paper files, pricing sheets, sales databases, customer lists, financial statements, etc.  *Id.*  Counsel for Cobalt also asked counsel for Switch to make its promised re-production of documents in conformance with the ESI order by March 9, 2018.  *Id.*  Finally, in an effort to compromise and avoid a dispute over Switch's failure to serve responses and objections to Cobalt's Requests on behalf of three of the four defendants, counsel for Cobalt offered to extend the time for these defendants to respond to March 14, 2018.  *Id.*  Counsel for Cobalt requested a meet and confer the following week.  *Id.*

By March 14, 2018, Mr. Castor and Ms. Birk had not responded to counsel for Cobalt's email and had not served written responses to Cobalt's Requests on behalf of the three Switch defendants that had failed to serve written responses.  Kleiman Decl., ¶ 18.  In the meantime, in a further effort to avoid a dispute over the three Switch defendants' failure to serve written responses, on March 9, 2018, Cobalt re-served three additional copies of its first set of requests for production on the three defendants through Switch's outside counsel, Greenberg Traurig.  *Id.*, ¶ 19.  Cobalt attempted to serve copies on Mr. Castor and Ms. Birk, but the process server reported that upon arriving at the front desk of Switch's Las Vegas office, the front desk "would not give me any information on how to contact either" Mr. Castor or Ms. Birk and "was told

th[e]s[e] documents must be delivered through another channel — nobody can accept here." *Id.*, ¶ 19 & Ex. L.  In other words, *in-house counsel for Switch (who demanded to be the sole point of contact) actively evaded service*, and Cobalt accomplished service only through Switch's outside counsel.

On March 14, 2018, counsel for Cobalt followed up to again request to schedule a meet and confer.  Kleiman Decl., Ex. K at 4.  In Ms. Birk's response the same day, she stated Switch had since conducted "an additional search across our servers to include any reference to" the search terms "Cobalt," "ViaWest," "7710 W Cheyenne," and "V5 Technologies," had "just received the search results" and would "produce any relevant documents after review." *Id.* at 3. Ms. Birk also stated "we will begin conducting searches for those terms you requested with which we have no dispute." *Id.* at 4.  Finally, Ms. Birk denied that Mr. Castor had represented that Switch would re-produce documents in compliance with the ESI order by late February or early March.  *Id.* at 4.

On March 20, 2018, counsel for Cobalt and Mr. Castor and Ms. Birk met and conferred again telephonically.  Kleiman Decl., ¶ 21.  Mr. Castor and Ms. Birk refused to commit to a date by which Switch would re-produce documents in compliance with the ESI order.  *Id.*  Counsel for Cobalt attempted to discuss each of Cobalt's requests with Mr. Castor and Ms. Birk, starting with RFP No. 1 (which seeks all documents concerning Cobalt and/or Cobalt's Las Vegas data center). Switch's written response to this request reads:

> Objection, this Request is vague, ambiguous, overbroad, and unduly burdensome. In addition, this Request calls for confidential, trade secret, and/or work product material.  Discovery is ongoing and Defendant reserves the right to supplement this response.  Moreover, the Request fails to identify scope as to time or duration, or seeks information which is readily available from publicly available sources.  The Request also fails to identify a requested form as such, any responsive documents (if any) will be produced or have been in OCR (readable) PDF consistent with RCP 34(b)(2)(D) and RFCP 24(E). NotwithstandingNotwithstanding [sic] the foregoing, Plaintiff [sic] will respond to this Request once it receives additional clarity regarding the same from Plaintiff.  Without waiving said objection: See Defendant's Initial Disclosure documents, specifically SWITCH000001-000037, SWITCH000785-000797, SWITCH000842-000937.  Additional documents may be disclosed pursuant to the terms of the protective order.

1   Kleiman Decl., Ex. C at 3, RFP No. 1.  Counsel for Cobalt asked Mr. Castor what was "vague"

2   and "ambiguous" about this request.  Kleiman Decl., ¶ 21.  Eventually, Mr. Castor claimed the

3   definition of "Cobalt" in Cobalt's Requests is vague because it includes representatives and

4   affiliates of Cobalt, not just the entity itself.  *Id.*  Counsel for Cobalt explained the definition of

5   "Cobalt" in Cobalt's Requests is a standard definition used in document requests and is merely

6   meant to clarify that requests using that term seek not only documents expressly referencing the

7   term "Cobalt" but also individuals and entities acting on its behalf.  *Id.*  Mr. Castor provided no

8   explanation for Switch's confidentiality and trade secret objections.  *Id.*

9          With respect to Switch's "scope as to time or duration" objection, counsel for Cobalt

10   pointed Mr. Castor and Ms. Birk to the instructions in Cobalt's Requests, which provide:  "Unless

11   otherwise stated herein, all DOCUMENTS requested cover the period between January 1, 2011 to

12   the present."  Kleiman Decl., ¶ 22; *see id.* Ex. A at 9, ¶ 11.  Mr. Castor stated his position that

13   Cobalt was required to repeat this instruction in every single one of its requests.  With respect to

14   Switch's objection that RFP No. 1 purportedly fails to specify a form for production, counsel for

15   Cobalt again pointed Mr. Castor and Ms. Birk to Cobalt's instructions, which provide:

16   "DOCUMENTS and electronically stored information should be produced in accordance with the

17   Production Specifications attached hereto as Exhibit A."  Kleiman Decl., ¶ 22; *see id.* Ex. A at 7,

18   ¶ 2.  Mr. Castor again insisted that Cobalt was required to include the specified form of

19   production in each individual request.  Kleiman Decl., ¶ 22.

20          Counsel for Cobalt asked Mr. Castor to agree to revise Switch's response to this request to

21   remove all objections and respond that Switch will conduct a good faith search for responsive

22   documents and to produce all non-privileged responsive documents located.  Kleiman Decl, ¶ 23.

23   Mr. Castor and Ms. Birk repeatedly and unequivocally insisted that Switch would not amend any

24   of its responses and would not agree to withdraw its objections.  *Id.*  Instead, Ms. Birk stated,

25   Switch would only consider amending its responses after it completed searching for responsive

26   documents and determined whether Switch desired to withhold any documents on the basis of any

27   of the stated objections.  *Id.*  Counsel for Cobalt explained to Ms. Birk that the Federal Rules do

28   not allow a party to assert unfounded, boilerplate objections and then self-servingly use them to

- 12 -

withhold responsive documents the party decides after the fact it does not wish to disclose.  *Id.*

Mr. Castor and Ms. Birk were adamant that Switch would not amend any of its responses until, if

at all, Switch had completed its document review.  *Id.*  Mr. Castor again stated multiple times

during the call his belief that Cobalt's complaint is "frivolous."  *Id.*

### C.   Switch's Responses to Cobalt's Requests for Production

On April 9, 2018, Switch, Inc., Switch Communications Group L.L.C., and Switch

Business Solutions, LLC — the three Switch entities on whose behalf their counsel decided not to

respond when initially served — finally served written responses to Cobalt's Requests, which

Cobalt had served almost *six months* earlier, on October 16, 2017.  Kleiman Decl., ¶ 24; *see id.*,

Exs. M-O.  These entities' substantive objections and responses are identical to Switch, Ltd.'s,

except they each add an irrelevant preamble specific to each entity in response to each request.

*See id.*

Switch's Responses begin with seven paragraphs of "general objections," which Switch

purports to "incorporate[] by reference into each" specific response.  Ex. C at 2-3.  These

objections include:  (1) Cobalt's definitions and instructions are purportedly too "complex,

numerous and burdensome," "cause the Requests for Production to reach an objectionable

breadth, depth, ambiguity, complexity and vagueness," and "are designed to harass and annoy";

(2) the definitions, instructions, and requests "call for information and/or documents which are

irrelevant, not calculated to lead to the discovery of admissible evidence" and seek attorney-client

privileged documents and attorney work product; (3) the requests "require[] production in a form

that risks or violates the safety or security of Defendants, Defendant's clients, or Defendant's

vendors operations, security, data integrity or confidentiality protocols"; and (4) the requests

purportedly "fail[] [to] specify a requested form of production."  *Id.*

In response to all but 12 requests (all but RFP Nos. 2, 14, 21-22, 24-26, 39, 49, 88-89, and

91), Switch objected, "the Request fails to identify scope as to time or duration," even though

Cobalt's requests included the instruction, "Unless otherwise stated herein, all DOCUMENTS

requested cover the period between January 1, 2011 to the present."  *See* Ex. A at 9, ¶ 11.

In response to 79 requests (all but RFP Nos. 22, 24-26, 39, 47-49, and 87-91), Switch

objected, "[t]he Request also fails to identify a requested form as such, any responsive documents (if any) will be produced or have been in OCR (readable) PDF," even though Cobalt's requests included the instruction, "DOCUMENTS and electronically stored information should be produced in accordance with the Production Specifications attached hereto as Exhibit A" — production specifications later codified in the ESI order.  *See* Ex. A at 7, ¶ 2.

In response to RFP Nos. 1, 4-6, 8, 10-13, 16-19, 23, and 40, Switch objected that the requests "seek[] information which is readily available from publicly available sources," including, for example, in response to RFP No. 8, which seeks documents concerning Switch's desire, intent, plan, or strategy to acquire as customers for Switch Las Vegas any actual or prospective customers of any other colocation data center in Las Vegas.  Switch further objected to RFP Nos. 37-38, 40-42, and 45, that the requests "seek[] information which is readily accessible from Plaintiff's own files."  In response to RFP Nos. 20, 29-31, and 35, which seek documents concerning the effect of Cobalt's entry into the market on prices, the term in Switch's 2013 AUP forbidding entities having business dealings with Cobalt from entering or working with the Switch ecosystem, and documents concerning Cobalt and Silverback or TBAN, Switch objected that the requests "seek[] information which is directly derived from Plaintiff's own creation or sources."  Similarly, in response to RFP No. 38 (regarding potential partnerships between Cobalt and Opportunity Village), Switch objected that the request seeks "documents best produced by Plaintiff."  In response to RFP Nos. 84-85 (regarding switching costs), 86 (regarding Switch Las Vegas's share of any market), and 89 (regarding the release in the Settlement Agreement), Switch objected that the requests seek "documents not in the possession of Defendant."

In response to all but one request (RFP No. 7), Switch repeated the boilerplate objection, "this Request is vague, ambiguous, overbroad, and unduly burdensome."  For example, in the case of RFP No. 16 (which seeks "documents concerning any other Las Vegas colocation data center's prices"), Switch responded it "is unable to provide a response" "given the overbroad and vague nature of this request."  In three of these cases (RFP Nos. 12, 15, 25), Switch further objected that the request "seeks irrelevant information."  In 14 of these cases (RFP Nos. 32-35,

1    37-45, and 83), Switch further objected that the request is "duplicative" and "compound."  Switch

2    further objected to RFP Nos. 82-86 (which seek documents concerning customer preferences and

3    switching costs) on the ground that they "call[] for speculation."

4         In response to 77 requests (all but RFP No. 2-3, 6-8, 22-24, 68, and 87-92), Switch

5    repeated the boilerplate objection, "this Request calls for confidential, trade secret, and/or work

6    product material," including in response to numerous requests seeking communications between

7    Switch and third parties that could not possibly be subject to confidentiality, trade secret,

8    privilege, or attorney work product protection.  Switch further objected to RFP No. 4 (seeking

9    documents concerning ViaWest Las Vegas) as seeking "material subject to protective order or

10   ongoing litigation" and responded that Switch would "provide" "additional materials" "once no

11   longer subject to protective order."

12        In response to RFP Nos. 6-8 and 87-88 (relating to Switch's market power, intent to

13   control markets and exclude competitors, and barriers to entry), Switch responded:  "Objection,

14   this Request lacks foundation and Defendant rejects the premise of this request."  In response to

15   RFP Nos. 6-7 and 87-88, Switch further responded:  "Defendant is unable to respond to this

16   Request."

17        In response to RFP Nos. 2, 14, 18, 21-23, 29, 32-33, 38-39, 42, 44, 47-49, 52, 54-55, 58-

18   60, 66, 69-74, and 77 — which seek, *inter alia*, Switch's agreements with former Cobalt

19   customers, documents concerning the term in Switch's 2013 AUP forbidding entities having

20   business dealings with Cobalt from entering or working with the Switch ecosystem, and

21   documents comparing and contrasting Switch Las Vegas with Cobalt Cheyenne, ViaWest, or any

22   other colocation data center in Las Vegas — Switch responded:  "Without waiving said objection:

23   None," or "None at this time," and in response to RFP No. 3 (regarding Switch's attempt to

24   interfere with Cobalt's lease), Switch similarly responded:  "Switch has had no communications

25   with the lessor of said property."  In response to most of these requests (RFP Nos. 2, 14, 18, 22-

26   23, 29, 32-33, 47-49, 52, 54-55, 58-60, 66, and 69-75), and also in response to RFP Nos. 8 and

27   34, Switch further responded:  "Should any documents come to our attention, these will be

28   produced for inspection pursuant to the terms of the protective order."  In the case of RFP No. 22

- 15 -

1   (seeking "documents concerning Switch Las Vegas's potential acquisition of Cobalt"), Switch

2   inconsistently responded, "None at this time," while at the same time referring Cobalt to emails

3   between Switch and Cobalt about the potential acquisition Switch included in the 1,417-page

4   PDF it produced in 2017.

5         In response to RFP Nos. 30-33, 36-39, 41-48, 50-67, and 72-85, Switch also "note[d]" that

6   the requests "seek[] confidential third party data." *See also* RFP Nos. 25-27 ("Documents and

7   contracts related to CenturyLink and Zayo . . . have been identified and if production is not

8   objected to by these carriers, such documents be [sic] produced.").

9         With respect to all responses in which Switch responded it would produce or has produced

10   some responsive documents, Switch stated its agreement to do so "without waiving" its

11   objections. *See* RFP Nos. 9-12, 15, 17, 80.  Finally, in many cases, Switch did not state it would

12   produce any responsive documents but rather simply referred Cobalt to a few documents located

13   in the 1,417-page PDF.  *See* RFP Nos. 5, 13, 19, 20, 24, 28, 35, 68, 86, and 89-91.  For example,

14   in response to RFP No. 13, which requests "all documents concerning summary and/or analysis

15   of Switch Las Vegas's revenues, costs, and/or profits," Switch did not state it would produce

16   responsive documents but rather merely cited the copy of Switch, Inc.'s S-1 Registration

17   Statement included in the 1,417-page PDF.

18   **III.**    **LEGAL STANDARD**

19         "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any

20   party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  As

21   of December 1, 2015, "the test is not — not — whether information is 'reasonably calculated to

22   lead to admissible evidence,' but whether evidence is 'relevant to any party's claim or defense.'"

23   *Caballero v. Bodega Latina Corp.*, No. 2:17-cv-00236-JAD-VCF, 2017 U.S. Dist. LEXIS

24   116869, at *5 (D. Nev. July 24, 2017).  "The scope of discovery under the Federal Rules is broad.

25   . . .  Because discovery is designed to define and clarify the issues, it is not limited to only those

26   specific issues raised in the pleadings."  *Santos v. Baca*, No. 2:11-cv-01251-KJD-NJK, 2015 U.S.

27   Dist. LEXIS 155894, at *3-5 (D. Nev. Nov. 17, 2015) (Koppe, J.).

28

> Parties resisting discovery carry        the        heavy burden of showing why discovery should   be   denied.    The objecting party must   show   that the discovery request is  overly broad,  unduly burdensome irrelevant.   To meet this burden,   the objecting party must   specifically   detail   the   reasons   why each request is improper.

*Prado-Guajardo v. Perez*, No. 2:16-cv-00546-GMN-VCF, 2017 U.S. Dist. LEXIS 114844, at *4-5 (D. Nev. July 24, 2017) (citations omitted); *see Santa Monica Baykeeper v. Kramer Metals, Inc.*, No. CV 07-3849 DDP (FMOx), 2009 U.S. Dist. LEXIS 69130, at *20-21 (C.D. Cal. Feb. 27, 2009); *Am. Rock Salt Co., LLC v. Norfolk S. Corp.*, 228 F.R.D. 426, 440 (W.D.N.Y. 2004).

## IV.   THE COURT SHOULD ORDER SWITCH TO SERVE FURTHER WRITTEN RESPONSES AND PRODUCE RESPONSIVE DOCUMENTS IN COMPLIANCE WITH THE ESI ORDER

### A.   Three Defendants Waived Their Objections by Failing to Serve Timely Written Responses

"The party to whom the request [for production] is directed must respond in writing within 30 days after being served."  Fed. R. Civ. P. 34(b)(2)(A).  "It is well established that a failure to object to discovery requests within the time required constitutes a waiver of any objection."  *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992); *see, e.g.*, *Feldman v. PokerTek, Inc.*, No. 2:09-cv-01598-JCM-LRL, 2010 U.S. Dist. LEXIS 131136, at *6-8 (D. Nev. Nov. 29, 2010) (ordering defendant to respond to plaintiff's requests "without objection" because defendant did not serve written responses within 30 days).

Cobalt served its Requests on all four Switch defendants on October 16, 2017.  Only Switch, Ltd. responded within the 30-day period (which was tolled during the interim stay of discovery), on December 21, 2017.  Even after counsel for Cobalt offered to extend the date for the other three Switch defendants to serve written responses, to March 14, 2018, those three defendants still failed to serve written responses by the extended date.  As a courtesy, Cobalt re-served the Requests on those three defendants, and only 31 days after re-service (on April 9, 2018) did they finally serve written responses.  Switch, Inc., Switch Communications Group L.L.C., and Switch Business Solutions, LLC served responses almost *six months* after being served with Cobalt's Requests.  Accordingly, they waived all objections stated in those responses.  *See, e.g.*, *Fifty-Six Hope Rd. Music, Ltd. v. Mayah Collections, Inc.*, No. 2:05-cv-01059-KJD-

- 17 -

GWF, 2007 U.S. Dist. LEXIS 43012, at *11-12 (D. Nev. June 11, 2007) ("Plaintiffs did not serve their discovery responses with objections until nearly two months after they were due and more than a month and a half after Defendant's counsel demanded that responses be provided without objection. The Court therefore deems Plaintiffs' objections to have generally been waived."). The Court should order these three defendants to serve further responses to Cobalt's Requests without objections.

**B.**      **Switch's Objections Do Not Comply with Rule 34 and the Court Should Order Them Stricken from Switch's Responses**

Switch's "General Objections." "For each item or category, the response [to a request for production] must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons. . . . An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest." Fed. R. Civ. P. 34(b)(2)(B) & (C). "[I]ncorporating all of the General Objections into each response violates Rule 34(b)(2)(B)'s specificity requirement as well as Rule 34(b)(2)(C)'s requirement to indicate whether any responsive materials are withheld on the basis of an objection." *Fischer v. Forrest*, Nos. 14 Civ. 1304, 1307 (PAE) (AJP), 2017 U.S. Dist. LEXIS 28102, at *7 (S.D.N.Y. Feb. 28, 2017).[4] Switch's seven paragraphs of boilerplate "General Objections" are not permitted under the Federal Rules, and the Court should overrule them.

---

[4] For example, in *Kristensen v. Credit Payment Services*, No. 2:12-cv-0528-APG-PAL, 2014 U.S. Dist. LEXIS 165489 (D. Nev. Nov. 24, 2014), defendant "asserted three pages and twelve separate paragraphs of voluminous boilerplate objections to all of the discovery requests at issue" and "to the instructions and definitions," most of which mirror precisely Switch's boilerplate general objections. *Id.* at *12-13. The court held "[t]hese boilerplate objections are improper, fail to preserve any privilege, and are no justification for . . . withhold[ing] responsive documents. The objections are therefore overruled and stricken. [Defendant's] boilerplate relevancy objections are also overruled and stricken." *Id.* at *13-14; *see also, e.g.*, *Queensridge Towers, LLC v. Allianz Glob. Risks US Ins. Co.*, No. 2:13-cv-00197-JCM-PAL, 2014 U.S. Dist. LEXIS 14167, at *11-13, 19 (D. Nev. Feb. 4, 2014) (granting motion to strike "all of [defendant's] general objections and reservations," holding "[t]he responses are particularly evasive, incomplete and unresponsive in light of the litany of 'general objections and reservations' followed by lengthy boilerplate objections made to each individual request"); *DL v. District of Columbia*, 251 F.R.D. 38, 43 (D.D.C. 2008) ("[Defendant's] 'boilerplate' general objections to plaintiffs discovery requests, without more, fail to satisfy [defendant's] burdens under the Federal Rules of Civil Procedure to justify its objections to discovery. . . . Accordingly, all of [defendant's] general objections . . . are overruled.").

- 18 -

1      Form of Production.  Switch's objection that Cobalt's Requests "fail[] to identify a

2   requested form" for production is frivolous.  The Requests expressly instruct Switch to produce

3   documents and ESI in accordance with detailed production specifications.  Ex. A at 7, ¶ 2.  The

4   Court since ordered the parties to produce documents largely in conformance with these

5   specifications.  ECF No. 49.  Switch may not simply produce "OCR (readable) PDF" files with

6   no metadata or load file.  The Court should overrule this objection each time it appears in

7   Switch's Responses and order Switch to produce documents in compliance with the ESI order.

8      Temporal Scope.  Switch's objection that the Requests "fail[] to identify scope as to time

9   or duration" is equally frivolous.  Again, the Requests expressly instruct Switch:  "Unless

10  otherwise stated herein, all DOCUMENTS requested cover the period between January 1, 2011 to

11  the present."  Ex. A at 9, ¶ 11.  The Court should overrule this objection each time it appears and

12  order Switch to search for responsive documents for the requested time period.[5]

13     Possession/Availability.  Switch's objections in response to RFP Nos. 1, 4-6, 8, 10-13, 16-

14  20, 23, 29-31, 35, 37-38, 40-42, 45, 84-86, and 89, that the requests seek documents that are

15  publicly available, accessible from Cobalt's files, "derived from Plaintiff's own creation or

16  sources," "best produced by Plaintiff," or "not in the possession" of Switch, are boilerplate,

17  nonsensical, and contradicted by Switch's own production.  For example, despite the fact that

18  Switch, Inc.'s S-1 Registration Statement is publicly available, Switch has now produced two

19  copies of it to Cobalt.  Switch has produced hundreds of emails with Cobalt or its representatives

20  that Cobalt already possesses.  And it is simply not credible for Switch to claim it has no

21  documents in its possession, custody, or control regarding switching costs, Switch's market share,

22

23  _____

    [5] Cobalt began planning to build a data center in 2011, and Switch attempted to interfere as soon
24  as Switch learned of Cobalt's plans.  Compl., ¶¶ 32-34.  Cobalt Cheyenne opened its doors in
    2013 and attempted to compete in a market perverted by Switch's anticompetitive conduct until
25  Cobalt closed its doors at the end of 2015.  *Id.*, ¶¶ 40-41.  The time period following Cobalt's exit
    is relevant to whether Switch's elimination of this competitor allowed Switch to charge monopoly
26  prices.  Accordingly, good cause supports a discovery period of 2011 to the present.  *See In re
    Transpacific Passenger Air Transp. Antitrust Litig.*, No. C-07-05634 CRB (DMR), 2012 U.S.
27  Dist. LEXIS 5648, at *15-16 (N.D. Cal. Jan. 18, 2012) ("The scope of relevance
    in discovery in antitrust actions is indeed broad.  Where allegations of conspiracy or
28  monopolization are involved, broad discovery may be needed to uncover evidence of design,
    pattern, or intent.") (internal citation omitted).

- 19 -

or the Settlement Agreement (RFP Nos. 84-86 and 89).  Cobalt's Requests clearly state they seek only documents in Switch's possession, custody, or control and do not purport to require Switch to collect responsive documents from third parties not under Switch's control.  *See* Kleiman Decl., Ex. A at 7, ¶ 3.  Accordingly, Switch's objections lack merit, and the Court should overrule them.  *See, e.g.*, *Sweeney v. UNLV Research Found.*, No. 2:09-cv-01167-JCM-GWF, 2010 U.S. Dist. LEXIS 143869, at *10-12 (D. Nev. Apr. 30, 2010) (finding similar objections "substantively invalid" and overruling them).

Vague, Ambiguous, Overbroad, Unduly Burdensome, and Irrelevant.  This Court should overrule Switch's objections — which Switch repeated in response to *every* request except one — that Cobalt's Requests are "vague, ambiguous, overbroad, and unduly burdensome," and its further objection to RFP Nos. 12, 15, and 25 that the requests "seek[] irrelevant information." Courts routinely overrule such unfounded, boilerplate copy-and-paste jobs in discovery responses.  Indeed, as this Court has explained, "[b]oilerplate, generalized objections are inadequate and tantamount to making no objection at all."  *Collins v. Landry's Inc.*, No. 2:13-cv-01674-JCM-VCF, 2014 U.S. Dist. LEXIS 83003, at *6-7 (D. Nev. June 17, 2014).[6]  Switch has utterly failed to "carry [its] heavy burden" as the "party resisting discovery" of "specifically detail[ing] the reasons why each request is improper."  *Collins*, 2014 U.S. Dist. LEXIS 83003, at *6.  Indeed, "[t]he fact that [Switch] has apparently produced . . . documents subject to [its] objections also indicates the lack of undue burden."  *Sweeney*, 2010 U.S. Dist. LEXIS 143869, at *12 (overruling boilerplate undue burden requests).  The Court should overrule

---

[6] *See Am. Rock*, 228 F.R.D. at 432 ("generalized objections that discovery requests are vague, overly broad, or unduly burdensome are not acceptable, and will be overruled"); *Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc.*, Nos. 2:05-cv-01532-RLH-GWF, 2:06-cv-00101-RLH-GWF, 2007 U.S. Dist. LEXIS 13956, at *12 (D. Nev. Feb. 21, 2007) ("[B]oilerplate relevancy objections that do not set forth any argument or explanation why the requested documents are irrelevant are also improper."); *see, e.g.*, *Feldman v. PokerTek, Inc.*, No. 2:09-cv-01598-JCM-LRL, 2010 U.S. Dist. LEXIS 131136, at *7 (D. Nev. Nov. 29, 2010) (holding defendant's responses, which "consisted almost entirely of boilerplate objections," were "evasive or nonresponsive within the meaning of Rule 37(a)(4)" and ordering defendant "to supplement its responses . . . without objection"); *Kristensen*, 2014 U.S. Dist. LEXIS 165489, at *14 ("[defendant's] boilerplate relevancy objections are also overruled and stricken").  As one federal court explained, "responses . . . stating that the requests are 'overly broad and unduly burdensome' is meaningless boilerplate.  Why is it burdensome?  How is it overly broad?  This language tells the Court nothing."  *Fischer*, 2017 U.S. Dist. LEXIS 28102, at *8.

1   Switch's "vague, ambiguous, overbroad, and unduly burdensome" and "irrelevant" objections.

2        <u>Duplicative, Compound, Speculation, Foundation/Premise</u>.  Switch objected to RFP Nos.

3   32-35, 37-45, and 83 as "duplicative" and "compound," to RFP Nos. 82-86 as "call[ing] for

4   speculation," and to RFP Nos. 6-8, 87-88 as "lack[ing] foundation" and having a faulty

5   "premise."  Aside from being inaccurate, these objections are invalid.  That multiple requests may

6   call for the same document does not justify withholding it.  And while "compound" questions are

7   objectionable at depositions, there is no such rule regarding document requests.  Requests 82-86

8   do not ask Switch to speculate, but rather to produce any documents in its possession, custody, or

9   control concerning customer preferences and switching costs.  Certainly Switch, the self-anointed

10  founder of the data center industry, knows something about these topics.  "Foundation" is also not

11  a valid objection to a document request.  Switch may dislike the "premise" of Cobalt's requests

12  seeking documents relating to Switch's market power, intent to control markets and exclude

13  competitors, and barriers to entry, but if Switch has responsive documents, Switch must produce

14  them.  The Court should overrule these objections.

15       <u>Confidentiality and Trade Secrets</u>.  "Confidentiality in and of itself is not a legitimate

16  grounds of objection."  *Caesars Entm't Operating Co. v. Emarker, LLC*, No. 2:15-cv-02214-

17  JAD-VCF, 2016 U.S. Dist. LEXIS 86735, at *8 (D. Nev. July 1, 2016) (quoting *Collins*, 2014

18  U.S. Dist. LEXIS 130298, at *3).  "Merely because the Defendant[] assert[s] a document may be

19  'confidential' will not govern discoverability in a federal court action, particularly where the

20  objecting party fails to state why or how the document is confidential nor cite any relevant federal

21  discovery authority which upholds such an assertion of confidentiality and that discovery or

22  review of such a document is precluded."  *Id.* (citing *Collins* at *3).  This is particularly the case

23  where, as here, the Court has entered a stipulated protective order governing the disclosure of

24  confidential information.  *See id.*  Accordingly, the Court should overrule Switch's 77

25  "confidential" and "trade secret" objections.  The Court should also overrule Switch's objection

26  to RFP Nos. 25-27, 30-33, 36-39, 41-48, 50-67, and 72-85 as seeking third parties' allegedly

27  confidential data.  The protective order does not allow a third party to "object" to Switch

28  producing the third party's confidential information.  *See* Ex. C at 16-17, RFP Nos. 25-27.

Rather, to the extent Switch has a third party's confidential documents, and "*an agreement with the Non-Party not to produce the Non-Party's confidential information*," Switch must notify the non-party.  ECF No. 45 at 8, ¶ 8(b) (emphasis added).  If the non-party does not file a motion for a protective order within 14 days, Switch must produce the documents.  *Id.* at 9, ¶ 8(c).  Given Switch served its Responses months ago and no third party has filed a motion for a protective order, Switch cannot invoke any third parties' confidentiality concerns to avoid producing documents.[7]

> **C.**   **The Court Should Order Switch to Serve Further Responses Agreeing to Conduct a Good Faith Search for and Produce All Responsive, Non-Privileged Documents in Switch's Possession, Custody, or Control**

In response to all of Cobalt's Requests, Switch failed to "state that inspection and related activities will be permitted as requested" and failed to "state whether any responsive materials are being withheld."  Fed. R. Civ. P. 34(b)(2)(B)-(C).  Instead, with the condition, "without waiving said objection," Switch responded with one or more of the following:

- "None," "None at this time," or "Switch has had no communications" about the requested information (RFP Nos. 2-3, 14, 18, 21-23, 29, 32-33, 38-39, 42, 44, 47-49, 52, 54-55, 58-60, 66, 69-74, and 77);
- "Defendant is unable to respond to this Request" (RFP Nos. 6-7 and 87-88);
- "Plaintiff [sic] will respond [or further respond] to this Request once it receives additional clarity regarding the same from Plaintiff" (RFP Nos. 1, 3-5, 7-13, 15-20, 23, 27-38, 40-46, 50-86, and 92);
- "Additional documents may be disclosed pursuant to the terms of the protective order" (RFP Nos. 1 and 80);
- "Should any documents come to our attention, these will be produced for inspection pursuant to the terms of the protective order" (RFP Nos. 2, 8, 14, 18, 22-23, 29, 32-34, 47-49, 52, 54-55, 58-60, 66, and 69-75);
- "Documents will be produced pursuant to the terms of the stipulated protective order" (RFP Nos. 9-12, 15, 17, 40, 45-46, 50-51, 53, 56, 57, 61-65, 67, 81-82); and/or
- by referring Cobalt to one or a few (largely non-responsive) documents included in Switch's 1,417-page PDF (RFP Nos. 1, 4-5, 13, 19-20, 22, 24, 28, 34-35, 43, 68, 75-76, 78-80, 86, and 89-91).

---

[7] The Court should also overrule Switch's objection to RFP No. 4 as seeking "material subject to protective order or ongoing litigation" in another case.  That material may be "subject to a protective order" or the subject of other litigation does not render it non-discoverable.

1    These responses violate Rule 34 because they fail to specify what documents Switch will produce

2    and what documents it purports to withhold on the basis of its objections.  Instead, Switch states a

3    litany of boilerplate objections and either (1) does not state it will produce responsive documents

4    or (2) states Switch "may" produce responsive documents — in some cases, only if they

5    somehow "come to [Switch's] attention" — but "without waiving" Switch's objections.   Such

6    "[c]onditional responses and/or the purported reservation of rights by a responding party are

7    improper and ultimately have the effect of waiving the objections to the discovery requests"

8    because they "leave[] [the requesting party] and the Court guessing as to whether all responsive

9    documents will be produced."  *Herrera v. AllianceOne Receivable Mgmt.*, No. 14-CV-1844-BTM

10   (WVG), 2016 U.S. Dist. LEXIS 40474, at *7-8 (S.D. Cal. Mar. 28, 2016).[8]

11          In addition, Switch's statements that it has no documents responsive to 30 of Cobalt's

12   requests, and that the only documents it has responsive to some requests are a few contained in its

13   1,417-page PDF, are not credible.  Indeed, counsel for Switch conceded that, by and large, the

14   only thing they did to identify responsive documents was to search for emails between Switch and

15   10 external email domain names, and that Switch is not remotely close to completing its search

16   for responsive documents.  Accordingly, the Court should order Switch to serve further responses

17   stating Switch will conduct a reasonable inquiry and diligent search for responsive documents and

18   produce all non-privileged responsive documents it locates.  See *Lizarraga v. Buffalo Wild Wings,*

19   *Inc.*, No. 2:15-cv-1655-MMD-VCF, 2016 U.S. Dist. LEXIS 50358 (D. Nev. Apr. 14, 2016):

20          If the responding party asserts that the requested documents do not exist, the
21          responding party should so state with sufficient specificity to allow the Court to
             determine whether the party made a reasonable inquiry and exercised due
22          diligence.  Information regarding the search conducted should be provided
             through declarations under oath detailing the nature of the efforts to locate
23          responsive documents.

24

25   _____

26   [8] *See also Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns, LLC*, No. 11-2684- JWL,
     2014 U.S. Dist. LEXIS 16938, at *8 (D. Kan. Feb. 11, 2014) ("The court recognizes that it has
     become common practice . . . to respond to discovery requests by asserting objections and then
27   answering 'subject to' or 'without waiving' their objections.  This practice, however, is
     manifestly confusing (at best) and misleading (at worse), and has no basis at all in the Federal
28   Rules of Civil Procedure. . . .  [S]uch conditional answers are invalid and unsustainable.").

- 23 -

*Id.* at *11-12 (quotation marks and alterations omitted).[9]

### D. The Court Should Order Switch to Produce All Responsive, Non-Privileged Documents in Compliance with the ESI Order by May 31, 2018

Cobalt served its Requests on October 16, 2017 — *six months* ago.  This Court entered the ESI order in December 2017.  To date, Switch has produced a handful of PDF files numbering a mere 8,060 pages, containing duplicative, mostly irrelevant documents or documents to which Cobalt already had access.  Kleiman Decl., ¶¶ 4, 12.  Cobalt has extended more than reasonable patience and courtesy to Switch as Switch has taken now over three months simply to secure an e-discovery vendor.  The obstructionism and delay must end.  The Court should order Switch to conduct a diligent search for all responsive documents and produce all documents it locates, in compliance with the ESI order, by May 31, 2018.

## V.   CONCLUSION

For the foregoing reasons, the Court should grant Cobalt's motion and order Switch: (1) to serve further responses on behalf of Switch, Inc., Switch Communications Group L.L.C., and Switch Business Solutions, LLC, without objections, within ten days; (2) to serve further responses on behalf of Switch, Ltd. without any objections other than attorney-client privilege and attorney work product, within ten days; (3) to serve further responses on behalf of all defendants stating Switch will conduct a diligent search for all responsive documents and produce all responsive documents in its possession, custody, or control, within ten days; (4) with respect to any requests in response to which Switch determines it has no responsive documents after a diligent search and inquiry, serve an affidavit that Switch conducted such a search, including the

---

[9] *See, e.g., Gen. Cigar Co. v. Cohiba Caribbean's Finest, Inc.*, No. 2:06-cv-00575-BES-GWF, 2007 U.S. Dist. LEXIS 24595, at *22 (D. Nev. Mar. 30, 2007) (ordering defendants to "make a further reasonable inquiry to identify and produce all additional documents in their possession, custody and control" and "provide Plaintiff with a sworn affidavit or declaration detailing the nature of their 'reasonable inquiry'"); *Garcia v. Bana*, No. C 11-02047 LB, 2012 U.S. Dist. LEXIS 79888, at *30-31 (N.D. Cal. June 9, 2012) (holding plaintiff must supplement its responses that stated "Plaintiff has no responsive documents in his possession" with a "state[ment] that a diligent search and reasonable inquiry have been made in an effort to locate the documents requested"); *Banuelos v. City of San Bernardino*, No. EDCV 13-736-GW (KKx), 2017 U.S. Dist. LEXIS 198247, at *14 (C.D. Cal. Dec. 1, 2017) ("To the extent Plaintiff does not have any additional responsive documents in his possession, custody, or control, he must state under oath that he has conducted a diligent search and reasonable inquiry.").

- 24 -

1  steps undertaken in such search, within ten days; and (5) to complete Switch's document

2  production by May 31, 2018.

3

4  Dated:  April 19, 2018

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  s/ I. Scott Bogatz
I. Scott Bogatz
Nevada Bar No. 3367
Kerry E. Kleiman
Nevada Bar No. 14071
**REID RUBINSTEIN & BOGATZ**
Bank of America Plaza
300 South 4th Street, Suite 830
Las Vegas, NV 89101
Telephone:  (702) 776-7000
Facsimile:  (702) 776-7900
sbogatz@rrblf.com
kkleiman@rrblf.com


Bryan A. Merryman (*Pro Hac Vice*)
Catherine Simonsen (*Pro Hac Vice*)
**WHITE & CASE LLP**
555 S. Flower Street, Suite 2700
Los Angeles, CA  90071-2433
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329
bmerryman@whitecase.com
catherine.simonsen@whitecase.com

Claire DeLelle (*Pro Hac Vice*)
**WHITE & CASE LLP**
701 Thirteenth Street, NW
Washington, DC 20005-3807
Telephone:  (202) 626-3600
Facsimile:  (202) 639-9355
claire.delelle@whitecase.com

Attorneys for Plaintiff
V5 TECHNOLOGIES, LLC, d/b/a COBALT
DATA CENTERS

- 25 -

## PROOF OF SERVICE

I hereby certify that I am employed in Las Vegas, Nevada.  I am over the age of 18 and not a party to the within action.  My business address is:

REID RUBINSTEIN & BOGATZ
Bank of America Plaza
300 South 4th Street, Suite 830
Las Vegas, NV 89101

On April 19, 2018, I caused the foregoing document(s) to be filed via the Court's CM/ECF system, which will accomplish service on all parties of record through their counsel.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on April 19, 2018, at Los Angeles, California.


By:  s/ I. Scott Bogatz
I. Scott Bogatz