1

2

3

4

5

6

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

**\* \* \***

| | |
|---|---|
| V5 TECHNOLOGIES, LLC d/b/a COBALT DATA CENTERS, | Case No. 2:17-cv-02349-KJD-NJK |
| Plaintiff, | **ORDER RE MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| SWITCH, LTD., | |
| Defendant. | |

Before the Court are Plaintiff's Motion for Partial Summary Judgment (#189) and Defendant's Motion for Summary Judgment (#200). Both parties responded in opposition (#282/294) to which each party replied (#315/321).

I.    Factual and Procedural History

Plaintiff V5 Technologies, LLC d/b/a Cobalt Data Centers ("Cobalt") brought this antitrust and tortious interference action on September 7, 2017 after a failed attempt to enter the data storage market. (#1 at 3). Cobalt alleges that Defendant Switch, LTD. ("Switch") employed anticompetitive practices that forced Cobalt to close and attempt to mitigate substantial losses. Id. In addition to the antitrust claims, Cobalt alleges that Switch tortiously interfered with Cobalt's contractual relationships, causing it to go out of business.

The issue began when a former Switch employee, Michael Ballard ("Ballard") allegedly stole intellectual property from Switch and used it to start Cobalt, a competing data storage facility. (#200 at 16). Switch filed a lawsuit against Ballard, which concluded with a settlement agreement in 2013. Id. at 17. Cobalt alleges that Switch became focused on eliminating Ballard's new company and making it impossible for Cobalt to compete with Switch. (#189 at 2). Cobalt continued soliciting clients in the data colocation storage business but by 2015 Cobalt was forced to shut down its operations. (#189 at 10).

Cobalt claims that Switch led an intentional campaign against Cobalt and competition in

1  general by creating exclusive partnership and sponsorship agreements with important industry

2  leaders and network providers in Las Vegas. Id. These included Zayo, CenturyLink, Las Vegas

3  Chamber of Commerce, and Las Vegas Global Economic Alliance, among others. Cobalt also

4  alleges that Switch colluded with certain customers to "rig" competitive contracting procedures

5  to ensure that only Switch could win certain business. Id. Additionally, Cobalt alleges that

6  Switch utilized an Acceptable Use Policy that made it impossible for competitors to thrive in the

7  market. Id. The policy prohibited interconnections between Switch and other data centers. Id. at

8  12–13.

9  Switch alleges that the lawsuit is meritless and an attempt to win a settlement from

10  Switch. (#200 at 18–19). It argues that Cobalt failed because it was mismanaged, entered the

11  market at a time of oversupply of data center space, and offered an inferior product. Id. The

12  record is extensive and many of the facts are disputed. Discovery has concluded, and after

13  "millions of dollars and millions of documents" Plaintiff seeks partial summary judgment for

14  elements of its state tortious interference claims and Defendant seeks complete summary

15  judgment on all claims. Id. at 13.[1]

16  II.    Legal Standard

17  Summary judgment may be granted if the pleadings, depositions, answers to

18  interrogatories, and admissions on file, together with affidavits, if any, show that there is no

19  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

20  matter of law.  See FED. R. CIV. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322

21  (1986).  The moving party bears the initial burden of showing the absence of a genuine issue of

22  material fact.  See Celotex, 477 U.S. at 323.  The burden then shifts to the nonmoving party to

23  set forth specific facts demonstrating a genuine factual issue for trial.  See Matsushita Elec.

24  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

25  All justifiable inferences must be viewed in the light most favorable to the nonmoving

26  party.  See Matsushita, 475 U.S. at 587.  However, the nonmoving party may not rest upon the

---

[1] The parties are well aware of the facts. A more detailed review of the facts exists in the analysis section discussing Switch's behavior toward specific Cobalt customers.

1   mere allegations or denials of his or her pleadings, but he or she must produce specific facts, by

2   affidavit or other evidentiary materials as provided by Rule 56(e), showing there is a genuine

3   issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "Where evidence

4   is genuinely disputed on a particular issue—such as by conflicting testimony—that 'issue is

5   inappropriate for resolution on summary judgment.'" Zetwick v. Cnty. of Yolo, 850 F.3d 436,

6   441 (9th Cir. 2017) (quoting Direct Techs., LLC v. Elec. Arts, Inc., 836 F.3d 1059, 1067 (9th

7   Cir. 2016)).

8        III.    Analysis

9        Switch argues that summary judgment is warranted because Cobalt has not provided and

10  cannot provide evidence to support its antitrust and tortious interference claims. In this case, with

11  such an extensive docket, a myriad of factual disputes, conflicting expert reports, and significant

12  discovery regarding the antitrust claims, granting summary judgment without giving a jury the

13  chance to weigh the evidence is improper. See Campbell v. PricewaterhouseCoopers, LLP, 642

14  F.3d 820, 832 (9th Cir. 2011) (holding summary judgment is improper when a jury should

15  evaluate the credibility and weight of the extensive conflicting evidence). Conversely, the state

16  tort claims, with their different elements, do warrant summary judgment. The Court will analyze

17  the motion on the antitrust claims first before analyzing the state tort claims.

18        A.  Relevant market

19       Switch argues that Cobalt cannot support its claimed relevant market. To prevail on a

20  claim under the Sherman Act, "a plaintiff must allege that the defendant has market power within

21  a relevant market." Newcal Indus. v. Ikon Office Solution, 513 F.3d 1038, 1045 (9th Cir. 2008)

22  (citations omitted). "The term 'relevant market' encompasses notions of geography as well as

23  product use, quality, and description." Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1446 (9th

24  Cir. 1988). The relevant product market includes "the group or groups of sellers or producers

25  who have actual or potential ability to deprive each other of significant levels of business."

26  Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1374 (9th Cir. 1989). The

27  relevant geographic market "is the area of effective competition where buyers can turn for

28  alternate sources of supply." St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., 778

1   F.3d 775, 784 (9th Cir. 2015) (citations omitted). The definition of the relevant market "is a

2   factual inquiry for the jury, and the court may not weigh evidence or judge witness credibility."

3   Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1435 (9th Cir. 1995). Summary

4   judgment regarding the relevant market definition is only appropriate if the plaintiff's evidence

5   "cannot sustain a jury verdict on the issue." Id.

6       Both parties have provided substantial evidence to support their claims. Experts have

7   given contradictory opinions regarding what the relevant market is and how it should be defined.

8   At this state in the litigation, it is outside the Court's authority to weigh the evidence and

9   consider the credibility of the witnesses. Id. The Court cannot find that no reasonable jury could

10  sustain a verdict based on the evidence provided. Therefore, summary judgment regarding the

11  relevant market definition is improper.

12                  B.  Anticompetitive behavior

13      Switch argues that none of Cobalt's evidence can sustain a claim of anticompetitive

14  behavior. Switch claims that it had procompetitive rights to act as it did and that its actions only

15  harmed Cobalt, not competition in general, which the law requires. Additionally, Switch claims

16  that Cobalt released Switch of all potential claims in a 2013 settlement agreement and that

17  Cobalt's damages were miscalculated and not attributable to Switch's conduct. Cobalt contends

18  that a jury could find anticompetitive behavior when looking at Switch's actions in the aggregate

19  as it led to substantial foreclosure from the market, that the 2013 settlement agreement only

20  applied to the intellectual property claims relevant to that case, and that factual disputes exist as

21  to the amount of damages.

22      Cobalt has alleged that Switch violated the Sherman Act. Specifically, it claims antitrust

23  violations for monopolization, attempted monopolization, and unlawful agreements in restraint

24  of trade. To prevail on a monopolization claim, Cobalt must prove "(1) the possession of

25  monopoly power in the relevant market and (2) the willful acquisition or maintenance of that

26  power as distinguished from growth or development as a consequence of a superior product,

27  business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570–71

28  (1966). Monopoly power is defined as "the power to control prices or exclude competition."

1    United States v. E. I. du Pont De Nemours & Co., 351 U.S. 377, 391 (1956). To prevail on an

2    attempted monopolization claim, Cobalt must establish "(1) specific intent to control prices or

3    destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that

4    purpose; (3) a dangerous probability of achieving 'monopoly power'; and (4) causal antitrust

5    injury." Rebel Oil Co., Inc. v. Atlantic Richfield, Co., 51 F.3d 1421, 1434 (9th Cir. 1995). The

6    requirements of an attempted monopolization claim are similar to a monopolization claim but

7    differ "primarily in the requisite intent and the necessary level of monopoly power." Image

8    Technical Services, Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1202 (9th Cir. 1997). The

9    unlawful agreements in restraint of trade claim requires a showing of "(1) the existence of an

10   agreement, and (2) that the agreement was in unreasonable restraint of trade." Aerotec Int'l, Inc.

11   v. Honeywell Int'l, Inc., 836 F.3d 1171, 1178 (9th Cir. 2016). Cobalt brings this claim due to

12   Switch's acceptable use policy agreement, partnership and exclusivity agreements, and an

13   alleged scheme "tying" benefits of Switch's C.O.R.E. program with other Switch offerings.

14           Summary judgment is only appropriate when there are no genuine issues of material fact.

15   FED. R. CIV. P. 56(a). After reviewing the record in the light most favorable to the non-moving

16   party, the Court finds that Cobalt has met its burden to show genuine factual issues for trial.

17   Matsushita, 475 U.S. at 587. The parties have provided vast amounts of competing expert

18   testimony. Switch alleges that there is no evidence from which a jury could conclude that its

19   actions excluded Cobalt from any portion of the market. Cobalt counters with expert testimony

20   that states that Switch's conduct foreclosed it, and other companies, from the market. Switch also

21   argues it did not create barriers to entry in the market for prospective competitors. Cobalt's

22   expert disagrees. The Court will not determine which experts are correct. A jury will be tasked

23   with listening to the expert testimony, judging its credibility, and determining the facts.

24   Questions of material fact exist as to whether Switch's actions had anticompetitive effects.

25   Additionally, the anticompetitive behavior relies heavily on a finding of monopoly power in a

26   market. The market will be defined by the jury, which provides more reason for a jury to

27   determine the facts regarding the anticompetitive behavior. Therefore, the Court denies Switch

28   summary judgment on the anticompetitive behavior aspect of the antitrust claims.

1      C.  <u>Damages</u>

2          Experts for both parties have testified regarding the amount of damages Cobalt allegedly

3      suffered as well. Their testimony will assist a jury in determining the proper amount of damages.

4      In antitrust cases, "as long as the fact of damage is certain, uncertainty as to the extent of that

5      damage is not fatal to a plaintiff's case." <u>Rebel Oil Co. v. Atlantic Richfield Co.</u>, 957 F.Supp.

6      1184, 1197 (D. Nev. 1997). Switch argues that Cobalt's expert's damages calculation is too

7      speculative because it calculates what Cobalt's financial state would have been but for Switch's

8      actions. However, "[h]ypothetical markets are often the only way to prove damages in antitrust

9      cases." <u>Id.</u> Cobalt provides evidence to support the damages calculation and the jury will be

10     tasked with weighing the provided evidence. The Court addressed one issue of the damages

11     calculation in its order denying Switch's motion to exclude Cobalt's experts. (#377). As stated in

12     the order, if Cobalt is successful in its antitrust claim, it may recover "its going-concern value or

13     its projected future lost profits, but not both." 4 Antitrust Counseling and Litigation Techniques §

14     42.01(i) (quoting <u>Coastal Fuels, Inc. v. Caribbean Petroleum Corp.</u>, 175 F.3d 18, 27 (1st Cir.

15     1999)). The going-concern value is to be evaluated as of the date Cobalt went out of business. <u>Id.</u>

16     Evaluating the going-concern value as of a date closer to trial and "long after the company

17     ceased to be a going concern" would rely "too heavily on speculation and conjecture." <u>Coastal</u>

18     <u>Fuels</u>, 175 F.3d at 27 (quoting <u>Farmington Dowel Products Co. v. Forster Mfg. Co.</u>, 421 F.2d 61,

19     81 (1st Cir. 1969)). Cobalt's expert will have to testify regarding the going-concern value as of

20     the date Cobalt went out of business.

21         Cobalt's current aggregated damages calculation is permitted because a jury could find

22     that certain aspects of the antitrust claim warrant the entire award. Cobalt's failure to

23     disaggregate the damages between the multiple alleged anticompetitive acts or the tort claims

24     makes it difficult for a jury to properly award damages without relying on mere speculation. If

25     the jury finds that some of the alleged behavior is not an antitrust violation, the Court will have

26     to take care to ensure any jury verdict is not too speculative. In this case, the Court finds that

27     Cobalt "has presented evidence from which a jury could reasonably estimate the amount of

28     [Cobalt's] injury without speculation if [Cobalt's] damages evidence [is] filled in by testimony at

1   trial." <u>Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.</u>, 773 F.2d 1506, 1513 (9th Cir. 1985).[2]

2   Therefore, the Court denies Switch summary judgment on the issue of damages.

3         Because genuine issues of material fact exist, summary judgment on the antitrust claims,

4   i.e., monopolization, attempted monopolization, and unlawful agreements in restraint of trade, is

5   improper.

6                     D.  <u>Tortious interference claims</u>

7         In its complaint, Cobalt brought claims of intentional interference with contractual

8   relations and intentional interference with prospective economic advantage. Both Cobalt and

9   Switch seek summary judgment on these state tort claims. Switch alleges that the tort claims

10  cannot survive if the antitrust actions do not survive and petitions the Court to grant summary

11  judgment in its favor. Switch contends that its behavior was nothing more than privileged

12  competition, and that Cobalt cannot prove that Switch intended to interfere or acted improperly.

13  Cobalt argues that there are no genuine issues of material fact that prevent partial summary

14  judgment. It argues that Switch was aware of Cobalt's contracts and prospective economic

15  relationships, intended to interfere with them, and had no justifiable reason to do so.

16               i.   <u>Intentional Interference with Prospective Economic Advantage</u>

17        To prevail on an intentional interference with prospective economic advantage claim a

18  plaintiff must show "(1) a prospective contractual relationship between the plaintiff and a third

19  party; (2) the defendant's knowledge of this prospective relationship; (3) the intent to harm the

20  plaintiff by preventing the relationship; (4) the absence of privilege or justification by the

21  defendant; and, (5) actual harm to the plaintiff as a result of the defendant's conduct." <u>Leavitt v.</u>

22  <u>Leisure Sports, Inc.</u>, 734 P.2d 1221, 1225 (Nev. 1987). Interference with another's "prospective

23  contractual relation is intentional if the actor desires to bring it about or if he knows that the

24  interference is certain or substantially certain to occur as a result of his action." <u>Las Vegas-</u>

25  <u>Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of So. Nev.</u>, 792 P.2d 386, 388 (Nev. 1990).

26  "Privilege can exist when the defendant acts to protect his own interests." <u>Leavitt</u>, 734 P.2d at

27  1226. "Free competition is a significant privilege or justification for interference with

28   

[2] The Court will consider bifurcating the trial to assess damages after the issue of liability has been decided.

1   prospective economic advantage." <u>Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.</u>, 254

2   F.Supp.3d 1173, 1181 (D. Nev. 2003). However, this does not give competitors "carte blanche in

3   their dealings with each other." <u>Id.</u> The "gravamen of this cause of action is that the interference

4   be unlawful or resort to improper means." <u>Id.</u>

5        Cobalt seeks summary judgment on the first four elements of this claim relating to

6   potential economic relationships with Zayo, CenturyLink, Cannery Casino, PAR Technology,

7   Opportunity Village, Defense Advanced Research Projects Agency ("DARPA"), City of

8   Henderson, Yorba Linda Water District ("YLWD"), SLS Las Vegas, Las Vegas Chamber of

9   Commerce ("LVCC"), Las Vegas Global Economic Alliance ("LVGEA"), and Technology

10  Business Alliance of Nevada ("TBAN"). Cobalt also alleges it lost "countless" and "innumerable

11  other prospects" due to Switch's behavior. (#189, at 33).

12       Nevada has adopted the Restatement view when determining if conduct that interferes

13  with economic advantage is privileged. <u>Rebel Comms., LLC v. Virgin Valley Water Dist.</u>, 2015

14  WL 4172442, *4 (D. Nev. July 9, 2015). Those factors include "

15  (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the
    other with which the actor's conduct interferes, (d) the interests sought to be
16  advanced by the actor, (e) the social interests in protecting the freedom of action
    of the actor and the contractual interests of the other, (f) the proximity or
17  remoteness of the actor's conduct to the interference, and (g) the relations
    between the parties.

18
19  Restatement (Second) of Torts §767. Applying these factors and the relevant state law, the Court

20  finds that much of Switch's conduct was privileged. Therefore, Cobalt cannot prove a necessary

21  element of its intentional interference with prospective economic advantage claim.

22       The nature of Switch's conduct appears mostly to be enforcing exclusivity, acceptable

23  use, or partnership agreements with third parties. Switch competes in the industry and seeks to

24  protect its investments. These mutually beneficial agreements are commonplace in a free market.

25  Exclusive dealing "is neither per se nor presumptively illegal." WILLIAM C. HOLMES & MELISSA

26  H. MANGIARACINA, ANTITRUST LAW HANDBOOK § 2:19. Switch's motive was to enforce its

27  contracts and expand its business. Cobalt has provided evidence that there was bad blood

28  between Switch and Cobalt and that some of Switch's conduct mentions Cobalt specifically.

    While some of the actions might have been impacted by this bad blood, Switch has every right to

enforce the agreements negotiated and agreed to by the participating parties. Cobalt's interests were the same as Switch's; to compete in the industry and grow the business. Promoting competition strengthens the social interest of protecting the freedom of action. Both parties had the right to enter into and enforce contracts. A customer ultimately deciding not to agree to a contract with one business, because doing so would threaten its ongoing relationship with another strategic partner, does not strike the Court as improper. These factors weigh in favor of a finding that Switch's conduct was privileged competition.

The remaining factors weigh in favor of the opposite. Switch employees had their hands directly involved in many of the alleged interferences. Combine that direct involvement with the history of conflict these parties share as Switch has viewed Cobalt as an unethical company founded on the theft of its intellectual property. These final factors weigh in favor of finding that Switch's behavior was not privileged. However, Nevada permits parties to "protect the interests they had acquired via a valid contract." Rimini Street, Inc. v. Oracle International Corp., 2020 WL 5531493, *9 (D. Nev. 2020) (quoting Leavitt v. Leisure Sports, Inc., 734 P.2d 1221, 1226 (Nev. 1987)). Cobalt does not allege that the agreements are not valid contracts and the Court is unaware of any authority that makes such a finding. As such, the Court grants Switch summary judgment on Cobalt's intentional interference with prospective economic advantage claim regarding the relationships with CenturyLink, Zayo, Cannery Casino, PAR Technology, City of Henderson, SLS Las Vegas, LVCC, LVGEA, TBAN, Nicole Folino, MGM, Caesar's, Boyd Gaming, the Cosmopolitan, Station Casinos, and the unnamed vendors, contractors, and other parties. Cobalt's allegations regarding these relationships all stem from Switch's valid exclusivity, partnership, or acceptable use agreements, which Switch was privileged to enforce.

Switch's actions regarding other named parties with whom Cobalt had a prospective economic relationship will be discussed individually.

### 1. Opportunity Village

Cobalt argues that Switch utilized predatory pricing to win a contract with the non-profit organization over Cobalt. There is no dispute that Cobalt was negotiating a deal with Opportunity Village. Switch employees became aware of the potential deal and offered to

1    provide Opportunity Village its services free of charge. Cobalt alleges this is predatory pricing

2    and evidence of improper interference. In antitrust law, predatory pricing is proved by showing

3    prices "below an appropriate measure of its rival's costs" and a dangerous probability "that the

4    defendant will be able to recoup its investment in below-cost prices." Pac. Bell Telephone Co. v.

5    linkLine Comms., Inc., 555 U.S. 438, 451 (2009) (quotations omitted). While Switch's donation

6    to Opportunity Village might be below Cobalt's prices, Cobalt has not shown how Switch can

7    recoup its losses. Alternatively, Switch continues to donate these services to Opportunity

8    Village. (#282, at 3).

9            Cobalt has failed to show how Switch's donation of services to a non-profit organization

10    warrants tort liability. An analysis of the Restatement factors shows that Switch's conduct was

11    privileged. It intended to garner goodwill and donate to a charity. Opportunity Village, as a non-

12    profit organization, has an interest in keeping costs low. This type of services donation should be

13    encouraged in a free market system. Therefore, the Court grants summary judgment to Switch on

14    Cobalt's claim of intentional interference with a prospective economic advantage regarding its

15    relationship with Opportunity Village.

16                              2.   YLWD

17            Cobalt alleges that Switch interfered with its prospective economic advantage from

18    Yorba Linda Water District. Cobalt claims to have been in extensive negotiations with YLWD to

19    provide data colocation services. Then, out of the blue, YLWD decided to do business with

20    Switch. Cobalt claims that Switch found out YLWD was likely going to do business with Cobalt

21    and engaged in predatory pricing to interfere with Cobalt's prospective contract. Switch alleges

22    that Cobalt lost the YLWD contract because it did not offer the lowest price. Switch provides

23    evidence showing that Cobalt's bid was more expensive than both Switch's and ViaWest's. The

24    record evidence cited by Cobalt cannot show that Switch's intent was to interfere with Cobalt's

25    prospective economic advantage.

26            The evidence shows that Switch ended up providing its services for less than originally

27    quoted. However, none of the evidence Cobalt cites to in its motion indicates that Switch

28    lowered its prices because Cobalt was about to win the contract. Mr. Brown's deposition

1   testimony states that he was surprised Switch was interested in such a small contract and did not

2   know how Switch could profit from such a price. He also testifies that he is not an expert in

3   Switch's revenue scheme. Switch was also competing with ViaWest for this business. Without

4   evidence showing Switch altered its prices with the intent to harm Cobalt, the elements of the

5   tort cannot be satisfied. <u>Leavitt</u>, 734 P.2d at 1225 (listing the elements of the tort that must be

6   satisfied, including "intent to harm the plaintiff."). This was competition between three

7   companies for a contract and it does not rise to the level of tortious interference. Therefore, the

8   Court grants summary judgment to Switch on Cobalt's intentional interference of prospective

9   economic advantage regarding the YLWD contract.

10   <center>3. <u>DARPA</u></center>

11   Cobalt's tort claim concerning the DARPA prospective contract fails for the same reason

12   as the YLWD claim. Cobalt cannot prove the elements required to succeed. Cobalt, along with

13   other data centers, was in the running for the DARPA contract. Along the way, DARPA decided

14   it was important to make sure the event was successful and decided to alter its requirements.

15   Cobalt acknowledges that DARPA "inexplicably rewrote the requirements." (#189, at 15 on

16   printed version). DARPA spoke with Switch before changing the requirements. However, Cobalt

17   has not shown that Switch's influence was responsible for the change. DARPA decided it needed

18   a Tier IV certified data center with onsite conference room space to hold all the event

19   participants in the event the original space would not work. It also needed to be within a certain

20   physical distance from the event. Switch was the only data center that met those requirements.

21   Cobalt cannot prove that Switch caused those changes to be made. The Court will not analyze

22   DARPA's needs for its event or its motive in changing the requirement. Cobalt's problem

23   appears to be more with DARPA than it is with Switch.

24   Based on the evidence, Cobalt cannot prove the necessary elements of the tort. Switch's

25   motive was to win a contract, not interfere specifically with Cobalt's contract. There is no

26   indication in the record that Cobalt would have won the contract over any other data center had

27   the requirements not changed. Switch participated in a competitive market and ultimately the

28   prospective client determined it was the best option. Cobalt cannot show, under the Restatement

<center>- 11 -</center>

1    factors, that Switch's actions were not privileged competition. "Conduct consistent with free

2    competition, that does not involve interference by 'unlawful or improper means' and does not

3    'unjustly enrich' a defendant, is privileged." INAG, Inc. v. Richar, Inc., 2017 WL 4273103, * 4

4    (D. Nev. Sept. 25, 2017) (quoting Crockett v. Sahara Realty Corp., 591 P.2d 1135, 1137 (Nev.

5    1979)). This is such conduct. The Court grants summary judgment to Switch on Cobalt's

6    intentional interference with prospective economic advantage claim regarding the DARPA

7    bidding process.

8        Accordingly, the Court grants summary judgment to Switch regarding Cobalt's tortious

9    interference with prospective economic advantage claims.

10                          ii.     Intentional Interference with Contractual Relations

11       Cobalt seeks partial summary judgment on the first three elements of its tortious

12   interference with contractual relations claim. Cobalt alleges that Switch engaged in behavior

13   designed to interfere with the contracts Cobalt had with all of its customers, but specifically

14   names contracts with Networx, SilverBack, Zeneva, Vince Sandoval, NefEffect, and SLS. Cobalt

15   has produced some, but not all, of its contracts during discovery. Switch seeks full summary

16   judgment on the claim, arguing that Switch's behavior was nothing more than legal competition.

17   Switch also argues that Cobalt's claims fall outside the statute of limitations, Cobalt has not

18   proven damages, and that the allegations are not specific enough to warrant presentation to a

19   jury.

20       In an action for intentional interference with contractual relations, a plaintiff must

21   establish "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3)

22   intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption

23   of the contract; and (5) resulting damage." Blanck v. Hager, 360 F.Supp. 2d 1137, 1154 (D. Nev.

24   2005). A plaintiff must also establish "that the defendant had a motive to induce breach of the

25   contract with the third party." J.J. Indus. LLC v. Bennett, 71 P.3d 1264, 1268 (Nev. 2003)

26   (quoting Nat'l Right to Life Pol. Action Comm. v. Friends of Bryan, 741 F.Supp. 807, 814 (D.

27   Nev. 1990)). Mere knowledge that a plaintiff had a contract with a third party is "insufficient to

28   establish that the defendant intended or designed to disrupt the plaintiff's contractual

- 12 -

1    relationship." J.J. Indus., 71 P.3d at 1268. The element of actual breach or disruption "requires

2    that a plaintiff show either an actual breach of a contract or a significant disruption of a contract

3    rather than a simple impairment of contractual duties." Rimini Street, Inc. v. Oracle Intern.

4    Corp., 2020 WL 5531493, *8 (D. Nev. Sept. 14, 2020) (citing Treasury Sols. Holdings, Inc. v.

5    Upromise, Inc., 2010 WL 5390134, *5 (D. Nev. Dec. 22, 2010)).

6           Recently, this district was faced with an open question of law that no Nevada court had

7    addressed. Rimini Street, 2020 WL 5531493, at *8–9. The Rimini Street court predicted that the

8    Nevada Supreme Court would extend the absolute privilege doctrine from intentional

9    interference with prospective economic advantage claims to claims of intentional interference

10   with contractual relations. Id. "Absolute privilege is included in the Restatement approach to

11   intentional contractual interference, and 'Nevada state courts often follow the Restatement

12   approach to the interference torts.'" Id. at *9 (quoting Nationwide Transp. Fin. v. Cass Info. Sys.,

13   Inc., 523 F.3d 1051, 1055 n.2 (9th Cir. 2008)). This Court agrees with that analysis and extends

14   the absolute privilege doctrine to Cobalt's intentional interference with contractual relations

15   claim.

16          As stated previously, Switch had a privilege to protect its interests acquired via a valid

17   contract. Therefore, Cobalt's claims that Switch's AUP, partnership agreements, or exclusivity

18   agreements constituted Switch's tortious behavior cannot survive. The Court grants summary

19   judgment to Switch on Cobalt's intentional interference with contractual relations claims

20   regarding all contracts that were impacted by Switch's exclusivity agreements.

21          The Court will analyze the other named parties with whom Cobalt had a contractual

22   relationship individually.

23                              1.   NetEffect

24          The alleged interference with the NetEffect contract does not arise from Switch's

25   exclusivity contracts. Instead, Cobalt alleges that Switch told NetEffects' CEO, Jeffrey Grace

26   ("Grace") that he had to cut all ties with Cobalt. No genuine issues of fact exist regarding this

27   contract. In 2014, Grace provided a quote promoting Cobalt in an article about the data center.

28   When Switch employees discovered that Grace, one of Switch's customers, had something

1  positive to say about Cobalt, they wondered if there was any action that needed to be taken

2  against Grace because Switch had given Grace and NetEffect a discount on cabinet space.

3  Switch then called Grace and asked him "are you with Switch or with Cobalt?" (#189, at 19).

4  Grace and NetEffect terminated their contract with Cobalt in July 2015.

5    Cobalt alleges that this behavior by Switch to make a customer pick sides constitutes

6  intentional interference with contractual relations. While that might be the case, the evidence

7  Cobalt cites does not support this argument. In his deposition, Grace was asked about this

8  interaction. Grace testified that someone at Switch had asked if he wanted to join their alliance.

9  (#197-2, at 69). Grace declined joining Switch's "Rebel Alliance."[3] Grace was then asked about

10  Switch asking him to terminate his contract with Cobalt. Grace testified that he was never

11  threatened by anyone at Switch to leave Cobalt and that it "doesn't sound like something I've

12  ever thought or believed." Id. No reasonable jury could find that this evidence is sufficient to

13  prove the elements of this tort. Even if Switch had threatened Grace to leave Cobalt at that time,

14  Grace did not terminate his contract until almost one year later. Switch's phone call inquiring

15  about Grace's allegiance a full year before he canceled his Cobalt contract is insufficient

16  evidence to prove the elements of this tort. The Court grants summary judgment to Switch on

17  Cobalt's intentional interference with contractual relations claim regarding its contract with

18  NetEffect.

19         2.  <u>SilverBack Migration Solutions</u>

20    Cobalt claims that Switch's behavior regarding SilverBack Migrations Solutions

21  ("SilverBack") interfered with its contractual relationship. SilverBack provides colocation

22  support services for companies that store data with companies like Cobalt or Switch. The parties

23  dispute whether Cobalt and SilverBack officially entered into a partnership agreement.[4]

24  

25    [3] The Rebel Alliance is a reference to the science fiction movie Star Wars. In Star Wars, the Rebel Alliance,
26  i.e. the good guys, is a small group of dissenters who are determined to bring down the evil Empire. Switch appears
to see itself as the Rebel Alliance; a small group of loveable heroes, while it sees Cobalt as the Empire; an evil group
27  determined to destroy all who defy them.

28    [4] Cobalt states it "had a partnership agreement" with the company while Switch cites deposition testimony
stating it was "probably true" that there was an unwritten agreement between SilverBack and Cobalt. However, the
terms of the agreement have not been identified and no agreement has been produced.

However, the evidence makes it clear that SilverBack and Cobalt held an event together and Cobalt announced a partnership with SilverBack in a press release. After the press release, Switch CEO Rob Roy ("Roy") called SilverBack CEO Kan Jamaca ("Jamaca"). Roy asked Jamaca why he was involved with Cobalt and told him to pick a side. Jamaca told Roy that he was on Team Switch and that he remained "committed to [their] partnership." (#195-5, at 18). There is no evidence of the specifics of a partnership agreement between Switch and SilverBack either. If there was such an agreement, Switch would have been permitted to enforce any kind of exclusivity agreement. However, absent this evidence, the Court is unsure that Switch had the privilege to act. However, the Court agrees with Switch that Cobalt has not alleged damages based on this claim. There is nothing in the record that shows how or when Cobalt was damaged or lost business due to it not having an agreement with Cobalt. Without such evidence, the Court grants summary judgment to Switch for Cobalt's intentional interference with prospective economic advantage claim regarding its relationship with SilverBack.

### 3. Zeneva

The undisputed facts show that Zeneva entered into a contract with Cobalt but Zeneva failed to make its payments. Zeneva then informed Cobalt that it wished to terminate its contract. Only after this announcement to Cobalt did Switch reach out to Zeneva. Switch then offered to provide Zeneva documents that would assist in Zeneva's contract termination with Cobalt. The letter stated Zeneva's displeasure that Cobalt could not offer Zayo connectivity and threatened legal action unless Cobalt reimbursed Zeneva what it had paid. Cobalt never collected the money it claims it was due under Zeneva's contract. Switch did not reach out to Zeneva until after it had expressed a desire to terminate its contract with Cobalt. A plaintiff "must demonstrate that the defendant intended to induce the other party to breach the contract with plaintiff." J.J. Industries, 71 P.3d at 1268. Zeneva had already terminated its contract and Switch's intent was to sign a new customer, not induce a breach. Additionally, as discussed below, this claim was discovered in June of 2013 and falls outside the statute of limitations. Therefore, summary judgment is granted to Switch.

1

4.  <u>Networx</u>

2        Networx, a business unit of another company called Teledata, Inc., entered into a service

3 contract with Cobalt. After Switch found out about this contract, it prohibited Teledata and

4 Networx employees from entering Switch facilities. This was difficult for Teledata because a

5 significant amount of its business came from Switch's colocation customers. Switch drafted a

6 letter to help Networx get out of its contract with Cobalt, but Networx did not send it.

7 Eventually, Networx cancelled its contract and began doing work with Switch. The undisputed

8 evidence shows that Switch and Networx signed their contract in November of 2013. As

9 discussed later, this claim falls outside the statute of limitations. As such, the Court grants

10 summary judgment on Cobalt's intentional interference with contractual relations claim

11 regarding the Networx contract to Switch.

12

5.  <u>SLS Las Vegas</u>

13        Cobalt claims that it had a contract with SLS Las Vegas that Switch was aware of. Switch

14 then approached SLS about its data storage needs. After meeting with Switch, SLS was

15 concerned about Cobalt's inability to provide Zayo connectivity. SLS then notified Switch it

16 would terminate its contract with Cobalt and move to Switch. Cobalt claims that this behavior,

17 making a sales pitch to a potential customer that has a contract with a competitor, constitutes

18 tortious interference of a contract. Switch asserts that this is merely competitive behavior and

19 that customers should have the right to know about all service options and decide with whom to

20 do business. The Court agrees with Switch.

21        While Switch was aware of Cobalt's contract with SLS, the Court finds that Cobalt has

22 failed to show sufficient intent to interfere with this contract. A general intent to interfere "does

23 not alone suffice to impose liability." <u>J.J. Industries</u>, 71 P.3d at 1268 (quoting <u>Nat. Right to Life.</u>

24 <u>P.A.C. v. Friends of Bryan</u>, 741 F.Supp. 807, 814 (D. Nev. 1990)). The inquiry of this intentional

25 tort "usually concerns the defendant's ultimate purpose or the objective that he or she is seeking

26 to advance." <u>Id.</u> Cobalt has not shown that Switch's ultimate purpose or objective was anything

27 other than winning this contract and growing its business. Switch's ultimate purpose was not

28 simply to deprive Cobalt of this work. Further, Cobalt discovered this claim in September 2013

1   and it falls outside the statute of limitations, as discussed below. As such, summary judgment is

2   appropriate for Switch on Cobalt's intentional interference with contractual relations regarding

3   Cobalt's contract with SLS.

### 6.   Vince Sandoval

5       Cobalt claims it had an agreement with Vince Sandoval ("Sandoval") to refer business to

6   Cobalt. When Switch found out about this agreement, it threatened to refuse to do business with

7   Sandoval unless he stopped referring business to Cobalt. Sandoval then refused to refer business

8   to Cobalt. However, Cobalt does not allege what damages ensued or which portions of the

9   contract Sandoval breached. Because there are no damages alleged, the Court grants summary

10  judgment to Switch regarding Cobalt's intentional interference with contractual relations claim

11  regarding Vince Sandoval.

### 7.   Unnamed Customers

13      Cobalt also alleges that because Switch contacted Cobalt's customers after Cobalt

14  announced its closure, Switch intended to interfere with those contracts. The Court disagrees.

15  Contacting customers of a company that has announced its closure cannot be classified as

16  tortious behavior. The Court grants summary judgment to Switch for Cobalt's intentional

17  interference with contractual relations and prospective economic advantage claims regarding all

18  other unnamed contracts existing at the time Cobalt announced its closure.

### 8.   Other Arguments

20      i.   Breach of Implied Covenant of Good Faith and Fair Dealing

21      Cobalt argues that Switch breached its duty of good faith and fair dealing regarding the

22  settlement agreement of 2013. A breach of this duty might have been evidence that Switch's

23  interference was improper. However, Cobalt did not bring a breach of the duty of good faith and

24  fair dealing action and the Court will not conduct such an analysis. As such, the Court rejects

25  Cobalt's argument that Switch's actions were a breach of the duty and its "interference is *ipso*

26  *facto* unprivileged." (#189, at 37).

27      ii.   2013 Settlement Agreement

28      Switch argues that the 2013 settlement agreement between the parties released Switch

1    from these claims. However, the Court made it clear that the agreement's plain language only

2    releases claims "arising out of the facts related to the Lawsuit." (#82, at 7). The Court again

3    refuses to grant Switch relief based on the settlement agreement. However, the plain language of

4    the agreement forecloses some of Cobalt's evidence of alleged improper conduct. The agreement

5    states that the parties release all claims, "arising out of the facts related to the Lawsuit or any

6    online publications and statements, including, but not limited to those on Twitter and

7    [www.mikeballardlv.com]." (#204-1, at 176). The release remains "in full effect notwithstanding

8    the discovery or existence of any such additional or different facts." Id. Because Cobalt released

9    Switch from claims arising out of Switch's comments made prior to the 2013 settlement and the

10   publication of the Ballard website, Cobalt may not use those comments as evidence for its claims

11   in this action. All references to Switch's comments regarding Mr. Ballard prior to the 2013

12   settlement agreement are hereby excluded.

13                        iii.    Statute of Limitations

14           The parties also disagree on the statute of limitations for the state tort claims. Switch

15   asserts that the claims carry a three-year statute of limitations and any evidence of events that

16   took place earlier than three years prior to the filing of the suit should be excluded. Cobalt argues

17   that the proper statute of limitations is four years. This appears to be contested in Nevada law.

18   The Nevada Supreme Court held that "intentional interference with business interests are subject

19   to the three-year statute of limitations set forth in NRS 11.190(3)(c)." Stalk v. Mushkin, 199 P.3d

20   838, 842 (Nev. 2009). Two years later, the Nevada Supreme Court held that a "claim for

21   wrongful interference with prospective economic advantage is subject to a four-year statute of

22   limitations." In re Amerco Derivative Litigation, 252 P.3d 681, 703 (Nev. 2011). The Nevada

23   Court of Appeals, in an unpublished decision, recognized this conflict between the holdings but

24   refused to address it because it was not properly before the court. Hitt v. Ruthe, 2015 WL

25   4068435, *2 n.4 (Nev. Ct. App. June 24, 2015). The district court has applied different statutes

26   of limitations to these claims ever since.[5]

27   _____

28           [5] See e.g., Harfouche v. Wehbe, 2014 WL 12789831, *2 (D. Nev. Mar. 18, 2014) (holding claims for both
     intentional interference of contractual relations and prospective economic advantage are subject to a three-year statute
     of limitations); Forman v. United Health Products, Inc., 2020 WL 1308326, *4 (D. Nev. Mar. 19, 2020) (same). But

                                                        - 18 -

1    The Court finds that the plain language of the Nevada Supreme Court's decisions gives

2 the claims different statutes of limitations. The claim for intentional interference with contractual

3 relations therefore has a three-year statute of limitations. See Stalk, 199 P.3d at 842. Cobalt's

4 claim for intentional interference with prospective economic advantage carries a four-year statute

5 of limitations. See Amerco, 252 P.3d at 703. Switch argues that Cobalt's claims of interference

6 that occurred before September 7, 2014 are inadmissible because they fall outside the statute of

7 limitations. The Court agrees.

8    Cobalt argues that Switch intentionally interfered with all of its contracts by forcing

9 Cobalt out of business. Normally at the summary judgment stage, a question of when a party

10 should have discovered a claim is a question of fact for a jury. Millspaugh v. Millspaugh, 611

11 P.2d 201, 203 (Nev. 1980). The time of discovery of a claim may be determined as a matter of

12 law "'when uncontroverted evidence irrefutably demonstrates that the plaintiff discovered or

13 should have discovered' the facts giving rise to the cause of action." Bemis v. Estate of Bemis,

14 967 P.2d 437, 440 (Nev. 1998) (quoting Nevada Power Co. v. Monsanto Co., 955 F.2d 1304,

15 1307 (9th Cir. 1992)). All claims discovered prior to September 7, 2014 are barred by the statute

16 of limitations for intentional interference with contractual relations. The claims for intentional

17 interference with prospective economic advantage discovered prior to September 7, 2013 are

18 barred as well.[6] Cobalt discovered Switch's alleged intentional interference through an

19 acceptable use policy with CenturyLink in an email dated July 30, 2013 and the behavior

20 continued into 2014. Zayo's partnership agreement with Switch that provides the basis for some

21 of Cobalt's other claims was discovered by Cobalt on June 8, 2012 and continued into 2014.

22 These dates fall outside the statute of limitations. Cobalt discovered the behavior that it claims

23 constitutes intentional interference outside the permitted window of the statute of limitations.

24 The claims regarding these parties, as well as the claims mentioned previously, are barred. As

25 such, the Court grants summary judgment to Switch on Cobalt's state tort claims arising from

26

27 see Nickler v. Clark Cty., 2019 U.S. Dist. LEXIS 63951, *9 (D. Nev. April 15, 2019) (finding intentional interference of prospective economic advantage claims are subject to a four-year statute of limitations).

28    [6] The Court has already granted summary judgment on this claim to Switch. A full statute of limitations analysis on the intentional interference with prospective economic advantage claim is not included.

1   Switch's agreements with Zayo and CenturyLink and the other claims discovered prior to this

2   date as discussed previously.

3         Having considered the facts in the light most favorable to the non-moving party, the

4   Court grants summary judgment to Switch on Cobalt's state tort claims. As discussed above, the

5   statute of limitations, pro-competitive privilege, lack of harm or damages, and exclusion of

6   certain evidence, among other arguments, justify this finding. However, the antitrust laws do not

7   contain the same elements as Nevada's tort laws and genuine issues of material fact exist

8   regarding those claims. As such, trial is still appropriate to determine the outcome of the antitrust

9   allegations.

10                    E.   Motion to Strike

11        In addition to these motions, before the Court is Cobalt's Motion to Strike (#331). Switch

12   responded in opposition (#336) to which Cobalt replied (#339). Cobalt alleges that Switch

13   included new evidence in its reply in support of its motion for summary judgment that it did not

14   include in the original motion. As such, Cobalt asks the Court not to consider this evidence.

15   Switch argues that the evidence should not be stricken, was used by Cobalt in its response and is

16   not new, and that Cobalt is using the motion to strike to get the last word on the motions for

17   summary judgment.

18        "Where new evidence is presented in a reply to a motion for summary judgment, the

19   district court should not consider the new evidence without giving the [non-]movant an

20   opportunity to respond." Meggs v. Boulevard Ventures, LLC, 2016 WL 1259390, *3 (D. Nev.

21   March 30, 2016) (citing Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996)). The Court

22   considers Cobalt's motion to strike as a response to the evidence provided in Switch's reply to its

23   motion for summary judgment. In making its summary judgment determination, the Court

24   considered Cobalt's arguments regarding Switch's reply evidence. Because Cobalt's motion has

25   been treated as an opportunity to respond to Switch's evidence, the Court denies Cobalt's motion

26   to strike.

27   //

28   //

IV.    Conclusion

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (#200) is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's Motion for Partial Summary Judgment (#189) is **DENIED**.

IT IF FURTHER ORDERED that Defendant's Motions for Leave to File Supplemental Authority (#346/359) are **DENIED**.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike (#331) is **DENIED**.

Dated this 15th day of January, 2021.

_____
Kent J. Dawson
United States District Judge

- 21 -